IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOWARD L. MOON, JR., | : |
| | : |
| Plaintiff, | : C.A. NO. |
| | : |
| v. | : |
| | : JURY TRIAL DEMANDED |
| THE DELAWARE RIVER AND BAY AUTHORITY, | : |
| | : |
| Defendant. | : |

## COMPLAINT

### PARTIES

1.      Howard L. Moon, Jr. (hereinafter "Plaintiff"), has at all times relevant to this Complaint been a resident of New Castle County, State of Delaware.

2.      The Delaware River and Bay Authority (hereinafter "Defendant") is a bi-state agency of the States of Delaware and New Jersey, and at all times relevant to this Complaint, the employer of Plaintiff. The Delaware River and Bay Authority is subject to service through the Delaware River and Bay Authority, Delaware Memorial Bridge Plaza, Jct. I-295 and Route 13, New Castle, Delaware 19720.

### JURISDICTION

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202. The cause of action is founded on the existence of a question arising under federal statutes. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure

protection and redress deprivation of rights secured by federal law which prohibits discrimination against employees because of their race.

## **FACTUAL BACKGROUND**

4. Plaintiff, an African American, began employment with Defendant in November 1992 as a temporary toll collector with a promise of permanent employment within six (6) months.

5. Within two (2) weeks of his employment with Defendant, Plaintiff was the subject of racially derogatory comments which continued throughout his employment.

6. In or around January 1996, Plaintiff applied for and was awarded the position of Ferry Reservations Administrator. However, Plaintiff made less money with his promotion to a department head manager position than he did previously as a toll collector, yet he was required to take on ten times the responsibilities of a toll collector. Plaintiff was advised by Jeff Lewis, Chief Operating Officer, that he [Plaintiff] had to obtain a four-year college degree in business to receive a management salary. As a result, Plaintiff enrolled in the University of Delaware to pursue his degree as directed. Plaintiff attended mandatory management staff meetings with senior managers, directors and department heads, where Mike Harkins, CEO, began the meetings by making racial gestures about Renard Johnson, Budget Director, who was an African-American employee. All the Caucasian managers laughed at the comments. This practice continued over the course of several years.

7. In or around summer 1998, Plaintiff voiced his concerns about racially motivated incidents to Steve Russell, Assistant Director of Logistics, Ferry Operations, and Mike Owens, Director of Ferry Operations. Mr. Russell told Plaintiff that he thought the incidents, involving Ku Klux Klan hoods, noose ropes for hanging African-Americans and putting a paper cone on an African-American worker's head and setting it on fire, were harmless jokes. Plaintiff was

directed by his supervisor, Mike Owens, Director of Ferry Operations, to not become involved because it was not his [Plaintiff's] concern.

8. In or around June of 1999, Plaintiff met with Jeff Lewis, COO, to discuss fair pay and advancement opportunities. Mr. Lewis assured Plaintiff that once he [Plaintiff] completed his degree he would advance and receive a higher salary. Mr. Lewis told Plaintiff on several occasions that completion of his degree program would allow him to advance and receive a salary at the management level.

9. Beginning November 2000 through February 2001, Plaintiff was investigated by Steve Russell (Caucasian, male), Linda Murphy (Caucasian, female), and Glenn Cox (Caucasian, male). Plaintiff's e-mails were pulled and reviewed in an attempt to terminate Plaintiff's employment. Glenn Cox and Steve Russell asked Tom Irvin, an African-American male who was terminated in June 2003, to "watch" Plaintiff and "keep an eye on him." Mr. Irvin refused, stating that "the behavior was inappropriate and [he was] not going to do their 'dirty work'." Steve Russell threatened and intimidated Plaintiff by saying that they found "something" in his e-mails and that he was in trouble. Plaintiff reported this threat to Jeff Lewis, COO. Mr. Lewis indicated that he would take care of it; however, no action was taken.

10. In or around February 2001, Plaintiff met with Jeff Lewis, COO, to communicate his frustration with not being provided an opportunity to advance. Plaintiff was again assured that once he completed his degree he would be afforded an opportunity to advance.

11. In or around April 2001, Plaintiff was informed by Steve Russell that he could not attend college during the summer of 2001 because he [Plaintiff] needed to keep his focus on the busy season. Plaintiff would have graduated in December 2001 had he been able to continue attending courses during the summer. As a result, Plaintiff missed the chance to attend the

University of Pennsylvania's Wharton School of Business for his MBA because the Executive MBA program started in May 2002. Defendant's Caucasian employees are/were allowed to attend college courses during the summer of 2002.

12.    In or around May 2001, after Plaintiff had designed a new call center and put several business plans together recommending that when EZ-Pass was implemented that it be consolidated with the Reservations Center, he was denied the opportunity to advance because Curt Esposito recommended the promotion of Joe DeSantis (Caucasian employee with no call center or management experience) to the position of EZ-Pass Manager. Plaintiff was directed to attend all implementation meetings and was additionally trained along with all EZ-Pass staff on the new system. Subsequently, Mr. DeSantis was given three years to learn the position and was awarded it permanently in May 2004 without the position being posted to allow for competitive selection.

13.    In or around March 2002, Plaintiff sent a letter appealing his Hay Group pay structure, requesting equal pay to other Ferry Directors, pointing out that he was severely underpaid relative to his similarly-situated Caucasian co-workers. One week after the letter was sent to Glenn Cox, the organizational reporting structure was changed and Plaintiff was demoted. However, his similarly-situated Caucasian co-workers, Mark Whittington, Director of Marine Operations, Alan Ahren, Food Service Director, and Brian McEwing the Training and Regulatory Officer, were strategically placed to report to the Director of Ferry Operations. In order to justify Plaintiff's lower pay, two Caucasian front-line Customer Relations Supervisors, Bob Bryan and Charisse Rudolph, were moved up to positions that were equal to Plaintiff's position.

14. In or around April 2002, Defendant finally allowed Plaintiff the opportunity to have his position studied by the Hay Group for which he was excluded from participating during the initial phase, yet the Caucasian employees within his department had their positions studied.

15. In or around May 2002, Mr. Russell tried to discuss a pending discrimination lawsuit against Defendant with Plaintiff. Mr. Russell pressured Plaintiff to testify in court that he [Russell] was not a racist and informed Plaintiff that he would be subpoenaed. Plaintiff communicated that he did not want to testify and that it would not be in Defendant's best interest if he did testify. Mr. Russell continued to pressure Plaintiff. Plaintiff raised the racial incidents that had occurred previously and Mr. Russell indicated that the incidents were inappropriate, but not racist. Plaintiff immediately began to be subjected to retaliation. When the Hay Group was close to making a decision, Linda Murphy contacted Cape May Customer Relations Supervisor, Charisse Rudolph, and asked her to send her [Rudolph] job description and duties. The end result was keeping Plaintiff in the same pay grade with Customer Relations Supervisors who were still allowed to go by their unofficial titles of Guest Services Manager. Plaintiff was once again treated differently based upon his race.

16. In May 2002, Plaintiff graduated from the University of Delaware and on or about May 20, 2002, Mr. Lewis, COO, provided a sponsorship letter approving Plaintiff to attend the Villanova Executive MBA Program. Defendant also stated that it would provide financial support and grant Plaintiff the leave time needed to attend classes. Mr. Lewis, COO, and Brad Hopkins, CFO, provided the recommendation letters for the program. Plaintiff was contacted in July 2002 by Mr. Lewis and informed that Mr. James Johnson, CEO, over-ruled him and Defendant would no longer pay the cost of the program. Plaintiff had already been invoiced

$14,000 by Villanova and was committed to the $70,000 tuition cost. Plaintiff believes Mr. Johnson denied him this opportunity because of his race.

17. In or around July 2002 Plaintiff was called to meet with Jim Johnson, CEO, Glenn Cox, Director of Ferry Operations, Jeff Lewis, COO, Steve Russell, Assistant Director of Ferry Operations, and Linda Murphy, Human Resources Director, to discuss several issues, including why Plaintiff was demoted, why he was placed into a lower pay scale, and the treatment he was receiving which he believed to be unfair. During the meeting, Mr. Russell made an attempt to come forward to physically assault Plaintiff. Glenn Cox immediately reached his arm out, put his hand across Mr. Russell's chest, and restrained him. Neither Mr. Johnson nor anyone else did anything and just acted as if it had not happened. No disciplinary actions were taken against Mr. Russell.

18. In or around October 2002, Plaintiff applied for the Chief Operations Officer position and received a letter in or around November 2002 that his background did not ideally fit the unique needs of the position. Plaintiff requested a meeting with Mr. Johnson, CEO, and was granted a meeting in January 2003. Plaintiff was humiliated and offended in the meeting with Mr. Johnson and HR Director Linda Murphy. Plaintiff reiterated how he had continually been denied opportunities for advancement, as well as equal management salary, and how much his talents, experience and record of outstanding performance and dedication could benefit the Defendant. The response from Jim Johnson was, "education and training are not everything, look at me I only have an engineering degree." Mr. Johnson also made a comment that there were not any qualified minorities that could fill the senior COO and CHRO positions, the most qualified candidates were chosen for the positions, and he would resign before bending to political or

outside pressure. Plaintiff understood Johnson to mean hiring people of color and promoting him.

19. Plaintiff's budget has been cut several times and the elimination of funds is viewed by Plaintiff as another attempt to constructively discharge him. Plaintiff asked Jim Johnson what must be done to get an opportunity to advance and Mr. Johnson again advised Plaintiff to seek employment elsewhere. Mr. Johnson also told Plaintiff that neither he nor anyone else would be given a promotion under his administration without applying, competing and going through a formal process, and the most qualified candidate would get the position. The following two years demonstrated that Mr. Johnson and his administration did not follow their own words and Plaintiff and other minorities continued to suffer illegal and discriminatory employment practices by Defendant.

20. Plaintiff was threatened in or around December 2002 by Steve Russell. Plaintiff advised Mr. Russell that he [Plaintiff] would file a complaint for his threats. Mr. Russell made a statement "bring it on, you people are always bluffing" which Plaintiff understood as meaning African-American people. Plaintiff reported this incident to Linda Murphy, Human Resources Director, and sent a letter copying Jim Johnson, CEO. Defendant did not take any disciplinary action, nor did it conduct an investigation into the matter. After weeks of waiting, and since no action was taken to resolve the matter, Plaintiff requested that his complaint be dropped in fear of additional retaliation.

21. In or around February 2003, Steve Russell sent Plaintiff a memo which violated his sponsorship agreement advising him that he [Plaintiff] would have to take leave time to attend class. He [Russell] further refused to allow Plaintiff to load software and work on job related projects for Plaintiff's MBA, which was a part of his Villanova Executive MBA Program under

sponsorship. Mr. Russell made every effort to discourage Plaintiff from completing his MBA program, instead of taking advantage of the benefits the program was designed to bring to sponsoring organizations. Mr. Russell continued to retaliate against Plaintiff at every opportunity, even for past incidents. Plaintiff was also harassed and discouraged because of his race. Thousands of brochures were sent out, all over the country and world listing the Defendant as a Villanova Executive MBA Sponsor.

22. In or around May 2003 Plaintiff attended an Avaya conference in New Brunswick, New Jersey with Curt Esposito, Bridge Director, and Mike Scanlon, Technical Director, both Caucasian males. On the way back from the meeting, Curt Esposito said "I know this will come back to bite me, but is it in the black culture to be late to work?" Prior to that, he was talking about problems with lateness with a black employee, Grace Creamer, and how he and Joe DeSantis tried to stop it. Also, shortly after the new EEO Manager, Consuella Petty-Judkins was hired, Curt Esposito remarked "that's great we hired her, we have plenty of entry level positions to fill for minorities and I am trying to fill a janitor's position."

23. In or around May 2003 Plaintiff met with Trudy Spence-Parker for career advancement advice, at which time she told Plaintiff to forget his 10+ years of service and look at his options outside of the employ of Defendant. She said that her experience showed that employees get frustrated when they do not move up and become disgruntled employees. She told Plaintiff that he was lucky to have her advice regarding his resume. However, when Consuella Petty-Judkins, EEO Manager (African-American female) was hired in August 2003, she met with Plaintiff and pointed out that his resume format was incorrect and should be changed in order to post for jobs with Defendant even though he received the original format from Mrs. Spence-Parker. Mrs. Petty-Judkins stated she did not know why Mrs. Spence-Parker would give such poor advice.

Plaintiff believes Mrs. Spence–Parker clearly sent the message that he [Plaintiff] would not advance with Defendant and was trying to get him to move on.

24. In or around September 2003, Plaintiff was denied an opportunity to compete for the position of Acting Director of Ferry Operations. The position was given to Steve Russell, a Caucasian male, without the position ever being posted.

25. In or around September 2003, Plaintiff was denied an opportunity to work as the Assistant Director of Ferry Operations which would have given him more experience and a pay raise. Under the current administration, Caucasian employees were given acting positions to gain experience, and also given pay increases, and then they were promoted in most cases.

26. In or around October 2003 Plaintiff received another letter from Steve Russell informing him that he [Plaintiff] had not signed a service obligation agreement; therefore, any future funds out of the $5200 per year each employee of Defendant is entitled to receive would cease for Plaintiff. Mr. Russell also stated that if Plaintiff chose to continue his MBA program he would have to forward leave slips in advance, clearly violating Plaintiff's sponsorship agreement with Defendant. This action was another attempt to discourage Plaintiff from completing his MBA because of his race, and in retaliation for prior incidents.

27. In or around October 2003, Plaintiff met with Trudy Spence-Parker, Chief Human Resources Officer, and Jim Walls, COO, (Caucasian male) regarding the memo sent by Steve Russell. The memo discussed Plaintiff's funds being cut off and that he could opt to drop out of his MBA program or take leave time to attend the program if he was willing to work it out ahead of time. Mrs. Spence-Parker said "because the sponsorship letter said [the Defendant] endorsed rather than sponsored [Plaintiff] for the Villanova Executive MBA program, the letter was not valid." She stated the COO at the time, Jeff Lewis, did not have the power to grant sponsorship.

She denied that she told Plaintiff he was clearly granted time to attend class. Jim Walls, COO, said attendance did not mean grant work time and that those MBA programs just mean that you would make up the time by working extra hours for the time missed from work. Mr. Walls was wrong; the Villanova Program states on its web site and in the enrollment documentation forwarded to Jeff Lewis, COO, that is not the traditional educational arrangement, and that being granted time to attend class was just that, because the program is so intense and condensed. Traditional time was clearly communicated as interfering with the sponsored students completing the Villanova MBA program commitment. Plaintiff was required to continue making up work time and taking leave to complete his program in violation of his signed agreement.

28. In or around October 2003, Plaintiff was denied an opportunity to interview for the Acting Toll Plaza Manager position which would have given him broader work experience and higher pay. Mr. Walls and Curt Esposito gave the position to George Ayars, a Caucasian male who did not have a college education. Plaintiff had three (3) years of toll experience and knowledge, alone with specific experience with electronic tolls. Plaintiff was denied advancement opportunities because of his race.

29. In or around November 2003, Plaintiff met with Trudy Spence-Parker to discuss applying for the senior position of Director of Ferry Operations. She led Plaintiff to believe he was finally going to get a chance to interview for a higher management position and advised him to develop an action plan for the interview; Plaintiff however, was never afforded the opportunity to interview for the position. Ms. Spence-Parker later advised Plaintiff that she had nothing to do with his not being interviewed and that the decision was Jim Walls'. Plaintiff did apply for Director of Ferry Operations, a position for which he was qualified. After one month elapsed,

and without being informed of his status, Plaintiff received a letter of denial without ever being granted an interview. Plaintiff reported directly to the Director of Ferry Operations and the position he applied for was his next advancement step within his line of duty. Defendant hired Harry Nilsen who had no ferry work experience. Plaintiff received the letter in late December from Consuella Petty-Judkins telling him they had a large applicant base and Defendant decided to pursue other candidates.

30. Plaintiff met with Consuella Petty-Judkins, EEO Manager, who told him he did not have management, transportation, or any marine experience, despite the fact that Plaintiff had experience in all three of these areas, and that Defendant does not consider or look at job descriptions, performance evaluations, or internal documents. They only review resumes to determine whether an internal employee will receive an interview. As a last resort, Plaintiff sent a letter dated February 3, 2004 to Defendant's Chairman and Vice Chairman of the Board of Directors regarding a long history of racism, no opportunities for minority promotions or advancement, under-representation of minorities, lower pay for minorities, lack of diversity and cultural competency and continued affirmative action violations and practices.

31. Plaintiff received a request via e-mail on March 26, 2004 to attend an April 1, 2004 meeting with Jim Johnson, Trudy Spence-Parker, and Consuella Petty-Judkins. During the meeting, Plaintiff provided one example of how he and other minorities were not treated equally or given the same advancement and pay opportunities afforded to Caucasian employees. Plaintiff also reminded Jim Johnson that last year when they met he [Johnson] stated that all jobs would be posted, no one would be given any positions without competing and that Plaintiff would have to apply like everyone else.

32. Specifically, Joe DeSantis and Steve Strusowski advanced into new positions and were given more pay without the respective positions being posted which was clearly a contradiction and an example of Caucasian employees advancing and African-Americans not having the opportunity. Trudy Spence-Parker, CHRO, leaned forward, put her finger in Plaintiff's face, aggressively shouted and threatened him stating, "I am the Chief Human Resources Officer, sir, that is none of your business and you will be held accountable for your statements." Plaintiff was severely shaken, had to lean back in his chair with his hands up in a "surrender" position and looked to Jim Johnson and said, "all I did was give you an example as instructed and now I am getting threatened."

33. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 6, 2004

34. In or around June 2004, Charisse Rudolph, Caucasian female, was promoted to the Cape May-Lewes Ferry Customer Service Manager without the position being posted. Mrs. Rudolph was promoted to Cape May Customer Service Manager in 2002, and promoted again within a two (2) year period. Mrs. Rudolph continues to advance without a four-year degree. Plaintiff again was not afforded the same opportunity and was treated differently because of his race.

35. In or around April and June 2004, Plaintiff was excluded from participating in Defendant's Strategic Planning Sessions as a retaliatory measure for addressing its discriminatory practices and for filing a complaint with the EEOC.

36. In or around June 2004, Plaintiff, applied for the Superintendent of Tolls and EZ-Pass. He requested public information from Assistant Controller Dana Read (Caucasian female), specifically toll and EZ-Pass departmental budget line reports from Defendant's accounting information system MUNIS. Ms. Read referred Plaintiff to Budget Director Victor Ferzetti.

Victor Ferzetti told Plaintiff he would have to get approval from Jim Walls. Jim Walls denied Plaintiff's request for the reports and said he could obtain the information he needed form the annual reports, despite the fact that Plaintiff was entitled to this information pursuant to the Freedom of Information Act. Budget line items that include seasonal and permanent wages and line items by month and year are not in the annual reports by lines. Also, other associated expenses by departmental lines are not shown in the annual reports. Plaintiff was discriminated and retaliated against by Mr. Walls and Mr. Ferzetti on the basis of his race and subsequently denied the chance to better prepare himself for the interview.

37. In or around July 2004, Plaintiff was told by Jimmy Wilks (African-American male) that he asked Mr. Johnson, CEO, why Plaintiff was not included in the Strategic Planning Sessions, and that Plaintiff was a sharp and very intelligent guy. He [Wilks] informed Plaintiff that Mr. Johnson responded by saying "Howard is a sharp guy, but we were contacted by Howard's lawyer and we can't even meet with him without his lawyer." Mr. Johnson also communicated that Plaintiff is a smart guy and could use something against them. Mr. Wilks had also offered to set up a meeting with African Americans employed by Defendant to try to resolve problems, and Mr. Johnson declined because of the communication from Plaintiff's lawyer. Plaintiff was retaliated against because he filed an EEOC Complaint.

38. In or around July 2004, Plaintiff applied for the position of Assistant Director of Ferry Operations. Plaintiff never received any response or letter of contact regarding the position. Plaintiff found out he was not considered for the position when it was announced publicly that Heath Gehrke was awarded the position. Mr. Gehrke was brought in over Plaintiff to oversee his department (Reservations), Ferry Customer Service, Ferry Business Management, Lewes Terminal Office Management and Training and Regulatory for the ferry. Plaintiff was more

qualified for the position and not given an opportunity or even respected enough to be provided with a reason for not being considered for the position. Upon information and belief, Mr. Gehrke has no ferry experience, no managerial experience that included the transportation of vehicles, no reservations or call center experience, no government agency experience, very little budget experience, and no customer service management experience. Mr. Gehrke did not have to compete or interview for the Assistant Director of Ferry Operations job. He was one of the final two candidates for the Director of Ferry Operations position in early 2004.

39. In or around August 2004, Plaintiff was selected to interview for the Superintendent of Tolls and EZ-Pass. Plaintiff was one of four candidates selected out of 28 applicants for interviews. Plaintiff, prior to his interview, asked for a meeting with Acting Toll Superintendent and MIS Director Gerry DiNicola (now Chief Information Officer) to gather some additional insights. She refused, saying that she would be on the interview panel which she believed would be a conflict. Plaintiff asked Jim Walls one day when he came into Plaintiff's office about the status of the position. Mr. Walls closed his door and said "since you asked, I will tell you that we decided to look for more candidates and you will not be considered for the position." Mr. Walls told Plaintiff that he was only interviewed because he met the minimum qualifications. Plaintiff well exceeded the minimum requirements. Plaintiff clearly should have been selected for the position and even after he succeeded in the process was discriminated and retaliated against because of his race and EEOC filings.

40. In or around September 2004, Plaintiff filed a second Charge of Discrimination alleging retaliation with the EEOC.

41. All of Defendant's six (6) Senior Executives are Caucasian: the CEO, Deputy CEO, COO, CHRO and CFO. In Defendant's forty-one (41) year history, it has never employed any person of color in a senior-level-pay position.

42. In or around January 2005, Plaintiff opened up his MUNIS budget to find that his labor rate line was reduced by over 25%. Plaintiff contacted his supervisor, Heath Gehrke, who was unaware and very upset. He [Gehrke] informed Harry Nilsen who was also unaware and very upset. All three (3) met with Jim Walls who executed the action. Defendant continues to penalize Plaintiff for trying to be innovative and better his operation. Mr. Walls continues to retaliate against Plaintiff in an attempt to constructively discharge him.

43. In or around January 2005, Plaintiff received a letter from Jim Johnson asking him to be the Co-Chairman of the Strategic Planning Communications Task Force. Plaintiff believes he was included only because he filed two (2) Charges of Discrimination with the EEOC.

44. In or around March 2005, Mr. Gehrke presented a Communications Reservations Business Case to Jim Walls which recommended Plaintiff for a promotion which would expand his management role and title. Mr. Walls denied Plaintiff's advancement and commented to Mr. Gehrke that "it appears that [Plaintiff] is just trying to put another feather in his cap." Mr. Gehrke informed Mr. Walls that the recommendation was his and not Plaintiff's idea. Plaintiff continues to be retaliated against because of his race while taking on additional duties, responsibilities and projects without being promoted or receiving fair compensation.

45. Plaintiff has exhausted his administrative remedies as evidenced by the attached Right to Sue letters issued by the EEOC and received by the undersigned counsel on February 2, 2005 and February 22, 2005, respectively attached hereto as Exhibits "A" and "B".

## FIRST CAUSE OF ACTION
### (Title VII – Retaliation)

46. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-45.

47. This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

48. Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

   (a) denied Plaintiff the opportunity for promotions despite his qualifications; and

   (b) forced Plaintiff to work in a hostile work environment.

49. Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote Plaintiff are pretextual.

50. As a direct and proximate result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered and continues to suffer a loss of considerable pay: past, present, future and prospective and has suffered and continues to suffer humiliation, mental anguish and emotional pain.

## SECOND CAUSE OF ACTION
### (Racial Discrimination)

51. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-50.

52. The practices of Defendant as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected his employment because of his race. The practices employed by Defendant were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

53. The practices of Defendant as complained of above caused Plaintiff to experience conscious pain and suffering and other emotional harm.

54. The practices of Defendant as described above are imputable to Defendant in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

55. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damages to his reputation.

### THIRD CAUSE OF ACTION
### (Racial Discrimination – Failure to Promote)

56. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-55.

57. Defendant denied Plaintiff numerous opportunities for career advancement despite his qualifications.

58. Defendant denied Plaintiff career advancement opportunities by denying him the opportunity to interview for positions with Defendant.

59. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered, and continues to suffer, a loss of considerable pay: past, present, future and prospective and has suffered, and continues to suffer, humiliation, mental anguish and emotional pain.

60. Defendant's discrimination was willful, wanton and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

61. The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

### FOURTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

62. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-61.

63. The actions of Defendant constitute a violation of the Covenant of Good Faith and Fair Dealing implicit in every employment agreement.

64. Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff by failing to promote him and by discriminating against him based upon his race.

65. Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

66. The above-stated damages were not the result of any act or omission on the part of Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment against the Defendant, and in his favor for damages suffered by Plaintiff as a result of Defendant's actions, including, but not limited to, back pay, front pay, benefits (both retroactively and prospectively), compensatory damages, punitive damages, attorney's fees, the cost of this litigation, pre- and post-judgment interest and such other further relief as this Honorable Court deems just and proper.

**MARGOLIS EDELSTEIN**

_/s/ Keri L. Morris_
Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
(302) 777-4682 Facsimile
Attorney for Plaintiff

Dated: May 2, 2005