LEXSEE 2005 U.S. DIST. LEXIS 1608

THOMAS HOLMAN v. TRAMMELL CROW CO.

CIVIL ACTION NO. 03-3603

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2005 U.S. Dist. LEXIS 1608; 95 Fair Empl. Prac. Cas. (BNA) 386*

**February 3, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part,
Motion denied by, in part. *Holman v. Trammell Crow
Co., 2005 U.S. Dist. LEXIS 3501* (E.D. Pa., Mar. 7,
2005)

**DISPOSITION:** Defendant's motion for summary
judgment granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For THOMAS HOLMAN, Plaintiff:
JOSEPH DOMINIC DINOTO, CHERRY HILL, NJ;
MARDI HARRISON, DOYLESTOWN, PA.

For TRAMMELL CROW CO., Defendant: JENIFER M.
BOLOGNA, PAUL, HASTINGS, JANOFSKY &
WALKER LLP, STAMFORD, CT; LEAH C. LIVELY,
PAUL HASTINGS JANOFSKY & WALKER, LLP,
SAN DIEGO, CA; MARY C. DOLLARHIDE, PAUL,
HASTINGS, JANOFSKY, & WALKER, SAN DIEGO,
CA; PETER M. SCHULTZ, PAUL HASTINGS
JANOFSKY & WALKER, LLP, STAMFORD, CT;
STEPHEN J. IMRIGLIA, HECKER BROWN SHERRY
& JOHNSON LLP, PHILADELPHIA, PA.

**JUDGES:** JACOB P. HART, UNITED STATES
MAGISTRATE JUDGE.

**OPINIONBY:** JACOB P. HART

**OPINION:**

ORDER AND OPINION

JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

I. Introduction

Plaintiff Thomas Holman brought this action against
his former employer, Trammell Crow Co. ("TCC"). He
has asserted counts under *42 U.S.C. § 2000e et seq.*
("Title VII") for race discrimination, and retaliation for
complaints of race discrimination. He has also asserted
counts for racial discrimination under *42 U.S.C § 1981*.

TCC has moved for summary judgment on Holman's
entire case. For the reasons that follow, its motion will be
granted in part and denied in part. I will [*2] dismiss (a)
those claims based on Holman's termination; and (b)
Holman's Title VII claim for hostile work environment.

II. Factual Background

Between 1996 and September 30, 2002, TCC
provided real estate management and facilities services
to University City Associates ("UCA"), which owned
apartment complexes near the University of
Pennsylvania. Declaration of John Greenwood, attached
to TCC's Motion; Letter attached as Exhibit 26 to
Declaration of Leah Lively, attached to TCC's Motion.
At the time it was retained by UCA, TCC hired many of
UCA's workers, including Holman, who had worked for
UCA as a painter. Holman Deposition Excerpt, attached
as Exhibit 14 to Lively Declaration, at page 23. In his
offer letter from TCC, Holman's employment was made
contingent upon its management contract with UCA.
Exhibit 6 to Lively Declaration.

Holmes' title with TCC was "Maintenance
Assistant." Id. at 28. His first supervisor was Jim
Quindlen, who was replaced in the summer of 2000 by
John Economos. Statement of Louise Heick at P P 4 and
5. Under these Property Managers, Holman received

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

stellar performance reviews, complementing his speed, efficiency, and manner of relating to residents. [*3] Exhibits 9 and 11 to Lively Declaration, attached to TCC's Motion. Quindlen referred to Holman as his "MVP." Exhibit 9, supra.

Although Holman's job title did not change, Economos complimented him in his November, 1999, review on several projects he had undertaken on his own initiative. Exhibit 11, supra, at D00024 and Exhibit 12 at D00021. Economos also wrote that he would work with Holman to develop a floor finishing project Holman proposed, and commented that "this will give Tom an opportunity to learn more of the business side of decisions." Exhibit 11 at D00024 and 12 at D00021. In a section of the form which asked: "What added training or experience would improve the employee's performance in the present job and/or prepare the employee for advancement?" Economos wrote: "Taking courses in management skills and motivating people, combined with his experience will help him to achieve further career growth." Exhibit 12 at D00023.

According to Holman, Economos also gave him increasing responsibility in dealing with sub-contractors, eventually permitting him to receive bids and award contracts. Holman Deposition Excerpt, supra, at 80, 85-88.

According to TCC, however, [*4] Economos's sector, known as Zone 2, was poorly managed. Heick Declaration, supra, at P5. In May, 2000, Mark Brady replaced Economos as the Zone 2 supervisor. Id. at PP6-7; Holman Deposition Excerpt, supra, at 93.

Shortly after Brady and Holman began working together, they disagreed on a contracting matter. Holman was about to award contracts to two subcontractors: The Cors Company, which was owned by African-Americans, and Rusario, a white-owned business. Brady Declaration, attached to TCC's motion, at P9. At this meeting, Brady said that he "didn't like" Cors. Holman Deposition Excerpt, supra, at 99. According to Brady, he explained to Holman that this was because Cors's work in the past had been slow. Brady Declaration, supra. Nevertheless, both bids were forwarded to Brady's superiors and approved. Id.

According to Holman, as work progressed on the job for which Cors and Rusario were hired, Brady told Holman that he did not want Cors working inside the buildings, but only on the exteriors. Holman Deposition Excerpt at 102. On one occasion, having found Cors employees working inside a building, Brady allegedly screamed at Holmes: "What did I tell you? I [*5] don't want your kind of people in the buildings." Holman Deposition at 111-112. Holman has stated: "At that point, I called him a racist." Id.

According to Brady, he reported Holman's accusation of racism to TCC's Alliance Director, John Greenwood. Brady Declaration at P10. There followed three meetings in the space of ten days between Holman and various TCC higher-ups, including Louise Heick, Jim Quindlen, Jennifer Mathewson, DeeAnn Kelly, and John Greenwood. Holman Deposition at 115, 123, 187.

Holman claims that he told Heick and Quindlen that Brady was interfering with his responsibility for hiring subcontractors, but that he was told that hiring decisions were Brady's, and it was pointed out that Holman himself had terminated Cors in the past because it was not going to meet a deadline. Holman Deposition at 117-118.

Holman claims, however, that Greenwood, and Kelly (who was TCC's Senior Manager of Human Resources), "confirmed that awarding contracts was part of [his] responsibilities." Holman Affidavit attached as Exhibit D to Holman's Response at P10. Holman also asserts that he told Greenwood and Kelly that he considered Brady to be racist, and that his co-worker, Tommy [*6] Brennan, told Kelly that he agreed with this. Id. at PP10 and 11.

In August, 2000, Brady reassigned Brennan and Kyle Meyers, who had previously worked as painters under Holman, to general maintenance. Brady Declaration at P 12, and Exhibit 2 to Brady Declaration. Holman was the only remaining painter. Exhibit 2 to Brady Declaration.

In September, 2000, Quindlen assigned Holman the job of single-handedly painting three fire towers. Quindlen Declaration at P5. Holman claims that he asked Quindlen for assistance, but that Quindlen refused. Holman Affidavit at P15. According to Holman, Fire Tower One was unheated, with broken windows, and pigeon droppings coating the floor. Id. at P16. Holman complained about this to the project manager, but was not given any assistance. Id. at P17. Although he has not submitted records to substantiate this, Holman claims that he was taken to the hospital on "several occasions" because he had become sick to his stomach from these conditions. Id.

Holman maintains that Tower Number Two contained lead and asbestos, and that he was not issued a mask. Id. Although this too is unsubstantiated by medical records, Holman has asserted that [*7] he was taken to the hospital after several days with lead exposure. Id.

On December 11, 2000, while he was painting Fire Tower One, Holman fell from his ladder. Holman Deposition at 254. Since he was alone, Holman called for help from his cell phone. Memorandum at 5. He lay in the tower waiting for help for approximately 20 minutes or half an hour. Holman Deposition at 260. As a result of

Case 1:05-cv-00261-GMS    Document 5-3    Filed 08/03/2005    Page 3 of 26

Page 3

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

the injury, Holman claims, he incurred a sprained left ankle, foot tarsal tunnel syndrome, and a herniated disc. Holman Affidavit at P22.

After his accident, Holman remained at home on Workers' Compensation. Holman Affidavit at 260. In September, 2002, UCA terminated its contract with TCC. Exhibit 24 to Lively Declaration. Holman was discharged, along with all other TCC employees working at UCA. Id. TCC has provided evidence that, of the 56 employees discharged, 20 were white. Charlene Trace Declaration at P9, and Exhibit 1 thereto. Holman was offered employment by the new maintenance contractor, but did not accept it. Exhibit 25. There is a disputed issue of fact as to whether Holman was physically capable of work at this time.

III. Legal Standard For Summary Judgment

Summary [*8] judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)*

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. *Anderson v. Liberty Lobby, supra at 255; Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).* Nevertheless, [*9] Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra, at 323.*

III. Discussion

A. Claims Regarding Holman's Termination Will Be Dismissed

Holman has not shown that a question of material fact exists as to whether his termination was discriminatory or retaliatory. As discussed above, TCC has provided evidence that Holman formerly worked

directly for UCA, and that his retention by TCC was contingent upon TCC's management contract with UCA. It has also shown that Holman's employment was terminated only when TCC lost this contract. Most important, Holman was terminated along with every other TCC employee working at UCA, regardless of race or relationship with management. And, like the other terminated employees, Holman was offered employment by the new maintenance contractor.

Under both § 1981 and Title VII, a *prima facie* case of disparate treatment requires a plaintiff to demonstrate that (1) he is a member of a protected [*10] class; (2) he was qualified for the relevant position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably. *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).*

Since Holman cannot show the fourth factor -- i.e., that other, white, TCC employees were treated more favorably than he, he will not be able to make out a *prima facie* case of racial discrimination. See, e.g., *Tucker v. Merck & Co., Inc., 2004 U.S. Dist. LEXIS 11222, Civ. A. No. 03-5015, 2004 WL 1368823* (E.D. Pa. Jun. 17, 2004).

To establish a *prima facie* case of retaliation with respect to his termination, Holman would have to show a causal connection between his protected activity and the termination. *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).* Here, again, the fact that every TCC employee working at UCA was terminated would preclude a jury from finding the required connection.

Holman argues that he was not in a position to take advantage of the new offer of employment, because of his medical condition. He argues that his termination at such a time shows retaliation by TCC for his having [*11] filed for workers' compensation. However, there is no such claim in Holman's Complaint, nor has Holman come forth with any evidence of discrimination on this basis. In any event, I would repeat that, since all employees working on this project were dismissed, there was no apparent discrimination. I will dismiss Holman's claims of racial discrimination and retaliation for complaining of racial discrimination in so far as they relation to his termination from employment.

TCC has also asked for the dismissal of any claim that Holman was unfairly denied promotions. I will dismiss such claims since there is no evidence that Holman ever applied for a new position. However, as discussed below, Holman's allegations that he was subjected to discriminatory and retaliatory changes in his employment status will not be dismissed.

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

**B. Holman's Claims of Hostile Work Environment Are Dismissed as Unexhausted**

It is well-established that to bring suit under Title VII a plaintiff must first file a timely administrative charge with the EEOC or a similar state agency. *42 U.S.C. § 2000e-5*(e); *Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997)*; [*12] *Visnikar v. Dep't of Envtl. Prot., 2004 U.S. Dist. LEXIS 3645, Civ. A. No. 02-963, 2004 WL 438688 at *5* (W.D. Pa. Jan. 27, 2004). As Judge Francis X. Caiazza explained in Visnikar:

> To determine what claims are properly before the District Court, the test developed by the Third Circuit Court is whether the claims at issue fall "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." See *Antol [v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)]* (citation omitted). The Third Circuit Court has cautioned against reading a plaintiff's EEOC charge too narrowly, stating that courts must "keep in mind that charges are drafted by one who is not well versed in the art of legal description." See *Hicks v. ABT Associates, Inc., 572 F.2d 960, 965 (3d Cir. 1978)*. Thus, "the scope of the original charge should be liberally construed." See *id.* (citation omitted).

*2004 U.S. Dist. LEXIS 3645, 2004* WL at *5. This standard applies to PHRA claims as well. Id.

In his PHRA claim, Holman asserted only that TCC "discriminated against him by demoting him to a lesser position and title, all because of his race and/or color and/or [*13] retaliation." PCHR Statement of Particulars, attached as Exhibit 1 to Declaration of Leah Lively, attached to TCC's motion, at P10. He mentioned Brady's alleged racist statements only in the context of Brady's alleged interference with what Holman believed to be his job duties: "Brady commented that he was concerned about the Blacks and Minority Contractors' ability to do the work. He also said 'I do not want them working in the mainstream buildings. I want them to work outside the main campus of the University of Pennsylvania.'" Id. at P7.

Even construing this charge liberally, it is clear that it does not allege the existence of a hostile work environment, which exists only when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*; *Nerosa v. Storecast Merch. Corp., 2002 U.S. Dist. LEXIS 16210, Civ. A. No. 02-440, 2002 WL 1998181* at * 4 (E.D. Pa. Aug. 28, 2002).

In *Nerosa, supra, 2002 U.S. Dist. LEXIS 16210*, the Honorable Jay C. Waldman dismissed [*14] as unexhausted a hostile work environment claim where a plaintiff had indicated in her administrative charge only discrimination based on her termination. He cited *Cheek v. Western & Southern Life Insurance Co., 31 F.3d 497, 503 (7th Cir. 1994)*, where the Court of Appeals for the Seventh Circuit wrote: "ordinarily a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination." In other cases, hostile work environment charges have been dismissed where an administrative complaint asserted only failure to promote. *Visnikar, supra, 2004 U.S. Dist. LEXIS 3645*, [WL] at *6; *Lawton v. Sunoco, Inc., 2002 U.S. Dist. LEXIS 13039, Civ. A No. 01-2784, 2002 WL 1585582* at *4 (E.D. Pa. Jul. 17, 2002); *Wright v. Phila. Gas Works, 2001 U.S. Dist. LEXIS 15852, Civ. A. No. 01-2655, 2001 WL 1169108* (E.D. Pa. Oct. 2, 2001).

Holman points to *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164 (7th Cir. 1976)*, where the Court of Appeals for the Seventh Circuit permitted a plaintiff to claim sex discrimination even though her administrative charge asserted only race discrimination, because she had asserted in her charge that her supervisor [*15] had accused her of being "a leader of the girls on the floor." Even if Jenkins could be seen as establishing a more liberal construction of an administrative charge than the cases upon which I have relied, I note that it is a thirty-year-old case which has been cited only once in this Circuit, and not for this proposition. See *Hicks v. ABT Associates, Inc., 572 F.2d 960, 966 (3d Cir. 1978)*. Jenkins notwithstanding, therefore, I will dismiss Holman's claim of a hostile work environment.

**C. Holman's Remaining Claims**

Remaining in this case are Holman's claims under Title VII and § 1981 that (a) he was discriminated against in his work conditions on the basis of racial discrimination; and that (b) he was retaliated against in his work conditions for having complained about racial discrimination. As to these claims, TCC has argued that Holman cannot show an adverse action and cannot overcome TCC's asserted legitimate reasons for the actions it did take, as required by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*.

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

I remind TCC, however, that the Third Circuit has held that an action which does not involve a **[\*16]** change in salary or benefits can be considered an adverse action if it "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997)*; and see *Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998)* (transfer to an undesirable shift, eliminating the plaintiff's customary free time, was sufficient to establish a *prima facie* case) and *Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)* (transfer to a "dead-end" job could be actionable).

Holman has asserted that the terms of his employment were altered to take away his subordinates and to remove his authority for entering into subcontracts, ending his involvement in, as Economos put it, the "business side" of maintenance. He has also claimed that he was placed in dangerous and unfavorable physical surroundings with no assistance. These actions by TCC may be found adverse, under the authority cited above. Although TCC has come forward with non-discriminatory reasons for **[\*17]** its actions, the jury may choose to believe Holman's version of the facts. Therefore, TCC is not entitled to judgment as a matter of law on these claims.

## IV. Conclusion

For the reasons discussed above, I now enter the following:

ORDER

AND NOW, this 3rd day of February, 2005, upon consideration of Defendant Trammell Crow's Motion for Summary Judgment, docketed in this case as Document No. 36, and the response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART as follows:

1. The Motion is GRANTED in that the following claims are dismissed with prejudice:

a. All claims relating to Holman's termination as an employee of Trammell Crow;

b. All claims that Holman was denied promotions;

c. Holman's Title VII hostile work environment claim

2. The Motion is otherwise DENIED.

BY THE COURT:

JACOB P. HART

UNITED STATES MAGISTRATE JUDGE

LEXSEE 2002 U.S. DIST. LEXIS 13039

LEO LAWTON, Plaintiff, v. SUNOCO, INC., MASCOT PETROLEUM
COMPANY, INC., and LOUIS MAIELLANO, Defendants.

CIVIL ACTION NO. 01-2784

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2002 U.S. Dist. LEXIS 13039*

**July 17, 2002, Decided**
**July 17, 2002, Filed**

**SUBSEQUENT HISTORY:** *Affirmed by Lawton v Sunoco, Inc., 2003 U.S. App. LEXIS 8802* (3d Cir. Pa., Apr. 14, 2003)

**DISPOSITION:** Defendants' motion for summary judgment granted. Case dismissed with prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For LEO LAWTON, PLAINTIFF: JOSEPH A. CAPRARA, FELLHEIMER, BRAVERMAN & KASKEY, PHILA, PA USA. JAMIE M. PERRAPATO, FELLHEIMER BRAVERMAN & KASKEY, PHILA, PA USA. STEVEN L. BLOCH, BRAVERMAN, KASKEY & CAPRARA, PHILADELPHIA, PA USA. JARED T. HAY, BRAVERMAN, KASKEY & CAPRARA, PHILADELPHIA, PA USA.

For SUNOCO, INC., MASCOT PETROLEUM COMPANY, INC., LOUIS MAIELLANO, DEFENDANTS: IAN MATHESON BALLARD, JR., MORGAN, LEWIS & BOCKIUS, PHILADELPHIA, PA USA. MICHAEL J. EAGLES, MORGAN, LEWIS & BOCKIUS, PHILADELPHIA, PA USA.

**JUDGES:** Robert F. Kelly, Sr. J.

**OPINIONBY:** Robert F. Kelly

**OPINION:**

**MEMORANDUM**

ROBERT F. KELLY, Sr. J.

JULY 17, 2002

Presently before this Court is the Defendants' Motion for Summary Judgment. This action arises out of the Plaintiff's, Leo Lawton ("Lawton"), allegations that his direct employer Mascot Petroleum Company Inc ("Mascot"); Mascot's parent corporation Sunoco, Inc ("Sunoco")(or collectively "Sunoco"); and his manager Louis Maiellano ("Maiellano") have discriminated against him on the basis of his race. Specifically, Lawton alleges claims for failure to promote, wage discrimination, hostile work environment, retaliation, disparate impact, and intentional infliction [*2] of emotional distress. For the reasons that follow, the Motion will be granted.

**I. BACKGROUND**

In March 1999, Maiellano, who was at the time the Area Manager for Sunoco, interviewed and hired Lawton, an African-American male, to be the Food Services Manager at Sunoco's Walnut Street APlus store in Philadelphia, Pennsylvania based on his past twelve years of experience in the food service industry. As a Food Services Manager, Lawton's responsibilities include overseeing the Walnut Street Store's pizza, Subway, coffee, and breakfast operations, as well as supervising approximately seven other food service employees. Lawton is also responsible for submitting written reports to Subway containing sales information. In May 1999, Lawton received his first formal evaluation and a 2.4% raise from Maiellano. Lawton received an overall rating of "Accomplished" although Maiellano did

2002 U.S. Dist. LEXIS 13039, *

state that there were some problems with record keeping and submitting the Subway reports on time.

Lawton alleges in his Complaint that he has been denied promotions from July 1999, until the present time. Specifically in July 1999, the Walnut Street store required a General Manager, who would be [*3] responsible for the entire store, and a Facility Manager, who would report to the General Manager and would be primarily responsible for paperwork and inventory control. Lawton was not promoted to either of these positions. The Defendants claim that Maiellano hired George Tscherniawsky ("Tscherniawsky") as the General Manager because he had previously managed other convenience stores and had owned his own business. The Defendants claim that Maiellano hired Ivan Vynyk ("Vynyk") as the Facility Manager because he had been very successful at handling paperwork and controlling inventory at other Sunoco locations. The Defendants further allege that they did not promote Lawton to either of these positions because he lacked retail management experience. The Defendants also claim that they wanted Lawton to remain as the Food Services Manager so that he could continue to develop and expand the food service business at the Walnut Street Store, which he had been hired to do a few months earlier. Lawton claims, without support, that the two individuals who were hired have "suspect qualifications and experience" and that Lawton was not made aware of the two job positions.

Later in 1999, Lawton [*4] also was not promoted to the Facility Manager position at the APlus store on Fairmont Avenue in Philadelphia, Pennsylvania. The Defendants claim that Lawton was not selected for this promotion because he lacked retail management experience, unlike the individual that was hired for the position. In the Spring of 2000, Sunoco acquired an APlus store in Chester, Pennsylvania. Maiellano assigned Tscherniawsky to oversee the store in addition to his normal duties. A permanent manager was never hired for the Chester store because it was closed two months after it was acquired by Sunoco. Also in 2000, the Facility Manager position at Sunoco's Prospect Park, Pennsylvania APlus store became available. Maiellano hired William Dadich ("Dadich") for the position because of Dadich's prior years of experience managing another APlus store. The Defendants claim that they did not hire Lawton for this position because, unlike Dadich, Lawton did not have prior experience and success as a store manager. The Defendants also allege that Maiellano was concerned that Lawton would not be able to handle the administrative paperwork required for a Facility Manager position based on Lawton's past performance. [*5]

Lawton claims that he was again passed over for these positions and that he did not know about the

positions until after they were filled. Lawton also asserts that he asked Maiellano and later Richard Crisci ("Crisci"), who succeeded Maiellano as Sunoco's Area Manager in June 2000, if he could participate in Sunoco's manager-in-training ("MIT") program, but Lawton's request was denied. Lawton claims that he is not qualified for a managerial position without this training. The Defendants claim that, generally, only newly hired individuals who are not currently Sunoco employees participate in MIT training. The Defendants also claim that MIT training is not a prerequisite for becoming a store manager. Lawton testified that he is aware of two African-Americans who were promoted to manager positions without first completing MIT training. Furthermore, the Defendants allege that eleven of the sixteen MIT trainees under Maiellano and Crisci are African-American. In May 2000, Maiellano gave Lawton his second formal evaluation. The evaluation was generally positive, however, Maiellano noted that the Subway paperwork remained an issue. Lawton also received a 3.08% raise.

On January 11, 2001, Crisci [*6] met with Lawton to discuss several issues. One issue concerned fried chicken that was supposed to be delivered to the Walnut Street store, but was not delivered. Lawton could not contact Crisci to discuss and rectify the situation because Lawton could not find Crisci's phone number or other contact information. Another issue involved employee complaints which stated that Lawton had been correcting employees in front of customers and threatening to terminate them. The complaints also stated that Lawton had issued written warnings to employees without first obtaining approval. At the meeting, in response to the chicken incident, Crisci gave Lawton his contact information. Crisci also told Lawton to obtain approval from Vynyk before engaging in corrective actions against other employees. On January 18, 2001, Crisci, Lawton and Chris Buitron ("Buitron"), Crisci's direct supervisor, met again to discuss the employee complaints against Lawton. Buitron told Lawton to reprimand employees away from other co-workers and customers. However, in the Spring of 2001, Sunoco received several more complaints by other employees regarding Lawton. In May 2001, Crisci gave Lawton his formal evaluation. [*7] Lawton received a satisfactory review, except in the "Personnel" category in which he received a "Needs Improvement" rating because of the employee complaints filed against him.

In May 2001, Vynyk, who was then General Manager of the Walnut Street store, left, and the position became available. Crisci told Lawton about the opening, and Lawton interviewed for the position. During the interview, Lawton told Crisci that he was not interested in the position without first receiving MIT training.

Crisci told him that he would give Lawton a few days to get acquainted with the position, but Lawton felt that was not enough time. Therefore, Crisci did not select Lawton for the position but selected another individual who had positive experience as a Facility Manager at two other stores.

Lawton claims that despite a policy to promote from within, he was never offered a promotion and was unable to apply for open positions because he did not become aware of them until after they were filled. The Defendants dispute that such a policy exists. On June 1, 2000, Lawton filed his charge of discrimination involving his failure to promote claim with the Equal Employment Opportunity Commission ("EEOC"). **[*8]** Lawton filed the present action on June 6, 2001. His Complaint alleges disparate treatment in violation of Title VII of the Civil Rights Act of 1991, *42 U.S.C. § 2000e, et seq.* ("Title VII") (Count I; which includes Lawton's claims for failure to promote, wage discrimination and hostile work environment); racially disparate impact in violation of Title VII (Count II); retaliation in violation of Title VII (Count VI); mirror violations of the Pennsylvania Human Relations Act, ("PHRA") (Count VII); and intentional infliction of emotional distress (Count VIII).

## II. STANDARD

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* **[*9]** The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson, 477 U.S. at 249.* A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id. at 248.*

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e).* Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment

motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*(citing *Celotex, 477 U.S. at 325 (1986))*. Further, the non-moving party has the burden of producing **[*10]** evidence to establish *prima facie* each element of its claim. *Celotex, 477 U.S. at 322-23.* If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id. 477 U.S. at 322, Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).*

## III. DISCUSSION

### A. Failure to Exhaust Remedies

As a prerequisite to bringing suit under 43 Pa. Con. Stat. § 955(a) *et seq* Title VII and the PHRA, a plaintiff must first file a timely administrative charge of discrimination with the appropriate agencies. See, e.g., *Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)* The Defendants argue that Lawton has failed to exhaust his remedies with respect to his claims of wage discrimination, hostile work environment, disparate impact, and retaliation because Lawton's EEOC charge only alleges that he was not promoted because of his race. Lawton does not dispute that his EEOC charge only alleges failure to promote. However, Lawton argues that these other claims were within the scope of the charge. The Third Circuit has held that "'the relevant **[*11]** test in determining whether appellant was required to exhaust her administrative remedies [] is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.'" *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)*(quoting *Waiters, 729 F.2d at 237).* In support of this argument, Lawton states that along with his EEOC charge, he submitted to the EEOC a document entitled "Concerned Employees of Sunoco Against the Discrimination of Minorities and Disabled Persons in the Workplace" ("The Document"). The Document, which is dated one month before Lawton filed his EEOC charge, states, *inter alia*, "I have witnessed bias and discriminatory practice and behavior patterns toward minorities"; "minorities are being treated unfairly"; "white managers are abusive and undermining in their behavior towards minorities"; "minorities are being denied the right to advance"; "fearing retaliation many workers dismiss the idea of confronting their supervisor"; and "minorities make less money than white employees." (Resp. Summ. J., Ex. J). Lawton alleges that the Document is "sufficient **[*12]** to put the EEOC and defendants on notice" of his claims of wage discrimination, hostile work environment, disparate impact and retaliation. (Resp. Summ. J., 11).

The Defendants first counter by arguing that Lawton has not produced any evidence that Sunoco had notice of

the Document or the allegations contained therein. The Defendants argue that one of the two purposes of the exhaustion requirement is to put the "employer on notice that a complaint has been lodged against him and gives him the opportunity to take remedial action." *Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 786 (W.D. Pa. 2000), Fucci v. Graduate Hosp., 969 F. Supp. 310, 315 (E.D. Pa. 1997)*(stating that the "exhaustion requirement is designed to provide sufficient notice to the defendant concerning the charges and obtain voluntary compliance without resort to litigation.") The Defendants claim "that allegations made by a charging party to the EEOC, which were never disclosed to the employer, cannot form the basis of a later lawsuit" because it undermines the stated purpose of exhaustion. (Mot. Summ. J., 3).

The Defendants also attack each claim individually. First, the Defendants **[*13]** claim that the statement in the Document that "minorities make less money than white employees" would not have put them on notice of Lawton's wage discrimination claim or caused the EEOC to investigate it because the statement does not allege that Lawton made less money than other similarly situated white employees. Second, the Defendants argue that the Document does not identify a single remark or any other racially harassing conduct directed towards Lawton which would have put them or the EEOC on notice of his hostile work environment claim. Third, the Defendants allege that although the Document states that "fearing retaliation many workers dismiss the idea of confronting their supervisor", it does not describe any retaliatory conduct that actually occurred, and thus would not have been sufficient to provide notice of a retaliation claim. Fourth, the Defendants claim that the Document would not have provided adequate notice of the disparate impact claim because it does not describe any policy or practice which caused disparate impact on African-Americans.

We agree that Lawton has failed to exhaust his remedies with respect to these claims. However, as described below, we also find **[*14]** that each of these claims is deficient because Lawton has failed to establish a genuine issue of material fact regarding each claim.

### B. Failure to Promote Claim

Where, as here, there is no direct evidence of discrimination, the burden of proof in a discrimination claim under Title VII and the PHRA is governed by the framework established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999).* Under this framework, the plaintiff must first set forth a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 147 L. Ed. 2d 105, 120 S. Ct.*

*2097 (2000).* If the plaintiff succeeds in establishing a *prima facie* case, the employer must then produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The employer only bears the burden of production and not the burden of persuasion on this issue as "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the **[*15]** plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* Furthermore, the defendant's burden in articulating its reason is relatively light and is satisfied if it articulates any legitimate reason for the adverse employment action. *Woodson v. Scott Paper, Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997).* "Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision" the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves, 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097* (internal quotations omitted).

First, Lawton has failed to establish a *prima facie* claim for failure to promote because he has failed to show that he was qualified for the managerial positions. In order to establish a *prima facie* case of discrimination, Lawton must establish: (1) that he is a member of a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, **[*16]** despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas, 411 U.S. at 802.* Lawton admits that he has no prior retail experience. (Lawton Dep. at 44). Furthermore, Lawton claims that he is not qualified for managerial positions because he has not received MIT training. (Id. at 51). However, the Defendants allege that the MIT program is primarily for external candidates and not for current employees like Lawton. Also, the Defendants allege that MIT training is not a prerequisite for becoming a store manager. The Defendants further point out that Lawton admits that he knows of two African-American employees who were promoted to manager positions without obtaining MIT training. (Id. at 175-76). Lawton has not provided any evidence showing that he is qualified for a management position other than his bald assertions to that effect in his Response to the Motion for Summary Judgment, which contradict his deposition testimony. Therefore, Lawton has not established that he is qualified for a managerial position, **[*17]** nor has he established a *prima facie* case on this issue.

Even assuming that Lawton could make out a *prima facie* case of discrimination based upon the Defendants' failure to promote him, the Defendants have provided a nondiscriminatory reason for their actions which Lawton cannot successfully show was pretextual. Specifically, the Defendants claim that in each of the situations in which Lawton believes he was not promoted because of his race, he was actually not promoted because he lacked managerial experience and that those who were selected were promoted or hired because of their successful past managerial experience. (See Sec. I "Background", supra).

In order to avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999)*(quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).* Further, the plaintiff cannot simply show [*18] that the employer's decision was unwise or wrong since the actual issue is whether the employer had a discriminatory motive. *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)*(en banc). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons" that the factfinder could rationally find them unbelievable and could infer that the employer did not act for the non-discriminatory reasons proffered. Id. (quoting *Fuentes, 32 F.3d at 765).* In order to survive summary judgment, the plaintiff must show through admissible evidence that the employer's articulated reason was not merely wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." *Jones v. School Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999)*(quoting *Keller, 130 F.3d at 1109).*

In the Motion for Summary Judgment, the Defendants provide detailed explanations for why Lawton was not promoted to each of the positions and why those chosen were promoted or hired instead. Each of the candidates selected [*19] for the various positions had prior successful experience in management, whereas Lawton had no prior retail experience and a history of problems dealing with reports and paperwork. In another instance where Lawton alleges he should have been promoted, the Defendants counter by establishing that no permanent manager was hired for that store as it was closed soon after it was acquired by Sunoco.

In Lawton's Response to the Motion for Summary Judgment, he does not address the Defendants' nondiscriminatory reasons for hiring others to fill the managerial positions, but only addresses why he believes he has met his burden in establishing his *prima facie* case. Therefore, Lawton has failed to establish that the Defendants' articulated reason was not merely wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." Id. At best, Lawton alleges that he and other current Sunoco employees were not aware of open positions and that the Defendants gave preferential treatment to newly hired employees. Without evidence that this practice is somehow connected to the racial status of the current employees and new hires, it cannot support a violation of Title [*20] VII or the PHRA. As described by Lawton, this deficiency would apply to all current Sunoco employees, not just to those within the protected class and would likewise apply to all new hires, regardless of their race. Because Lawton has failed to establish a *prima facie* case of a failure to promote, and because he has failed to establish that the Defendants' proffered explanation is pretextual, summary judgment will be granted on this claim.

### C. Wage Discrimination Claim

In order to establish a *prima facie* case of wage discrimination under Title VII and the PHRA, the plaintiffs "must demonstrate that they were performing work substantially equal to that of white employees who were compensated at higher rates than they were." *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996)*(internal quotations omitted); *Watson v. Eastman Kodak Co., 235 F.3d 851 (3d Cir. 2000)*(finding that the plaintiff failed to identify any evidence that he was compensated at a lower rate than similarly situated employees). Lawton has failed to produce any evidence that Sunoco paid any similarly situated Caucasian employee at a higher rate than he receives. [*21] Instead, Lawton argues that he receives "lower wages than persons similarly situated in terms of Lawton's ability, stature, longevity, tenure and experience." (Resp. Summ. J., 19). In effect, Lawton argues that those in higher managerial positions than his make more money than he does even though they allegedly have similar abilities and experience to him. By definition, Lawton is not similarly situated to those who hold higher positions nor is he performing work substantially equal to them. Again, Lawton's argument appears to be that other new employees are being hired into management positions, while current employees are not. However, this argument does not address whether similarly situated Caucasian workers are being paid higher wages than Lawton. Furthermore, this argument is not sufficient to establish

2002 U.S. Dist. LEXIS 13039, *

any discrimination claim absent evidence that the new hires are outside of the protected class and that the current employees are all within the protected class.

Although Lawton claims that "similarly situated Caucasian employees have been promoted at a faster rate than Lawton, and have been receiving higher wages than Lawton", he provides absolutely no evidence that this is [*22] the case. In fact, Lawton does not name a single Food Services Manager or any Caucasian employee with similar qualifications and experience who has been promoted to a store manager position. Lawton may not rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive this summary judgment motion. *Williams, 891 F.2d at 460.* Because Lawton has failed to establish that he is paid less than other similarly situated Caucasian employees, his wage discrimination claim fails and summary judgment is appropriate on this claim.

**D. Hostile Work Environment Claim**

In order to establish a hostile work environment claim under Title VII and the PHRA, a plaintiff must show that: (1) the employee suffered intentional discrimination because of his or her race; (2) the discrimination was pervasive and severe; (3) the discrimination detrimentally affected the employee; (4) the discrimination would detrimentally affect a reasonable person; and (5) the existence of respondeat superior liability. Andrews v. City of Philadelphia; *895 F.2d 1469, 1482 (3d Cir. 1990).* The Supreme Court has enumerated factors that courts should consider [*23] in determining whether the alleged conduct is sufficiently serious to support a hostile work environment claim which include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* "'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998)*(quoting *Harris, 510 U.S. at 21).* Furthermore, "'for racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments.'" *Al-Salem v. Bucks County Water & Sewer Auth., 1999 U.S. Dist. LEXIS 3609, No. 97-6843, 1999 WL 167729,* [*24] at *5 (E.D. Pa. Mar. 25, 1999)(quoting *Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997))*

Here there is no evidence of pervasive or severe discriminatory conduct leading to a hostile work environment. Lawton admits that he has never been subjected to any racial remarks while employed at Sunoco. (Lawton Dep. at 308-09). However, Lawton does argue that after one female employee stole a credit card from another female employee, Tscherniawsky, the General Manager, held a general store meeting with all of the store employees. At the meeting Lawton alleges that Tscherniawsky addressed the employees as "you people" and stated that "nobody wants to work around here with a bunch of thieves" in an aggressive tone of voice. ( *Id. at 111-112).* Lawton further alleges that he believes that there were Caucasian employees at the meeting also. ( *Id. 147 L. Ed. 2d at 123)* Lawton was not present for the entire meeting, as he was required to see to his duties as the Food Services Manager. Lawton asserts that Tscherniawsky's behavior at this meeting shows racial discrimination because of his use of the words "you people" and "thief." The use of these phrases [*25] while addressing all of the store's employees, after one of the employees committed a theft, does not evidence racial discrimination against African-Americans.

Lawton also alleges that Maiellano circulated a fax entitled "How to Be a Good Redneck." Lawton alleges that because racially derogatory behavior is sometimes attributed to those considered "rednecks", by circulating "instructions" on how to be a redneck, Maiellano was suggesting that Sunoco employees should be bigots. However, the fax is completely devoid of any such racial undertones and has no connection to racial discrimination. The portions of the fax submitted into evidence instruct "rednecks" on how to behave at weddings (e.g. "Though uncomfortable say 'yes' to socks and shoes for this special occasion"); and driving etiquette (e.g. "When approaching a four-way stop, the vehicle with the largest tires always has the right of way"). This fax simply does not support Lawton's argument that he was subjected to workplace harassment because he is African-American. However, even if both of these events were in fact racially oriented, the two acts alone would still not be sufficient to establish a pervasive and severe pattern [*26] of discrimination leading to a hostile workplace. See *Oncale, 523 U.S. at 78.* Therefore, this count must fail and summary judgment is appropriate.

**E. Retaliation Claim**

In order to establish a *prima facie* case of retaliation under Title VII and the PHRA, a plaintiff must establish that: (1) he or she engaged in a protected activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the

adverse action. *Weston v. Pa., 251 F.3d 420, 430 (3d Cir. 2001)*. For retaliatory conduct to rise to the level of adverse employment action, it must alter "the employee's compensation, terms, conditions, or privileges of employment, deprive[] him or her of employment opportunities, or adversely affect[] his or her status as an employee. It follows that not everything that makes an employee unhappy qualifies as retaliation." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)*(internal citations omitted).

Initially in his Complaint, Lawton identified various acts which he believed were retaliatory. Two such [*27] acts concerned as a letter from Crisci reviewing the items discussed at the January 11, 2001 meeting between Crisci and Lawton, and Lawton's May 2001 performance evaluation. The Defendants argue, and we agree, that these events do not rise to the level of adverse employment actions under Robinson and similar cases, as these actions did not affect the terms or conditions of Lawton's employment. Furthermore, in his response to the Motion for Summary Judgment, Lawton does not dispute the Defendants' characterization of these events. Lawton fails to go beyond the pleadings regarding this issue and present "specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)*.

Instead of addressing the Defendants' arguments, Lawton alleges for the first time that he continues to be denied merit based promotions in retaliation for filing his EEOC complaint and subsequent lawsuit. However, Lawton does not identify any of the positions to which he was allegedly not promoted, nor does he point to any evidence to support his claim. Lawton cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. [*28] *Williams, 891 F.2d at 460*. Lastly, even if Lawton had successfully established a *prima facie* case of retaliation, Lawton has not provided any evidence that any action taken by the Defendants was a pretext for discriminatory retaliation. See *Weston, 251 F.3d at 432* (noting that the McDonnell Douglas burden shifting framework applies to retaliation claims). Therefore, Lawton has not met his burden of proof on this issue and summary judgment is appropriate on his claim of retaliation.

**F. Disparate Impact Claim**

In order to establish a *prima facie* case of disparate impact under Title VII and the PHRA, a plaintiff must: (1) identify a specific or particular employment practice that (2) creates a disparate impact on a protected group through statistical evidence. *Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989)*. "The plaintiff is . . . responsible for isolating and identifying the specific employment

practices that are allegedly responsible for any observed statistical disparities." *Id. at 656* (internal quotations omitted). Furthermore, the statistical evidence [*29] must be "of a kind and degree sufficient to show that the practice in question has caused" the disparate impact. *Johnston v. City of Philadelphia, 863 F. Supp. 231, 235 (E.D. Pa. 1994)*(citing *Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994, 101 L. Ed. 2d 827, 108 S. Ct. 2777 (1988)*). Lawton claims that vague and subjective criteria with respect to merit raises, promotions and performance evaluations, while facially neutral, give management total discretion and allow them to discriminate against African-American employees. We note that a plaintiff's burden in properly identifying specific employment practices which utilize subjective criteria may be quite difficult to meet. *Watson, 487 U.S. at 994*.

Lawton alleges that the following employment practices allow discrimination: (1) that vague criteria are used to determine advancement at Sunoco; (2) that despite a policy to promote from within, the majority of Sunoco's managers are newly hired; and (3) that evaluations are rarely performed and thus merit based raises and promotions are not common. Lawton does not provide any evidence that these policies exist, that the majority of [*30] Sunoco's managers are newly hired, or that merit based advancements are uncommon. Not only must Lawton allege specific policies, Lawton must provide some proof that such policies exist, for he has the burden of proof to establish his *prima facie* case. *Celotex, 477 U.S. at 322-23* (stating that the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim). Regardless, however, Lawton's claim also must fail because he has not established causation through properly analyzed statistical evidence.

As proof that Sunoco discriminates against African-Americans, Lawton produces data from Mascot's EEO-1 forms from the years 1995 to 2000. Mascot is Lawton's direct employer at the APlus store. These EEO-1 forms show that the average percentage of Caucasian employees in official and managerial positions to total Caucasian employees was 10.63%, while the average percentage of African-American employees in official and managerial positions to total African-American employees was 4%. The EEO-1 forms also show that the average percentage of all Mascot employees who were Caucasian was 82.53%, while the average percentage of all [*31] Mascot employees who were African-American was 11%. However, the United States Supreme Court noted that in a disparate impact case, "the 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market.'"

*Wards Cove Packing Co., 490 U.S. at 650* (quoting *Hazelwood Sch. Dist. v. U.S., 433 U.S. 299, 308, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977))*. The Wards Court further determined that statistical evidence showing a high percentage of non-white workers in cannery jobs and a low percentage of such workers in skilled non-cannery positions such as management, did not establish *prima facie* case of disparate impact. *Id. 490 U.S. at 651*. This is exactly the type of inappropriate comparison that Lawton would have us make in utilizing this data.

Lawton also points out that based upon 2000 U.S. Census data, the African-American population in the Philadelphia metropolitan area was 43.2% of the total population. Therefore, Lawton argues, the available African-American work force was larger than the percentage of African-Americans working for Sunoco through [*32] Mascot. However, Lawton fails to take into account the fact that the 43.2% includes all African-Americans, including children, elderly, disabled people, and those otherwise not qualified for management positions; all of whom are not representative of the actual available qualified African-American work force. Lawton also fails to take into account that Mascot's EEO-1 form utilize nationwide data, and thus they cannot be successfully compared to a work force percentage in a much smaller geographic area. As stated above, it is "the racial composition of the qualified . . . population in the relevant labor market" that is important to this analysis. *Id. 490 U.S. at 650*

Lawton further notes that the EEO-1 forms show that of the professional employees employed by Mascot, ten out of eleven were Caucasian in 1995; thirteen out of thirteen were Caucasian in 1996; fifteen out of fifteen were Caucasian in 1997; seventeen out of eighteen were Caucasian in 1998; fifteen out of seventeen were Caucasian in 1999; and seventeen out of nineteen were Caucasian in 2000. However, again, without comparing these numbers to "the racial composition of the qualified . . . population in the relevant labor market", [*33] the numbers are meaningless. n1 See Id. Lastly, Lawton states, without further analysis, that "the personnel files of other Sunoco employees shows the disparity between the salaries of African-American employees versus that of employees of other races. *See* Appendix 1" (Resp. Summ. J., 25). Appendix 1 to Lawton's Response includes charts prepared by Lawton of the wages allegedly earned by various Sunoco employees, without citation to any evidence. Without some analysis by Lawton; controls for a number of factors including educational experience, job performance, or work experience; or an attempt to show the statistical significance of his data, this information loses its possible value.

n1 Furthermore, this information concerning *professional employees* has little relevance to Lawton's claim that employment practices regarding advancement to *managerial* positions create a disparate impact on African-Americans.

Although Lawton has provided various percentages, he has failed to sufficiently or properly [*34] analyze these numbers, attempt to control for any variables, or compare them to the correct qualified population. Therefore, even if Lawton had sufficiently alleged a specific or particular employment practice, he has failed establish that the practice creates a disparate impact on a protected group through proper or sufficient statistical evidence. Therefore, Lawton's claim for disparate impact must fail and summary judgment is appropriate on this claim.

### G. Intentional Infliction of Emotional Distress

The Pennsylvania Workers Compensation Act, *77 Pa. C.S.A. § 481(a)* ("WCA"), "provides the sole remedy 'for injuries allegedly sustained during the course of employment.'" *Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997)*(quoting *Dugan v. Bell Tel. of Pa., 876 F. Supp. 713, 723 (W.D. Pa. 1994))*. "The exclusivity provision of that statute bars claims for 'intentional and/or negligent infliction of emotional distress [arising] out of [an] employment relationship.'" Id. (quoting *Dugan, 876 F. Supp. at 724*)

However, the WCA does provide one exception to the rule baring claims for intentional [*35] infliction of emotional distress if the actor was motivated by personal animus. *77 Pa. Stat. § 411(1)*; *Fugarino v. Univ. Servs., 123 F. Supp. 2d 838, 843-44 (E.D. Pa. 2000)*. The personal animus exception requires conduct "'that is not normally expected to be present in the workplace.'" *Hettler v. Zany Brainy, Inc., 2000 U.S. Dist. LEXIS 14537, No. 99-3879, 2000 WL 1468550*, at *5 (E.D. Pa. Sept. 27, 2000)(quoting *Snyder v. Specialty Glass Prods., Inc., 441 Pa. Super. 613, 658 A.2d 366, 374 (Pa. Super. 1995))*. Here, Lawton states without further analysis or factual support that "the actions taken by Maiellano, and the derogatory comments made to Lawton were inflicted for personal reasons, and not made solely within the context of employment." (Resp. Summ. J., 24). However, as stated, Lawton provides no evidence that anything was done to him for personal reasons and, in fact, states that he was never subjected to racially derogatory comments. (Lawton Dep. at 309). Therefore, because all of the allegedly offensive conduct occurred at work and appears to have arose out of the employment relationship, the personal animus exception is not applicable. See *DeWyer v. Temple Univ., 2001 U.S. Dist. LEXIS 1141, No. 00-1665, 2001 WL 115461*, [*36] at *5

(E.D. Pa. Feb. 5, 2001); *Coney v. Pepsi Cola Bottling Co., 1997 U.S. Dist. LEXIS 7722, No. 97-2419, 1997 WL 299434,* at *1 (E.D. Pa. May 29, 1997).

Regardless, the alleged actions are also not sufficiently extreme and outrageous to establish a cause of action for intentional infliction of emotional distress. Lawton states that "the fact that Lawton was retaliated against after filing his EEOC charge, in conjunction with the previous discrimination that he suffered based on his disability n2 and race, is sufficient to demonstrate extreme and outrageous conduct." (Resp. Summ. J., 30). In order for a plaintiff to establish a claim for intentional infliction of emotional distress, *inter alia,* "'the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)*(quoting *Buczek v. First Nat'l Bank of Mifflintown, 366 Pa. Super. 551, 531 A.2d 1122, 1125 (Pa. Super. 1987))* "At the outset, it must be recognized that it is extremely rare to find conduct in the employment [*37] context that will give rise to the level of outrageousness necessary to provide a basis for recovery of the tort of intentional infliction of emotional distress." Id. Generally, the type of employment discrimination alleged by Lawton does not give rise to a claim for intentional infliction of emotional distress, and Lawton has not provided any facts or evidence which would entice us to hold otherwise. *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp., 874 F. Supp. 92, 96 (E.D. Pa. 1995)*(stating that "racial discrimination alone does not state a claim for intentional infliction of emotional distress."); *Nichols v. Acme Markets, Inc., 712 F. Supp. 488 (E.D. Pa. 1989),* aff'd, *902 F.2d 1561 (3d Cir. 1990)*(same). Therefore, Lawton's claim of intentional infliction of emotional distress must fail.

n2 Although the "Disability" box on Lawton's EEOC charge is checked, there have been no arguments or evidence submitted relating to any claim of disability.

**[*38] VI. CONCLUSION**

Summary Judgment is appropriate on each of the legal theories presented by Lawton. First, Lawton's claims of wage discrimination, hostile work environment, retaliation, and disparate impact fail because Lawton has not exhausted his administrative remedies on these claims. Second, Lawton's failure to promote claim fails because he has not established that he is qualified for any of the positions nor has he established that the Defendants' proffered explanation was actually a pretext for discrimination. Third, Lawton's wage discrimination claim also fails because he has not established that similarly situated Caucasian employees are paid more than he is being paid. Fourth, Lawton's hostile work environment claim also fails because he has not established any of the factors necessary to make out a *prima facie* case. Fifth, Lawton's retaliation claim also fails because he has not established that the Defendants engaged in an adverse employment action, or that there is a causal link between his protected activity and any alleged employment action. Sixth, Lawton's disparate impact claim also fails because he has not sufficiently established any specific policies [*39] which create a disparate impact on a protected group through proper or sufficient statistical evidence. Last, Lawton's intentional infliction of emotional distress claim fails because it is barred by the WCA and because he fails to allege conduct that is sufficiently extreme and outrageous.

An appropriate Order follows.

**ORDER** - ENTERED JULY 17, 2002

AND NOW, this 17th day of July, 2002, upon consideration of the Defendants' Motion for Summary Judgment (Dkt. No. 21), and any Responses and Replies thereto, it is hereby ORDERED that the Motion is GRANTED and the case is dismissed with prejudice. The Clerk of Courts is hereby directed to mark this case as closed.

BY THE COURT:

Robert F. Kelly, Sr. J.

LEXSEE 2002 U.S. DIST. LEXIS 16210

KATHLEEN B. NEROSA and ROBERT NEROSA v. STORECAST
MERCHANDISING CORPORATION and STORECAST CORPORATION OF
AMERICA

CIVIL ACTION NO. 02-440

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2002 U.S. Dist. LEXIS 16210*

**August 28, 2002, Decided**

**DISPOSITION:** Motion to dismiss granted in part. Motion for sanctions denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Kathleen B Nerosa, Robert Nerosa, PLAINTIFFS: James B Mogul, Lowenthal & Abrams, Bala Cynwyd, PA, USA.

For Storecast Merchandising Corporation, Storecast Corporation of America, DEFENDANTS: Thomas G Servodidio, Duane Morris LLP, Philadelphia, PA, USA. Randi R Serota, Duane Morris LLP, Philadelphia, PA USA.

**JUDGES:** JAY C. WALDMAN, J.

**OPINIONBY:** JAY C. WALDMAN

**OPINION: MEMORANDUM**

WALDMAN, J.

August 28, 2002

**I. Introduction**

Plaintiff Kathleen Nerosa has asserted an array of claims under Title VII, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the Equal Pay Act ("EPA") and the Pennsylvania Human Relations Act ("PHRA") against her former employer, Storecast Merchandising Corporation ("Storecast"). n1 Her husband, Robert Nerosa, has asserted a claim for loss of consortium.

n1 The complaint also names Storecast Corporation of America as a defendant. In fact, the two defendants are the same entity Storecast Merchandising Corporation was formerly known as Storecast Corporation of America. Thus, although there has been no request to correct the caption, the court refers to the defendant in the singular

[*2]

Defendant has moved to dismiss Counts II, IV, V, VI, VII, VIII, IX, X and XI of plaintiffs' complaint as well as portions of Counts I and III for failure to state cognizable claims. Defendant has also requested sanctions against plaintiffs' attorney to compensate defendant for legal fees incurred in responding to "frivolous positions" taken by plaintiffs in their brief after being "presented with clear legal authority explaining the deficiencies therein."

**II. Factual Allegations**

The facts as alleged by plaintiffs are as follow.

Ms. Nerosa was hired by defendant in October 1985 as a full-time employee after working part-time for 1 1/2 years as a merchandiser. In April 1991, she was promoted to the supervisory position of retail manager. In March 2000, she was transferred to the I-Star Division where she was responsible for supervising 16 team leaders.

Ms. Nerosa was paid a lower salary than Frank Gilmartin and Richard Haggerty, two male supervisors in

their thirties who performed similar job functions and possessed similar job titles as plaintiff. The male supervisors were assigned more sales associates and more stores than was Ms. Nerosa and territories less saturated [*3] with competitors. They were thus able to generate more sales volume and revenues. During the course of her employment, Ms. Nerosa never received any negative performance evaluations or written or verbal warnings about her performance.

In September 2000, Ms. Nerosa was placed on medication to treat several related medical conditions including shortness of breath, a heart murmur, sinus tachycardia, rapid heart beat, chest pain and non-insulin dependent diabetes mellitus.

On December 1, 2000, a treating physician provided her with a medical note advising that she should refrain from heavy or strenuous physical activity such as pushing and pulling due to a cardiac condition. Ms. Nerosa could perform all essential functions of her job duties which did not include heavy or strenuous physical tasks. She had subordinate employees who could push or pull heavy boxes when an occasion to do so arose.

Ms. Nerosa presented the medical note to Matthew Kiernan, her supervisor and defendant's director of operations, on December 1, 2000. Later that day he berated Ms. Nerosa for nearly thirty minutes about an assigned project and a minor variation in her performance of certain job duties. She became [*4] faint, dizzy and weak. She collapsed into a wall and was taken to a hospital. n2

> n2 Plaintiff submits a copy of the hospital report with her brief in response to defendant's motion which she invites the court to consider. It shows that she was examined in the emergency room for shortness of breath and anxiety. In plaintiff's account to the admitting nurse there is no mention of an onset of symptoms during an altercation with a supervisor. Plaintiff related that she had been under a lot of stress at work and had a sudden onset of symptoms while standing at a copying machine. While plaintiff references her hospital visit in the complaint, she does not specifically reference or append the hospital report. In resolving the instant motion, the court will thus disregard the report and assume to be true the description of this event alleged in the complaint.

On January 5, 2001, Mr. Kiernan advised Ms. Nerosa that she was being terminated for poor work performance. Three days later, she received a letter of termination [*5] from defendant which did not specify any reason for her termination. n3

> n3 Defendant's employee handbook provides a list of progressive disciplinary steps generally to be undertaken prior to termination for other than a series of listed major infractions. None were undertaken in Ms. Nerosa's case.

At the time of her termination, Ms. Nerosa was 53 years of age and earned an annual salary of $ 33,700. Her replacement was a 34-year-old male with little prior relevant work experience who earned a lesser salary.

On March 26, 2001, Ms. Nerosa filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). She alleged that she was terminated because of her age and disability and was discriminated against in salary based on her gender. On October 31, 2001, the EEOC issued a formal Dismissal of Ms. Nerosa's charges on the ground that the agency could not conclude from its investigation that any violation had occurred. [*6] The EEOC advised plaintiff of her right to sue. The instant action followed. n4

> n4 Plaintiff expatiates for seven pages in her brief about the dismissal of her claims by the EEOC. She contends that the agency conducted an inadequate investigation, was guilty of actionable misfeasance and violated her due process rights including the right to cross-examine adverse witnesses. None of this has any bearing on the court's disposition of the instant motion.

The complaint contains 92 paragraphs and spans 37 pages. Much of what is pled is repetitive and the eleven counts into which the complaint is segmented fail to correspond in any coherent manner to the various legal claims and theories advanced.

In Count I, captioned "Violation of the Age Discrimination in Employment Act," plaintiffs actually set forth multiple claims which are then replicated in subsequent counts. Ms. Nerosa alleges that her termination was "part of a pattern and practice of unlawful age, sex and disability discrimination and age, sex and disability [*7] harassment." She also alleges that the defendant violated the Equal Pay Act by paying her a lesser salary than male supervisors.

2002 U.S. Dist. LEXIS 16210, *

In Count II, Ms. Nerosa alleges that defendant terminated her because of her age and created a work environment hostile to persons of her age in violation of the ADEA.

In Count III, Ms. Nerosa alleges that defendant engaged in unlawful age, sex and disability discrimination and age sex and disability harassment in violation of the PHRA

In Count IV, she alleges that defendant engaged in age, sex and disability discrimination as well as age, sex and disability harassment and retaliated against her for opposing this conduct with indifference to her federally protected rights thus entitling her to punitive damages under the PHRA, the ADEA, the ADA and Title VII.

In Count V, she alleges that defendant violated Title VII by engaging in unlawful age, sex and disability discrimination and a pattern or practice of unlawful age, sex, and disability harassment.

In Count VI, Ms. Nerosa alleges that defendant violated the ADA by refusing to permit her to continue to work, with or without a reasonable accommodation, based on her record of impairment and defendant's **[\*8]** erroneous perception of her inability to perform the essential functions of her job. In Count VIII, she alleges that the same conduct constitutes a violation of the PHRA

In Count VII, she alleges that defendant violated the ADA by failing to reasonably accommodate her perceived impairment and permit her to continue to work. In Count IX, captioned "Retaliation Pursuant to the Americans with Disabilities Act," she alleges that defendant wrongfully terminated her, refused to acknowledge her accommodation request and engaged in unspecified deceptive conduct calculated to prevent her from continuing to perform her job duties. In Count X, she alleges that the same conduct constitutes a violation of the PHRA.

In Count XI, Mr. Nerosa asserts a claim for loss of consortium.

### III. DISCUSSION

Defendant asserts that Ms. Nerosa failed to administratively exhaust her hostile work environment, retaliation and gender-based discrimination claims, and failed to state cognizable hostile work environment, retaliation or disability claims under federal or state law n5 Defendant also asserts that Mr. Nerosa may not predicate a loss of consortium claim on the employment discrimination statutes **[\*9]** relied upon and that Ms. Nerosa may not recover punitive damages on her ADEA and related PHRA claims. n6

n5 The PHRA is construed and applied in a manner consistent with the federal employment discrimination statutes. See *Weston v Pennsylvania*, 251 F.3d 420, 425 n 3 (3d Cir 2001), *Kelly v Drexel University*, 94 F.3d 102, 105 (3d Cir 1996).

n6 In their reply memorandum, plaintiffs concede that punitive damages are not recoverable under the ADEA and the PHRA. Defendant has not moved to strike the punitive damages claim under Title VII or the ADA, but rather to dismiss the Title VII and ADA claim in their entirety.

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim while accepting as true the claimant's allegations and reasonable inferences therefrom, and viewing them in the light most favorable to her. See *Markowitz v Northeast Land Co*, 906 F.2d 100, 103 (3d Cir 1990); *Sturm v Clark*, 835 F.2d 1009, 1011 (3d Cir 1987), **[\*10]** *Winterberg v CNA Ins Co*, 868 F. Supp 713, 718 (E.D Pa 1994), aff'd, 72 F.3d 318 (3d Cir 1995). A court may also consider any document referenced in or integral to the complaint on which plaintiff's claim is based. See *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir 1997); *In re Westinghouse Securities Litigation*, 90 F.3d 696, 707 (3d Cir 1996). A court, however, need not credit conclusory allegations or legal conclusions in deciding such a motion to dismiss. See *General Motors Corp v New A.C. Chevrolet, Inc*, 263 F.3d 296, 333 (3d Cir 2001), *Morse v Lower Merion School Dist*, 132 F.3d 902, 906 (3d Cir 1997), *L.S.T., Inc v Crow*, 49 F.3d 679, 683-84 (11th Cir 1995) A complaint may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. See *Pennsylvania ex rel Zimmerman v PepsiCo, Inc*, 836 F.2d 173, 179 (3d Cir 1988)

### A. Administrative Exhaustion

As a precondition for filing suit under Title VII, the ADEA, the **[\*11]** ADA and the PHRA, a plaintiff must exhaust a claim by presenting it in an administrative charge to the EEOC and the PHRC. See *Antol v. Perry*, 82 F.3d 1291, 1295-96 (3d Cir. 1996) (plaintiff must exhaust Title VII claims); *Fakete v Aetna, Inc*, 152 F. Supp 2d 722, 731 (E.D Pa. 2001) (plaintiff must exhaust PHRA and ADEA claims); *Deily v Waste Mgt of Allentown*, 118 F. Supp 2d 539, 541 (E.D Pa 2000) (plaintiff must exhaust ADA claims).

The scope of a judicial complaint is not limited to the four corners of the administrative charge. See *Love v. Pullman*, 404 U.S. 522, 527, 30 L. Ed. 2d 679, 92 S.

Ct 616 (1972), Hicks v ABT Assoc, 572 F 2d 960, 963 (3d Cir 1978), Duffy v Massinari, 202 F R D 437, 440 (E D Pa 2001) It is delimited, however, to acts fairly within the scope of the charge or the investigation which can reasonably be expected to result from it. See Holtz v Rockefeller & Co, 258 F 3d 62, 83 (2d Cir 2001), Hicks, 572 F 2d at 966, Ostapowicz v Johnson Bronze Co, 541 F 2d 394, 398-99 (3d Cir 1976), Schouten v CSX Transportation, Inc, 58 F Supp 2d 614, 616 (E D Pa 1999) [*12]

There must be a close nexus between the facts supporting each claim or an additional claim in the judicial complaint must fairly appear to be an explanation of the original charge or one growing out of it. See Duffy, 202 F R D at 440; Galvis v HGO Services, 49 F Supp 2d 445, 448-49 (E D Pa 1999) A plaintiff, for instance, may not maintain a hostile work environment or retaliation claim based on an administrative charge of discriminatory termination See Wright v Philadelphia Gas Works, 2001 U S Dist LEXIS 15852, 2001 WL 1169108, *2 (E D Pa 2001) (dismissing hostile work environment and retaliation claims where EEOC charge asserted only claim of racially-motivated discharge)

In her administrative charge, Ms Nerosa checked boxes indicating that the she was discriminated against on the basis of sex, age and disability She indicated that this discrimination took place on January 5, 2001, the day she was informed by Mr Kiernan of her termination. In the narrative section, she related that she had been terminated because of her age and after advising defendant of a medical restriction, and that she was paid less than male co-workers with similar [*13] responsibilities She also referenced the incident in which Mr Kiernan unfairly chastised her n7

n7 Plaintiff's counsel submitted a ten-page letter on October 4, 2001 to the EEOC in support of her claims It is abundantly clear from a reading of this submission that plaintiff's claims were limited to unlawful termination based on age, gender and disability, and disparate compensation to which there is a brief reference.

A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the victim's employment and create an abusive working environment See Harris v Forklift Systems, Inc, 510 U S 17, 21, 126 L Ed 2d 295, 114 S Ct 367 (1993) Conduct that is not sufficiently severe or pervasive to create an objectively hostile or abusive environment is not actionable Id.

"Conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v City of Boca Raton, 524 U S 775, 788, 141 L Ed 2d 662, 118 S Ct 2275 (1998) [*14] Incidents of harassment are pervasive if they occur in concert or with regularity. See Andrews v City of Philadelphia, 895 F 2d 1469, 1484 (3d Cir 1990) n8

n8 Plaintiffs variously use the terms harassment and hostile work environment It is not altogether clear whether they are using these terms interchangeably or in an attempt to assert different claims. Defendant has understandably presumed the former and proceeded to address the hostile work environment claims accordingly. In any event, there is no distinct cause of action for harassment If acts of harassment are sufficiently severe or pervasive, they may give rise to a hostile work environment claim.

To state a hostile work environment claim, a plaintiff must show that she suffered intentional discrimination because of her protected status; the discrimination was pervasive and regular; the discrimination detrimentally affected the plaintiff and would detrimentally affect a reasonable person of the same protected status in that position; [*15] and the existence of respondeat superior liability. See Weston, 251 F 3d at 426; Kunin v Sears, Roebuck & Co, 175 F 3d 289, 293 (3d Cir 1999) n9

n9 The Third Circuit has not addressed whether a claim based on hostile work environment is available under the ADEA See Tumolo v Triangle Pacific Corp, 46 F Supp 2d 410, 412 n 2 (E D Pa 1999) Courts that have considered an age based hostile work environment claim have similarly required the plaintiff to show that she is over forty; that she was subject to harassment; and that the harassment was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. See Lacher v West, 147 F Supp 2d 538, 543 (5th Cir 2001) See also Burns v AAF-McQuay, Inc, 166 F 3d 292, 294 (4th Cir 1999) (reciting elements but declining to decide whether such a claim would be viable); Crawford v Medina Gen Hosp, 96 F 3d 830, 834 (6th Cir 1996) The Third Circuit has recognized a claim for a work environment hostile to persons with disabilities which similarly requires a plaintiff to show, inter alia, that she has a disability within the meaning

Case 1:05-cv-00261-GMS    Document 5-3    Filed 08/03/2005    Page 21 of 26

Page 5
2002 U.S. Dist. LEXIS 16210, *

of the ADA and was subjected to severe or persistent harassment. See *Walton v. Mental Health Ass'n, 168 F 3d 661, 667 (3d Cir. 1999)*

**[\*16]**

To establish vicarious liability of an employer for the actions of a co-worker, a plaintiff must show that the employer failed to provide a reasonable avenue for complaint or was aware of the alleged harassment and failed to take appropriate remedial action. See *Weston, 251 F 3d at 427* When an actionable hostile work environment is created by a supervisor with immediate or successively higher authority over the plaintiff, the burden is on the employer to show it exercised reasonable care to prevent and promptly correct harassing behavior and the plaintiff unreasonably failed to pursue corrective opportunities it provided or otherwise to avoid harm, unless the supervisor's harassment culminates in a tangible adverse employment action in which case vicarious liability is established. See *Burlington Industries, Inc v. Ellerth, 524 US 742, 765, 141 L Ed 2d 633, 118 S Ct 2257 (1998)*.

In her administrative complaint, Ms. Nerosa related an instance of verbal abuse by a supervisor which resulted in her becoming faint. Nowhere in her administrative complaint did plaintiff state or allege facts which would show that she had been subjected to a hostile **[\*17]** work environment. Plaintiffs appear to think that proof of bias or animus of a type required to establish any claim of intentional discrimination necessarily shows the existence of a hostile work environment. Ms. Nerosa's current claims of a hostile work environment are not within the scope of her EEOC complaint or the investigation which could reasonably have been expected to flow from the claims of discrimination asserted in her administrative charge. See *Cheek v. Western & Southern Life Ins Co., 31 F 3d 497, 503 (7th Cir. 1994)* ("Ordinarily a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination."); *Aramburu v. Boeing Co., 112 F 3d 1398, 1409-1410 (10th Cir. 1997)* (hostile work environment claim not reasonably related to wrongful discharge claim contained in EEOC charge). n10

n10 Plaintiffs have also failed to set forth a cognizable hostile work environment claim in their court complaint. The age-based hostile work environment claim is based on three factual allegations: that younger employees were given preferential job assignments and greater assistance, that Storecast failed to train its employees in prevention of age discrimination

and that Storecast failed to take prompt remedial action to stop age discrimination. Assuming an age-based hostile work environment claim is cognizable, plaintiffs' allegations fall far short of stating one. In support of the gender-based hostile work environment claim, plaintiffs allege that Ms. Nerosa was paid less than similarly situated male employees and assigned more competitive sales territories with less assistants. While a decision to pay less to a female manager than a similarly situated male manager or intentionally to achieve the same result by assigning less lucrative sales territories to female managers is actionable discrimination, it does not as such constitute a sexually hostile work environment. Plaintiffs have not alleged facts which would show that Ms. Nerosa was subject to severe or pervasive harassment because of a disability or perceived disability

**[\*18]**

An employer may not retaliate against an employee because she has opposed a practice made unlawful by Title VII, the ADEA, the ADA or the PHRA respectively, or because she made a charge, testified, assisted or otherwise participated in an investigation, hearing or other proceeding under any of these statutes. See *42 USC § 2000e-3*(a); *29 USC § 623, 42 USC § 12203*(a); *43 Pa CSA § 955(d)* Essential to any such claim are factual allegations which show that the employee engaged in protected activity and was then the subject of an adverse employment action as a result. See *Fogleman v Mercy Hospital, Inc., 283 F 3d 561, 567-68 (3d Cir. 2002); Goosby v Johnson & Johnson Medical, Inc., 228 F 3d 313, 323 (3d Cir. 2000)*

In her administrative charge, Ms. Nerosa did not check the box for retaliation. Nowhere in her administrative complaint, filed subsequent to her termination, does plaintiff use the word retaliation. She does not allege that she protested against discrimination of any kind or had participated in any way in an investigation or proceeding involving discrimination **[\*19]** at or prior to the time of her termination. n11 Plaintiff did not exhaust any claim for retaliation. See *Watson v. SEPTA, 1997 U.S. Dist. LEXIS 13306, 1997 WL 560181, \*7 (E.D. Pa.1997)* (retaliation claims barred for failure to exhaust administrative remedies where in EEOC charge plaintiff neither alleged "retaliation" nor alleged that she had complained about discrimination), aff'd, *207 F 3d 207 (3d Cir. 2000)*, cert. denied, *531 US 1147, 148 L Ed. 2d 961, 121 S Ct 1086 (2001)* n12 Nowhere in her administrative complaint did Ms. Nerosa state that she was terminated on the basis of gender. She did, however, check a box indicating discrimination

based on sex. She also stated that she was paid less than two less experienced male managers with similar responsibilities and was replaced by a 34-year-old male. Were plaintiff claiming only that she was discharged on the basis of age, the fact that her replacement was male would be superfluous. It fairly appears that the scope of an investigation resulting from plaintiff's administrative charge would likely encompass the role gender may have played in her termination. n13

n11 Whether an employee's request for a reasonable accommodation is protected activity under the ADA is questionable based on the actual wording of the statute. See *Soileau v Guilford of Maine, Inc*, 105 F.3d 12, 16 (1st Cir 1997), *Williams v Eastside Lumberyard and Supply Co*, 190 F. Supp. 2d 1104, 1120 (S.D. Ill 2001). A number of courts, however, have inferred or assumed that such action is protected. See *id at 1121 & n 14*. Ms. Nerosa did relate that she presented defendant with a doctor's note regarding her need to avoid heavy or strenuous physical tasks. In the next sentence, however, plaintiff makes clear that such tasks were not essential functions of her job but that she had voluntarily "sometimes assisted subordinate employees with their job duties which required lifting, pushing and pulling heavy boxes." The ADA provides no basis for a request for accommodation, protected or otherwise, to enable an employee to perform the job duties of other employees. [*20]

n12 Plaintiffs' court complaint is also devoid of any allegations that Ms. Nerosa protested against discrimination or had participated in any investigation or proceeding under Title VII, the ADEA, the ADA or the PHRA at or prior to the time of her termination.

n13 In Count V, plaintiffs allege that defendant engaged in unlawful age, sex and disability discrimination and harassment in violation of Title VII. Title VII does not provide relief for age or disability discrimination.

## B. Disability Claims

To sustain a prima facie case of discrimination in violation of the ADA, a plaintiff must show that she has a disability, that she is a qualified individual and that she has suffered an adverse employment action because of

that disability. See *Deane v Pocono Med Center*, 142 F.3d 138, 142 (3d Cir. 1998).

A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111*. The ADA defines [*21] a disability as:

(A) A physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) A record of such impairment; or

(C) Being regarded as having such impairment.

*42 U.S.C. § 12102(2).* n14

n14 The PHRA contains a substantially identical definition. See *43 Pa. C.S.A. § 954(p).*

To survive a motion to dismiss, a plaintiff must allege facts which show she has an impairment that "substantially limits" at least one "major life activity." *Sacay v. Research Foundation of the City Univ of New York*, 44 F. Supp. 2d 496, 501-02 (E.D.N.Y 1999). See also *Johnson v. Lehigh County*, 2000 U.S. Dist. LEXIS 14679, 2000 WL 1507072, *4 n.4 (E.D. Pa.2000) ("simply restating the language of the statute without describing a disability fails to state a claim under the ADA"); *Parisi v. Coca-Cola Bottling Co*, 995 F. Supp 298, 302 (E.D.N.Y 1998) ("plaintiff must allege a factual basis that would support a [*22] finding of substantial limitation of a major life activity, and may not rely upon conclusory allegations of such a limitation") (internal quotations omitted), aff'd, *172 F.3d 38 (2d Cir. 1999); McCann v. Catholic Health Initiative, 1998 U.S. Dist LEXIS 14011, 1998 WL 575259*, at *2 (E.D. Pa.1998); *Sutton v. New Mexico Dept of Children, Youth and Families, 922 F. Supp. 516, 518 (D.N.M 1996)*

A major life activity is "substantially limited" if it is affected in a "considerable" manner or "to a large degree." *Toyota Motor Mfg Kentucky, Inc v Williams, 534 U.S. 184, 122 S. Ct. 681, 691, 151 L. Ed 2d 615 (2002)*. To be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts her from doing activities that are of central importance to most people's daily lives. "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *122 S. Ct. at 693*. See also *Heilweil v. Mount Sinai Hosp*, 32

F.3d 718, 722 (2d Cir. 1994), [*23] cert. denied, 513 U.S. 1147, 130 L. Ed. 2d 1063, 115 S. Ct. 1095 (1995) n15

> n15 Medication and other measures taken to correct or mitigate an impairment must be taken into account when determining whether an individual is substantially limited in a major life activity and is thus disabled within the meaning of the ADA. See Sutton v. United Airlines, Inc., 527 U.S. 471, 482, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999).

Ms. Nerosa has several related medical conditions which she treats with prescribed medication. The only resulting limitation identified in her complaint or in response to defendant's discussion of the major life activity requirement is an inability to engage in heavy lifting, pushing, pulling or similar strenuous physical tasks. n16

> n16 At one point in their brief, plaintiffs reiterate Ms. Nerosa's medical conditions and seem to suggest that this satisfies the requirement of a disability. Insofar as this was their intent, plaintiffs appear to confuse or conflate an impairment with a disability.

[*24]

Some capacity for lifting is of central importance to most people's daily lives. See 29 C.F.R. App. § 1630.2(i). n17 A limitation on the ability to lift, however, does not substantially limit an individual from performing activities of central importance to most people's daily lives. See Mellon v. Federal Express Corp., 239 F.3d 954, 957 (8th Cir. 2001) (15 pound lifting restriction and requirement that plaintiff avoid other stress to right arm not disability); Marinelli, 216 F.3d at 363-364; Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1207 (8th Cir. 1997) ("general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability"); Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996); Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir. 1996).

> n17 Although no agency has been given the authority to issue regulations interpreting the term disability, the EEOC has nonetheless done so. See Sutton, 527 U.S. at 479. The Supreme

Court has expressly declined to decide what level of deference the interpretive guidelines are due. See Toyota, 122 S. Ct. at 690; Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 563 n.10, 144 L. Ed. 2d 518, 119 S. Ct. 2162 (1999), Sutton, 527 U.S. at 480. The Third Circuit, however, has relied on the regulations and appended interpretative guidelines promulgated by the agency including the referenced guideline suggesting that lifting can be a major life activity. See Marinelli v. City of Erie, 216 F.3d 354, 363 (3d Cir. 2000). Although not specifically so listed by the EEOC, pushing and pulling would seem to be sufficiently comparable manual tasks. There is no sound basis, however, for the suggestion that the ability to perform strenuous physical tasks is a major life activity.

[*25]

The inability to engage in strenuous and heavy lifting, pulling or pushing does not render Ms. Nerosa disabled. Her conclusory allegation that she has a disability is unsupported by her actual factual allegations.

Ms. Nerosa also asserts that she was terminated because of her "record of impairment and the defendant employers' erroneous perception of her inability to perform the essential functions of her job."

To maintain a claim based on a record of an impairment, a plaintiff must show she had an impairment which substantially limited a major life activity. See Olson v. General Electric Astrospace, 101 F.3d 947, 953 (3d Cir. 1996), Kresge v. Circuitek, 958 F. Supp. 223, 225 (E.D. Pa. 1997). Plaintiffs do not allege facts which would show that Ms. Nerosa's condition substantially limited a major life activity at the time of her termination or in the past. She has failed to set forth a cognizable claim under 42 U.S.C. § 12102(2)(B).

Individuals who are regarded as having a disability are deemed disabled within the meaning of the ADA. See 42 U.S.C. § 12102(2)(C). To maintain a claim under this [*26] subsection, a plaintiff must show that a covered entity entertains the misperception that she has an impairment that substantially limits a major life activity when in fact she has no such impairment or has an impairment that is not so limiting. See Sutton, 527 U.S. at 489; Tice v. Centre Area Transportation Authority, 247 F.3d 506, 514 (3d Cir. 2001). The employer must have perceived that the impairment substantially limited plaintiff in a major life activity and not merely with respect to a particular job. See Murphy v. United Parcel Service, 527 U.S. 516, 522, 144 L. Ed. 2d 484, 119 S. Ct. 2133 (1999); Taylor v. Pathmark

2002 U.S. Dist. LEXIS 16210, *

*Stores, Inc., 177 F.3d 180, 192 (3d Cir. 1999)* ("an employer who simply and erroneously believes that a person is incapable of performing a particular job will not be liable under the ADA").

The mere fact that an employer is aware of an employee's impairment does not demonstrate that the employer regarded the employee as disabled. See *Kelly, 94 F.3d at 109.* That defendant knew plaintiff was incapable of engaging in heavy lifting, pushing or pulling would not demonstrate that the **[*27]** employer perceived her as being disabled. See *Thompson v. Holy Family Hosp., 121 F.3d 537, 541 (9th Cir. 1997).*

Plaintiffs assert that defendant was under the misperception that Ms. Nerosa was unable to perform the essential functions of her job. They do not allege any facts, however, from which it reasonably appears that defendant regarded her as incapable of performing a class or broad range of jobs or was otherwise substantially limited in a major life activity as required to maintain a claim under *42 U.S.C. § 12102*(2)(C). See *Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 784 (3d Cir. 1999).*

The only basis provided in the complaint for any perception or misperception by defendant regarding plaintiff's impairment is the note from plaintiff's physician which she presented to Mr. Kiernan on December 1, 2000. That note states only that plaintiff should refrain from heavy or strenuous pushing, pulling or physical tasks. One can reasonably infer that upon reading the note, Mr. Kiernan would perceive that plaintiff could not perform the referenced tasks but not that she was substantially limited in a major life activity. **[*28]** As it is not alleged that heavy or strenuous physical tasks were part of Ms. Nerosa's job duties, one cannot reasonably infer that Mr. Kiernan would perceive even that she was physically incapable of performing her particular job.

The failure of an employer to make reasonable accommodations for a disabled employee is also a form of actionable discrimination. See *42 U.S.C. § 12112*(b)(5)(A). Plaintiffs assert that defendant failed to accommodate Ms. Nerosa but do not elaborate. There is no allegation that defendant required Ms. Nerosa to perform heavy or strenuous physical tasks or forbade her to utilize subordinates to perform such tasks if and as needed. Rather, plaintiffs assert that defendant perceived Ms. Nerosa was unable to perform her job and suggest that the appropriate "accommodation" was to allow her to continue to do so as she had been.

A perception that an employee is incapable of performing a particular job is not the same as a perception that she is disabled. Moreover, an employer is not obligated to accommodate a perceived disability by

ignoring it or otherwise. See *Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999),* **[*29]** cert. denied, *528 U.S. 1078, 145 L. Ed. 2d 601, 120 S. Ct. 794 (2000); Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999); Newberry v. East Texas State University, 161 F.3d 276, 280 (5th Cir. 1998); Danyluk-Coyle v. St. Mary's Med. Ctr., 2001 WL 771048, *3* (E.D. Pa. Apr. 5, 2000); *Balliett v. Heydt, 1997 U.S. Dist. LEXIS 14913, 1997 WL 611609, *6* (E.D. Pa. 1997), aff'd, *176 F.3d 471* (3d Cir.), cert. denied, *528 U.S. 877, 145 L. Ed. 2d 157, 120 S. Ct. 186 (1999).* See also *Taylor, 177 F.3d at 196* (noting it would be "odd to give an impaired but not disabled person a windfall because of her employer's erroneous perception of disability when other impaired but not disabled people are not entitled to accommodation").

## C. Loss of Consortium

A claim for loss of consortium arises from the marital relationship and is based on the loss of a spouse's services and companionship resulting from an injury. See *Cleveland v. Johns-Manville Corp., 547 Pa. 402, 690 A.2d 1146, 1149 (Pa. 1997), Sprague v. Kaplan, 392 Pa. Super. 257, 572 A.2d 789 (Pa. Super. 1990).* **[*30]** Loss of consortium is a derivative claim. See *Patterson v. American Bosch Corp., 914 F.2d 384, 386 n.4 (3d Cir. 1990); Washkul v. City of Philadelphia, 998 F. Supp. 585, 590 (E.D. Pa. 1998); Stipp v. Kim, 874 F. Supp. 663, 666 (E.D. Pa. 1995); Little v. Jarvis, 219 Pa. Super. 156, 280 A.2d 617, 620 (Pa. Super. 1971).* It is limited to situations which the other spouse may recover in tort. See *Murray v. Commercial Union Ins. Co., 782 F.2d 432, 438 (3d Cir. 1986); Szydlowski v. City of Philadelphia, 134 F. Supp. 2d 636, 639 (E.D. Pa. 2001).*

A spouse's right to recover under an employment discrimination statute does not support a loss of consortium claim. See *Hettler v. Zany Brainy, Inc., 2000 U.S. Dist. LEXIS 14537, 2000 WL 1468550, *7* (E.D. Pa. 2000); *Danas v. Chapman Ford Sales, Inc., 120 F. Supp. 2d 478, 489 (E.D. Pa. 2000)* (dismissing loss of consortium claim alleged to derive from spouse's ADEA and PHRA claims); *Stauffer v. City of Easton, 1999 U.S. Dist. LEXIS 11407, *1* (E.D. Pa. July 20, 1999) See also *Quitmeyer v. Southeastern Pennsylvania Transportation Authority, 740 F. Supp. 363, 370 (E.D. Pa. 1990)* **[*31]** (no spousal recovery for loss of consortium based on violations of other spouse's civil rights). The only claims asserted by Ms. Nerosa are for employment discrimination under Title VII, the ADA, the ADEA and the PHRA.

## D. Defendant's Request for Sanctions

Defendant refers to "numerous deficiencies" in plaintiffs' complaint which it not altogether uncharitably

characterizes as "quite frankly a mess." Defendant, however, has not moved for sanctions under Rule 11. Defendant asks for an award of attorney's fees incurred in filing its reply memorandum in response to "completely irrelevant" matters argued at length in plaintiff's voluminous opposition brief. Defendant relies on a court's inherent authority to impose sanctions upon an attorney for bad faith, vexatious, wanton, or oppressive actions in the conduct of litigation. See *Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991).*

An award of fees and costs pursuant to the court's inherent authority to control litigation generally requires a finding of bad faith. See *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions, 278 F.3d 175, 181 (3d Cir. 2002)* [*32] Bad faith exists where there is some indication of an intentional advancement of a baseless contention for an ulterior purpose such as harassment or delay. See *Ford v. Temple Hosp., 790 F.2d 342, 347 (3d Cir. 1987), Loftus v. Southeastern Pennsylvania Transportation Authority, 8 F. Supp. 2d 458, 461 (E.D. Pa. 1998)* The exercise of a court's inherent power to sanction should generally be reserved for cases of egregious conduct where the use of such inherent power is clearly necessary. See *Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 109 (3d Cir. 1999), Martin v. Brown, 63 F.3d 1252, 1265 (3d Cir. 1995).*

Plaintiffs' complaint and brief are prolix and often redundant. Their brief is largely unresponsive to the deficiencies noted in defendant's motion to dismiss and contains many misstatements of applicable principles of law. Plaintiffs needlessly engage in a lengthy discussion in which they object to the investigatory procedures employed by the EEOC. This is followed by a lengthy discussion of the elements of an age discrimination claim which defendant did not move to dismiss. Plaintiffs continue to assert [*33] claims of age and disability discrimination under Title VII which clearly prohibits only discrimination based on race, color, religion, gender or national origin.

Defendant, however, has made no showing that plaintiffs' submissions were made in bad faith for an improper purpose rather than through carelessness or a tenacious form of wishful thinking by counsel. While plaintiffs have unnecessarily complicated the litigation of this action and have made some conspicuous or glaring mistakes, terms used to define egregious, their conduct falls short of atrocious, heinous, monstrous or outrageous, other synonyms for egregious. The court is not convinced that an exercise of the inherent power to impose sanctions is required in the circumstances presented.

**IV. Conclusion**

Ms. Nerosa has failed to exhaust or to plead cognizable hostile work environment or retaliation claims. She has failed to plead a cognizable claim of unlawful disability discrimination or to specify pertinent unpled facts she inadvertently omitted in response to defendant's clear identification of the deficiencies in the disability claims as pled. Mr. Nerosa has failed to state a cognizable loss for consortium [*34] claim. Punitive damages are unavailable under the ADEA or PHRA.

Ms. Nerosa has exhausted and adequately pled claims of gender discrimination under Title VII and the PHRA. Defendant has not challenged the legal sufficiency of Ms. Nerosa's claims of age discrimination under the ADEA and PHRA or her claim under the Equal Pay Act. Defendant does not contest that punitive damages are available under Title VII.

Consistent with the foregoing, the court will grant defendant's motion to dismiss Ms. Nerosa's hostile work environment and disability discrimination claims in Counts I and III; her age hostile work environment claim in Count II; her claims in Count IV for punitive damages under the PHRA, the ADEA and the ADA; and, her claims in Count V for an age and disability hostile work environment, and for age and disability discrimination under Title VII. Counts VI (ADA disability discrimination), VII (ADA failure to accommodate), VIII (PHRA disability discrimination), IX (retaliation), X (retaliation) and XI (loss of consortium) will be dismissed in their entirety.

Defendant's request for sanctions will be denied.

**ORDER**

AND NOW, this    day of August, 2002, upon [*35] consideration of defendant's Motion to Dismiss (Doc # 3) and plaintiffs' response thereto, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** as to plaintiff's hostile work environment and disability discrimination claims in Counts I and III; age-based hostile work environment claim in Count II; punitive damage claims under the PHRA, the ADEA, and the ADA in Count IV; hostile work environment, age and disability discrimination claims in Count V; and all claims asserted in Counts VI, VII, VIII, IX, X and XI; and, said Motion is otherwise **DENIED. IT IS FURTHER ORDERED** that defendant's request for sanctions is **DENIED.**

**BY THE COURT:**

**JAY C. WALDMAN, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOWARD L. MOON, JR.,                           )
                                               )
                    Plaintiff,                 )
                                               )
            v.                                 )    C.A. No. 05-261-JJF
                                               )
THE DELAWARE RIVER AND BAY AUTHORITY,          )    JURY TRIAL DEMANDED
                                               )
                    Defendant.                 )

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 3, 2005, I electronically filed a true and correct

copy of the foregoing **Unreported Decisions to Defendant's Opening Brief In Support Of Its**

**Motion For Judgment On The Pleadings and this Certificate of Service** with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

Jeffrey K. Martin (Bar I.D. 2407)
Keri L. Morris (Bar I.D. 4656)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Adria B. Martinelli
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com
Attorneys for Defendants
Delaware River and Bay Authority