# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HOWARD L. MOON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-261-JJF |
| | ) | |
| THE DELAWARE RIVER AND BAY AUTHORITY, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## UNREPORTED OPINIONS, PART 1, TO
## DEFENDANT'S REPLY BRIEF IN SUPPORT OF
## ITS MOTION FOR JUDGMENT ON THE PLEADINGS

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6623
Facsimile: (302) 576-3282, 3314
wbowser@ycst.com; amartinelli@ycst.com
Attorneys for Defendant
Delaware River and Bay Authority

DATED:      September 15, 2005

LEXSEE 1998 US DIST LEXIS 9100

**CHRISTINE A. EBERT, Plaintiff, v. OFFICE OF INFORMATION SYSTEMS, an Agency of the State of Delaware, Defendant.**

**C.A. No. 97-530-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 9100*

**June 12, 1998, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion to dismiss denied in part and granted in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For plaintiff: Roy S. Shiels, Esquire, Brown, Shiels & Chasanov, Dover, Delaware.

For defendant: Elizabeth D. Maron, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: June 12, 1998
Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

Plaintiff Christine A. Ebert filed this action on September 18, 1997 against defendant Office of Information Systems ("OIS"), an Agency of the State of Delaware, asserting a claim under the Civil Rights Act of 1964, *42 U.S.C. § 2000(e)* et seq. for sexual harassment, failure to promote, and retaliation. (D.I. 1) Plaintiff alleges that the actions of her manager and OIS, which were willful and intentional acts based on discriminatory animus, resulted in physical and mental abuse, including a mental breakdown disabling her from work. (D.I. 1) Currently before

the court is defendant's motion to dismiss. (D.I. 5) This court has jurisdiction pursuant to *28 U.S.C. § 1331.*

For [*2]  the reasons stated below, defendant's motion to dismiss will be denied in part and granted in part.

**II. BACKGROUND**

Beginning on or about October 16, 1980, plaintiff began employment with OIS as an Application Support Specialist. (D.I. 10 at A4) Plaintiff subsequently rose to the position of Management Information Specialist. (D.I. 10 at A4)

On October 28, 1994, plaintiff completed, as part of her employment, a Position Classification Questionnaire ("PCQ"). (D.I. 7 at A19-A24) In the general comments section of the questionnaire, plaintiff wrote the following:

> To be successful in this position, an incumbent must have an extremely large amount of endurance, resolve, persistence, resignation, stamina, backbone, guts, moxie, resilience, spirit, backbone, spunk, strength, pluck, chutzpa[] and determination to deal with items such as Attachment A. This item was given to me at the beginning of the first interview I had in this building with OIS-ASG.

(D.I. 7 at A23) Attachment A was a "puzzle" containing a sexually offensive suggestion. (D.I. 7 at A24)

In November 1994, Assistant Manager of OIS, Thomas Burn, brought plaintiff's PCQ to the attention of Richard [*3]  Iovino, Manager of OIS. After reviewing the PCQ, Iovino had Burn bring plaintiff to his office to discuss her allegations. (D.I. 7 at A4; A26-A27; A29-A30; A36) Plaintiff refused to cooperate in Iovino's in-

vestigation, denying that the conduct was sexual harassment (although admitting it was inappropriate) and refusing to identify the individual(s) who gave her the document in question. (D.I. 7 at A4; A26-A27; A29-A30; A36) As a result of her refusal to cooperate, Iovino reprimanded plaintiff, informing her that he would proceed with a "formal contact" for insubordination should she refuse to identify the individual(s) involved and that she was free to check the Merit Rules if she were in doubt as to his authority to do so. (D.I. 7 at A4; A26-A27; A29-A30; A36) Plaintiff left the room, returning a short while later with John Nold, Executive Director of OIS, whom she had asked to join the meeting. (D.I. 7 at A4; A26-A27; A29-30; A36) Iovino again asked plaintiff to identify the individual(s) involved and again she refused, indicating that Iovino was aware of the individuals' identities. (D.I. 7 at A4; A26-A27; A29-A30; A36) At no point during the meeting did Nold direct plaintiff to [*4] answer Iovino's questions. (D.I. 7 at A36)

On November 10, 1994, Iovino filed a "formal contact," charging plaintiff with insubordination, falsification of records, and insulting words toward the public or any state employee. (D.I. 7 at A4; A26-A27; A29-A30; A31-A32) Nold, acting as Hearing Officer for the "Third Step Grievance Proceeding" held on December 9, 1994, found that there existed insufficient testimony to substantiate the charges of falsification and insulting words; however, he found the charge of insubordination to be supported by the record. (D.I. 7 at A33-A34)

On September 5, 1995, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against defendant, alleging continuing acts of sexual discrimination and retaliation beginning in November 1981 and continuing until November 10, 1994. (D.I. 7 at A2) Specifically, the charge alleged (1) an on-going course of sexually offensive behavior on the part of management; and (2) retaliation on the part of defendant and Iovino after plaintiff complained to management about a sexually offensive item she had been given during her initial interview [*5] in 1980. (D.I. 7 at A2) In the charge, plaintiff stated:

> Mr. Iovino treats the women he supervises in a demeaning and insulting manner. In February, 1995, during a meeting of the entire office (approximately sixty people), Mr. Iovino criticized the women in the office. He said: "You women, you want to be treated equal but you're not willing to work equal." He accused the women employees of abusing the flex time policy to care for their children. He also criticized

> the women for using their accumulated sick leave to stay home and care for their sick children. . . . During the February, 1995, meeting Mr. Iovino criticized the women in the office but did not criticize the men who used flex time or sick leave.

(D.I. 10 at A4)

On September 18, 1995, as part of the Fourth Step Grievance Decision, plaintiff's written reprimand for insubordination was upheld while all other references to her alleged misconduct were purged from her file. (D.I. 7 at A35-A38)

On April 12, 1996, the State responded to the EEOC Charge of Discrimination, denying all the allegations made therein. (D.I. 7 at A3-A39)

Plaintiff appealed the insubordination disciplinary action to the Merit Employee [*6] Relations Board ("MERB"). (D.I. 7 at A5; A39) On September 4, 1996, defendant agreed to void the written reprimand and remove it from plaintiff's personnel file, thereby mooting the MERB grievance. (D.I. 7 at A40-A41) Consequently, the grievance was dismissed on September 6, 1996. (D.I. 7 at A42)

On August 28, 1996, after the EEOC's settlement efforts had failed, Marjorie McLean, the EEOC investigator assigned to plaintiff's charge, wrote to plaintiff asking her to reply to defendant's answer to the charge. (D.I. 7 at A9-A12; A16-A17) On September 12, 1996, plaintiff responded with a four-page letter supplementing her charge. (D.I. 10 at A9-A12) In the letter, plaintiff emphasized that her complaint was one of "'CONTINUING ACTION' with the earliest date of '11/81' with the last[] being '11/10/94.'" (D.I. 10 at A10) She further indicated that her complaint was "not about one incident of sexual harassment," citing to a number of other incidents of "sexual harassment." (D.I. 10 at A11)

On June 20, 1997, the EEOC issued a 90-day "Right to Sue" letter and dismissed plaintiff's charge, stating that

> based upon its investigation, the EEOC is unable to conclude that the information [*7] obtained established violations of the statutes. This does not certify that the respondent is in compliance with the statutes.

(D.I. 7 at A43)

1998 U.S. Dist. LEXIS 9100, *

Plaintiff filed this action on September 19, 1997 alleging generally that "continuous discriminatory acts of defendant, and Manager Richard Iovino in particular, have over a period of years deprived plaintiff of rights granted her by, and protected by *42 USC Section 2000*(e) et. []seq., known as Title VII." (D.I. 1) Specifically, plaintiff alleges that (1) she has been denied advancement in status and pay because of her gender; (2) the behavior and statements of Iovino have resulted in a hostile work environment; (3) she has been retaliated against because of her complaints; (4) the discriminatory actions of Iovino and defendant "were willful and intentional acts based on discriminatory animus"; and (5) intentional misrepresentation of her work performance and interpersonal relationships caused or contributed to her lack of advancement in status and pay. n1 (D.I. 1)

n1 In a sworn affidavit dated January 1998 submitted as an attachment to her answering brief, plaintiff clarified an unspecified count in the complaint as follows:

2. That one count of the Complaint in [the case at bar] deals with impeding the upward reclassification of her position by administrative superiors, including a Richard Iovino.

3. That impeding consisted of inaction and the giving of incorrect information over an extended period of time, and no reclassification of the position of any male employee of the agency was treated in the same fashion.

4. She believes the impeding of the reclassification of her position occurred because of discrimination, and because she was retaliated against for raising complaints of discrimination.

(D.I. 10 at A27)

[*8]

## III. STANDARD OF REVIEW

Since the parties have referred to matters outside the pleadings, defendant's motion shall be treated as one for

summary judgment. n2 See *Fed.R.Civ.P. 12(b)*. Summary judgment should be granted only if the court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact is in dispute. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id. at 587* (quoting *Fed.R.Civ.P. 56(e)*). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (citations omitted). If the nonmoving [*9] party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)* (citation omitted). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer [*10] intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987))*.

n2 Rule 12(b) provides that

if, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion

1998 U.S. Dist. LEXIS 9100, *

shall be treated as one for sum-
mary judgment and disposed of as
provided by Rule 56, and all par-
ties shall be given reasonable op-
portunity to present all material
made pertinent to such a motion
by Rule 56.

*Fed.R.Civ.P. 12(b).*

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

In the instant action, defendant maintains that plain-
tiff's Title VII n3 claims for hostile work environment
and failure to promote are precluded because she failed
to exhaust her administrative remedies by not including
these claims in the charge filed with the EEOC. Defen-
dant, [*11] thus, asserts that plaintiff's complaint should
be dismissed. Alternatively, defendant requests that the
court require plaintiff file a more definite statement of
her claims.

n3 Title VII of the 1964 Civil Rights Act
provides in pertinent part:

(a) Employer practices. It shall be
an unlawful employment practice
for an employer--(1) to fail or re-
fuse to hire or to discharge any in-
dividual, or otherwise discriminate
against any individual with respect
to his compensation, terms, condi-
tions, or privileges of employ-
ment, because of such individual's
race, color, religion, sex, or na-
tional origin; or (2) to limit, segre-
gate or classify his employees or
applicants for employment in any
way which would deprive or tend
to deprive any individual of em-
ployment opportunities or other-
wise adversely affect his status as
an employee, because of such in-
dividual's race, color, religion, sex,
or national origin.

*42 U.S.C. § 2000e-2*(a).

The preconditions (exhaustion requirements) to a
suit under Title VII are [*12] the filing of a charge with
the EEOC and the receipt of the EEOC's notice of the
right to sue. See *42 U.S.C. § § 2000e-5*(e), 2000(e)-5(f).
Because the statutory scheme of Title VII emphasizes
informal means of achieving settlement over formal ad-
judication, a potential plaintiff normally is required to set
forth in the charge to the EEOC those allegations subse-
quently raised in the district court. See *Schanzer v. Rut-
gers University, 934 F. Supp. 669, 673 (D.N.J. 1996).*

In accordance with the exhaustion requirement,
there are limitations on the presentation of new claims in
the trial court. See *Howze v. Jones & Laughlin Steel,
Corp., 750 F.2d 1208, 1212 (3d Cir. 1984).* The parame-
ters of the resulting civil complaint that may follow a
notice of a right to sue from the EEOC are "'defined by
the scope of the EEOC investigation which can reasona-
bly be expected to grow out of the charge of discrimina-
tion,'" regardless of the actual scope of the EEOC inves-
tigation. *Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966
(3d Cir. 1978)* (quoting *Ostapowicz v. Johnson Bronze
Co., 541 F.2d 394, 398-99 (3d Cir. 1976),* cert. denied,
*429 U.S. 1041, 50 L. Ed. 2d 753, 97 S. Ct. 741 (1977)).*
[*13]  Therefore, a trial court may assume jurisdiction
over additional charges only if "the acts alleged in the
subsequent Title VII suit are fairly within the scope of
the prior EEOC complaint, or the investigation arising
therefrom." *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.
1996)* (quoting *Waiters v. Parsons, 729 F.2d 233, 237
(3d Cir. 1984)).* However, this standard must be applied
in accord with the "sound and established policy that
procedural technicalities should not be used to prevent
Title VII claims from being decided on the merits." *Re-
vis, 814 F. Supp. at 1216* (quoting *Gooding v. Warner-
Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984)).*

Where the allegations in the complaint were suffi-
ciently distinct from those presented in the EEOC charge
and were not part of the EEOC investigation, courts have
refused to entertain the expanded claims until administra-
tive procedures have been exhausted. See e.g., *Zalewski
v. M.A.R.S. Enterprises, Ltd., 561 F. Supp. 601, 604-05
(D. Del. 1982)* (finding the charge of gender discrimina-
tion presented to the EEOC and the claim of sexual har-
assment in the civil suit to be unrelated and independent
charges since the facts alleged [*14]  in the complaint
were wholly different from those set forth in the charge);
*Sandom v. Travelers Mortgage Services, Inc., 752 F.
Supp. 1240, 1246-48 (D.N.J. 1990),* aff'd without op.,
*998 F.2d 1005 (3d Cir. 1993)* (dismissing a sexual har-
assment claim that was not raised in the EEOC charge
because it arose from a set of wholly distinct facts and
thus would not have been discovered by a reasonable
EEOC investigation of the filed charge of sexual dis-
crimination). However, courts have heard claims not

specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint. See e.g., *Howze, 750 F.2d at 1212* (finding the claim in the civil suit that plaintiff was discriminated against because of her involvement with a "Black Caucus" explained the original EEOC charge, which alleged racial discrimination in job promotion); *Ostapowicz, 541 F.2d at 398-99* (finding that additional charges of gender discrimination filed during the pendency of the administrative proceedings may be considered "explanations of the original charge and growing out of it").

In the instant action, the charge [*15] filed with the EEOC alleged an on-going course of gender discrimination and retaliation. (D.I. 33 at A8) The question is whether or not a reasonable investigation would have led to the facts surrounding plaintiff's claims of hostile work environment and failure to promote. See *Zalewski, 561 F. Supp. at 604.*

Reviewing the EEOC complaint filed by plaintiff and her September 12, 1995 response to the EEOC inquiry, the court finds, as a matter of law, that plaintiff's hostile work environment claim qualifies under the above standard. First, there is a close nexus between the facts supporting plaintiff's charge of gender discrimination and those supporting the complaint's claim of hostile work environment. Second, an EEOC investigation of retaliation and gender discrimination based on the original charge would have disclosed the hostile work environment claim. Cf. *Zalewski, 561 F. Supp. at 605* (finding "the sole common denominator of the two charges [a male-female sexual discrimination claim and a sexual harassment claim based on termination for refusal to accept offer for homosexual favors] is the fact that the discrimination allegedly involved sex, yet the two sex discrimination [*16] claims were in no way 'alike or related.'") (citations omitted)). Third, in the instant action, the activity alleged by plaintiff in her charge to the EEOC and her supplemental letter could give rise to both gender discrimination and hostile work environment claims. See *Ostapowicz, 541 F.2d at 399* ("The additional charges filed during the pendency of the administrative proceedings may fairly be considered explanations of the original charge and growing out of it."); accord *Schanzer, 934 F. Supp. at 674.* Accordingly, the court finds that a reasonable investigation by the EEOC of plaintiff's charge would have encompassed the allegations raised in her complaint with regard to the hostile work environment claim.

Unlike the hostile work environment claim, however, plaintiff's failure to promote or advance claim does not fall within the scope of the EEOC complaint or a reasonable investigation thereof. First, there is nothing in the record to indicate that the EEOC investigated or had

any reason to investigate whether plaintiff had been discriminated against by defendant's failure to promote or advance her. Plaintiff's charge alleged continuing discriminatory and retaliatory conduct; [*17] there was no mention of or allegation of any facts to support a claim of failure to promote or advance in the charge or in her September 12, 1996 letter to the EEOC. See *Antol, 82 F.3d at 1295-96* (finding that a disability discrimination charge did not encompass a claim for gender discrimination even though investigation would have revealed that the position plaintiff (a man) was denied was filled by two female employees); *Parsons v. City of Philadelphia Coordinating Office of Drug & Abuse Programs, 822 F. Supp. 1181 (E.D. Pa. 1993)* (finding that claims of retaliation and race discrimination for failure to compensate "out-of-class" for additional duties did not encompass a claim for failure to promote despite the fact that the EEOC investigation considered whether plaintiff was qualified for the position). Second, a claim of failure to promote does not logically flow from, and would have required investigation of events not raised by, claims of gender discrimination or retaliation. See *Parsons, 822 F. Supp. at 1183-84;* cf. *Foust v. FMC Corp., 962 F. Supp. 650 (E.D. Pa. 1997)* (finding that the additional allegation raised in the complaint was within the scope of the [*18] EEOC investigation since it "merely added other improper motives" for the same event raised in the charge). The record indicates that the occurrences of alleged failure to promote were distinct incidents from those of alleged gender discrimination and retaliation. Third, under the circumstances, neither the EEOC nor defendant were put on notice of plaintiff's failure to promote claim; thus the EEOC was not "afforded . . . the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Antol, 82 F.3d at 1296;* see also, *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 485 (3d Cir. 1997)* ("To allow a stale claim to proceed would be inconsistent with the administrative procedure established by Title VII which contemplates prompt filing of charges so that discrimination controversies may be resolved promptly."). Accordingly, the court concludes that plaintiff's failure to promote or advance claim is a distinct claim not within the scope of the EEOC charge. See *Rush, 113 F.3d at 483-85* (finding plaintiff's failure to promote and train claim distinct from her sexual harassment claim because, inter alia, the claims [*19] address different types of conduct). Consequently, to the extent that Counts I, n4 III, n5 and V n6 of the complaint allege failure to promote or advance claims, they shall be dismissed for failure to exhaust administrative remedies. n7

n4 Count I provides in relevant part:

10. By constant belittling of the work performance and contributions to the agency of women in general, and plaintiff in particular, Iovino made it clear to plaintiff as well as to subordinate supervisors that he did not believe females sufficiently contributed to be given advancements in status and pay equal to males.

11. Despite satisfactory or better than satisfactory work performance plaintiff has consistently been, over a period of years, denied advancement in status and pay within the agency because of her sex leading to severe frustration and mental distress, including a mental breakdown disabling plaintiff from work.

(D.I. 1)

n5 Count III provides in relevant part:

16. Plaintiff on a number of occasions complained to her supervisor or to Manager Iovino of the discriminatory treatment, and hostile work atmosphere, based on specific events which had occurred.

17. Defendant and Iovino took little or no action to effectively address plaintiff's complaints but instead retaliated against plaintiff because of those complaints.

(D.I. 1)

[*20]

n6 Count V provides in relevant part;

21. The actions of Iovino were intended to, and did, cause higher level administrative superiors within the agency to have a false impression of plaintiff's work performance and interpersonal relationships within [the] agency.

22. The intentional misrepresentations of plaintiff's work performance and interpersonal relationships caused or contributed to plaintiff's lack of advancement in status and pay, and the mental frustration and stress thereby caused plaintiff.

(D.I. 1)

n7 Even assuming arguendo that plaintiff exhausted administrative remedies with respect to the failure to promote or advance claim, she has failed to present sufficient evidence to establish a prima facie case under Title VII. In order to establish a prima facie case of failure to promote or advance a plaintiff must show:

(a) she belongs to a protected category; (b) she applied and was qualified for a promotion; (c) despite her qualifications, she was denied the promotion; and (d) other employees of similar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied.

*Lewis v. State of Delaware Dept. of Public Instruction, 948 F. Supp. 352, 358 (D. Del. 1996).* In the instant action, even accepting her allegations as true, plaintiff has not made such a showing. Specifically, although plaintiff alleges that Iovino impeded reclassification of her position (D.I. 1 at P 6A) and indicated that women did not deserve advancements in status and pay equal to that of men (D.I. 1 at P 10), plaintiff has failed to allege, much less establish, that she was qualified for a promotion or advancement and that male employees of similar qualifications were promoted or advanced while she was not.

[*21]

**B. The EEOC 300-Day Filing Requirement**

Defendant contends that only those discriminatory acts which occurred during the 300 days prior to the fil-

ing of the EEOC charge are actionable. Consequently, defendant argues that to the extent plaintiff's allegations are based on events occurring prior to November 9, 1994 the charge is untimely and that plaintiff failed to preserve her claims. Defendant contends that the EEOC charge relates solely to the 1994 discipline, which it argues was not raised in plaintiff's complaint.

According to *42 U.S.C. § 2000e-5*(e), a charge of employment discrimination must be filed within 300 days "after the alleged unlawful employment practice occurred." This filing requirement, however, "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 71 L. Ed. 2d 234, 102 S. Ct. 1127 (1982)*. In *West v. Philadelphia Electric Co., 45 F.3d 744 (3d Cir. 1995)*, the Third Circuit determined the continuing violation theory to be one such equitable exception to the timely filing requirement. [*22] See *id. at 754.* Under this theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." Id. To establish a continuing violation, a plaintiff must demonstrate (1) that at least one discriminatory act occurred within the filing period and (2) that the harassment is "'more than the occurrence of isolated or sporadic acts of intentional discrimination'" but is a "persistent, on-going pattern." *Id. at 754-55* (quoting *Jewett v. Int'l Tel. & Tel. Corp., 653 F.2d 89, 91 (3d Cir. 1981)); accord Rush, 113 F.3d at 481 (3d Cir. 1997)*. In determining whether a continuing violation exists, the court must consider:

> (i) subject matter--whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence--whether the nature of the violations would trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

*West, 45 F.3d at 755 n.9* (adopting [*23] the approach taken by the Fifth Circuit in *Berry v. Bd. of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir. 1983)); accord Rush, 113 F.3d at 481-82.* "Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, however, the 300-day filing period becomes irrelevant--as long as at least one viola-

tion has occurred within that 300 days." *West, 45 F.3d at 755.*

As the Third Circuit in West noted, "there is a natural affinity between" hostile work environment and continuing violation claims. *Id. at 755.*

> "In the arena of sexual [or racial] harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature: a hostile environment results from acts of sexual [or racial] harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment. Accordingly, claims based on hostile environment sexual [or racial] harassment often straddle both sides of an artificial statutory cut-off date."

Id. (quoting *Jenson v. Eveleth Taconite* [*24] *Co., 824 F. Supp. 847, 877 (D. Minn. 1993))* (alterations in original).

In the case at bar, a reasonable jury could conclude that plaintiff has alleged sufficient facts to support application of the continuing violation theory to her hostile environment claim. n8 First, the record indicates that there were episodes of alleged harassment after the 300-day period began to run on November 9, 1994. n9 Specifically, plaintiff cited the "formal contact" she received on November 10, 1994 and a February 1995 office meeting during which Iovino allegedly criticized the women, but not the men, in the office. Second, the record supports a finding that plaintiff experienced continuous sexual harassment, including intensified harassment after the filing of the EEOC charge. Plaintiff has cited a series of allegedly discriminatory incidents occurring consistently over the period of her employment. n10 These purported incidents all involved sexual harassment in some form, either demeaning comments, rude behavior, inappropriate touching, or discriminatory conduct. The alleged harassment, i.e., impeding the classification of her position, grabbing by a co-worker, Iovino's derogatory statements, was [*25] not of such a nature as to "trigger a duty of the plaintiff to assert [her] rights arising from the deprivation." *45 F.3d at 756.* Since plaintiff has alleged sufficient facts to support use of the continuing violation theory, the 300-day filing period is irrelevant. See id. Consequently, plaintiff may present evidence of the entire continuing violation. n11 See id.

n8 Although in the charge, plaintiff alleged the first and last dates of discrimination as being November 1981 and November 10, 1994, respectively, she also indicated that the discriminatory activity was continuing.

n9 Plaintiff filed the requisite EEOC charge on September 25, 1995. Consequently, the 300-day retrospective limitations period began to run on November 9, 1994.

n10 In many, if not most, of her allegations, plaintiff fails to specify the date of the purported discriminatory conduct. However, viewing the facts and all reasonable inferences therefrom in the light most favorable to the plaintiff, sufficient indicia exist for the court to discern a continuous pattern of allegedly discriminatory conduct.

n11 Since the court has already concluded that plaintiff's hostile work environment claim falls within the scope of the EEOC investigation, plaintiff also may present evidence of incidents of sexual harassment occurring subsequent to the filing of the charge. See *Robinson v. Dalton,, 107 F.3d 1018 at 1025; Waiters, 729 F.2d at 235.*

[*26]

## C. Plaintiff's Hostile Environment Claim

Defendant next contends that plaintiff has failed to produce sufficient evidence to establish a prima facie case of hostile work environment under Title VII. The Supreme Court has recognized that Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)* ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB, 477 U.S. at 67* (quoting *Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982).* In order to establish a hostile work environment,

a plaintiff must establish "by the totality of the circumstances, the existence of a hostile [*27]  or abusive working environment which is severe enough to affect

the psychological stability of a minority employee."

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)* (quoting *Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989).* Specifically, a plaintiff must demonstrate that:

(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Id.*

Defendant argues that plaintiff has failed to make the specific allegations required to establish factors four and five of the Andrews test. n12 In addressing the objective standard of factor four, the Third Circuit noted:

To make out a case under Title VII it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'"

*895 F.2d at 1485* (quoting  [*28]  *Tomkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044, 1047 n.4 (3d Cir. 1977)* (citation omitted)). The court went on to hold that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Id.* Review of the record reveals that plaintiff has alleged incidents involving demeaning comments, inappropriate touching, pornographic material, and discriminatory conduct. Considered as a whole and in a light most favorable to plaintiff, the court concludes that a reasonable juror could conclude that these incidents "produce a work environment hostile and offensive to women of reasonable sensibilities." *895 F.2d at 1486.*

n12 Defendant does not dispute that plaintiff has alleged sufficiently factors one, two, and three.

In accord with the agency principles, to establish respondeat superior liability as required by the fifth factor, a plaintiff must demonstrate

that management-level employees [*29] had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action.

Id. Defendant argues that by statute only Nold, the Executive Director of OIS, had sufficient authority so as to be an agent for Title VII purposes and that since plaintiff does not assert that Nold knew of the alleged hostile environment, defendant has no liability under Title VII. The Third Circuit, however, has stated that, under Title VII, "'the act of a supervisory employee or agent is imputed to the employer.'" *Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 751 (3d Cir. 1990)* (quoting *Meritor Sav. Sank, FSB, 477 U.S. at 75).* In Levendos, the Third Circuit found that a person with the power to hire and fire, or influence hiring and firing decisions, is a supervisory agent of the employer. See *909 F.2d at 751-52; Antol, 82 F.3d at 1301* (finding that an employee's discriminatory acts may be imputed to the employer if the employee is within "'the chain of decision-makers who had the authority to hire and fire plaintiff'") (quoting *Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079,*

*1085 (3d Cir.* [*30] *1995).* Thus, even if Nold was the only individual with the authority to hire and fire and was without knowledge of the sexually hostile environment, respondeat superior liability could still be found as long as a supervisory employee in a position to affect plaintiff's work situation subjected her to sexual harassment, i.e, contributed to the hostile work environment. See *Harris, 510 U.S. at 21-23.*

Review of the record reveals that plaintiff has produced sufficient evidence to establish respondeat superior liability. Plaintiff has alleged that Iovino, her manager, not only acquiesced in, but also wilfully and intentionally participated in, the hostile work atmosphere. She also contends that she complained repeatedly to her supervisor as well as to Iovino of the discriminatory treatment but to no avail. A reasonable jury could conclude that Iovino, as well as plaintiff's supervisor, are middle-management employees whose actions are properly imputed to defendant. Accordingly, the court concludes that the five-part Andrews test has been satisfied and plaintiff's claim for hostile work environment should go forward.

## IV. CONCLUSION

For the reasons stated above, the [*31] court finds that there exist genuine issues of material fact relating to plaintiff's claims of hostile environment discrimination under Title VII. The court further finds that to the extent plaintiff alleges failure to promote or advance claims in Counts I, III, and V, they shall be dismissed for failure to exhaust administrative remedies. Therefore, defendant's motion to dismiss shall be denied in part and granted in part. An appropriate order shall issue.

LEXSEE 2005 US DIST. LEXIS 1608

THOMAS HOLMAN v. TRAMMELL CROW CO.

CIVIL ACTION NO. 03-3603

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2005 U.S. Dist. LEXIS 1608; 95 Fair Empl. Prac. Cas. (BNA) 386*

**February 3, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Holman v. Trammell Crow Co., 2005 U.S. Dist. LEXIS 3501* (E.D. Pa., Mar. 7, 2005)

**DISPOSITION:** Defendant's motion for summary judgment granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For THOMAS HOLMAN, Plaintiff: JOSEPH DOMINIC DINOTO, CHERRY HILL, NJ; MARDI HARRISON, DOYLESTOWN, PA.

For TRAMMELL CROW CO., Defendant: JENIFER M. BOLOGNA, PAUL, HASTINGS, JANOFSKY & WALKER LLP, STAMFORD, CT; LEAH C. LIVELY, PAUL HASTINGS JANOFSKY & WALKER, LLP, SAN DIEGO, CA; MARY C. DOLLARHIDE, PAUL, HASTINGS, JANOFSKY, & WALKER, SAN DIEGO, CA; PETER M. SCHULTZ, PAUL HASTINGS JANOFSKY & WALKER, LLP, STAMFORD, CT; STEPHEN J. IMRIGLIA, HECKER BROWN SHERRY & JOHNSON LLP, PHILADELPHIA, PA.

**JUDGES:** JACOB P. HART, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JACOB P. HART

**OPINION:**

ORDER AND OPINION

JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

I. Introduction

Plaintiff Thomas Holman brought this action against his former employer, Trammell Crow Co. ("TCC"). He has asserted counts under *42 U.S.C. § 2000e et seq.* ("Title VII") for race discrimination, and retaliation for complaints of race discrimination. He has also asserted counts for racial discrimination under *42 U.S.C. § 1981*.

TCC has moved for summary judgment on Holman's entire case. For the reasons that follow, its motion will be granted in part and denied in part. I will [*2] dismiss (a) those claims based on Holman's termination; and (b) Holman's Title VII claim for hostile work environment.

II. Factual Background

Between 1996 and September 30, 2002, TCC provided real estate management and facilities services to University City Associates ("UCA"), which owned apartment complexes near the University of Pennsylvania. Declaration of John Greenwood, attached to TCC's Motion; Letter attached as Exhibit 26 to Declaration of Leah Lively, attached to TCC's Motion. At the time it was retained by UCA, TCC hired many of UCA's workers, including Holman, who had worked for UCA as a painter. Holman Deposition Excerpt, attached as Exhibit 14 to Lively Declaration, at page 23. In his offer letter from TCC, Holman's employment was made contingent upon its management contract with UCA. Exhibit 6 to Lively Declaration.

Holmes' title with TCC was "Maintenance Assistant." Id. at 28. His first supervisor was Jim Quindlen, who was replaced in the summer of 2000 by John Economos. Statement of Louise Heick at P P 4 and 5. Under these Property Managers, Holman received stellar performance reviews, complementing his speed, efficiency, and manner of relating to residents. [*3] Exhibits 9 and 11 to Lively Declaration, attached to TCC's Motion. Quindlen referred to Holman as his "MVP." Exhibit 9, supra.

Although Holman's job title did not change, Economos complimented him in his November, 1999, review on several projects he had undertaken on his own initiative. Exhibit 11, supra, at D00024 and Exhibit 12 at D00021. Economos also wrote that he would work with Holman to develop a floor finishing project Holman proposed, and commented that "this will give Tom an opportunity to learn more of the business side of decisions." Exhibit 11 at D00024 and 12 at D00021. In a section of the form which asked: "What added training or experience would improve the employee's performance in the present job and/or prepare the employee for advancement?" Economos wrote: "Taking courses in management skills and motivating people, combined with his experience will help him to achieve further career growth." Exhibit 12 at D00023.

According to Holman, Economos also gave him increasing responsibility in dealing with sub-contractors, eventually permitting him to receive bids and award contracts. Holman Deposition Excerpt, supra, at 80, 85-88.

According to TCC, however, [*4] Economos's sector, known as Zone 2, was poorly managed. Heick Declaration, supra, at P5. In May, 2000, Mark Brady replaced Economos as the Zone 2 supervisor. Id. at PP6-7; Holman Deposition Excerpt, supra, at 93.

Shortly after Brady and Holman began working together, they disagreed on a contracting matter. Holman was about to award contracts to two subcontractors: The Cors Company, which was owned by African-Americans, and Rusario, a white-owned business. Brady Declaration, attached to TCC's motion, at P9. At this meeting, Brady said that he "didn't like" Cors. Holman Deposition Excerpt, supra, at 99. According to Brady, he explained to Holman that this was because Cors's work in the past had been slow. Brady Declaration, supra. Nevertheless, both bids were forwarded to Brady's superiors and approved. Id.

According to Holman, as work progressed on the job for which Cors and Rusario were hired, Brady told Holman that he did not want Cors working inside the buildings, but only on the exteriors. Holman Deposition Excerpt at 102. On one occasion, having found Cors employees working inside a building, Brady allegedly screamed at Holmes: "What did I tell you? I [*5] don't want your kind of people in the buildings." Holman Deposition at 111-112. Holman has stated: "At that point, I called him a racist." Id.

According to Brady, he reported Holman's accusation of racism to TCC's Alliance Director, John Greenwood. Brady Declaration at P10. There followed three meetings in the space of ten days between Holman and various TCC higher-ups, including Louise Heick, Jim

Quindlen, Jennifer Mathewson, DeeAnn Kelly, and John Greenwood. Holman Deposition at 115, 123, 187.

Holman claims that he told Heick and Quindlen that Brady was interfering with his responsibility for hiring subcontractors, but that he was told that hiring decisions were Brady's, and it was pointed out that Holman himself had terminated Cors in the past because it was not going to meet a deadline. Holman Deposition at 117-118.

Holman claims, however, that Greenwood, and Kelly (who was TCC's Senior Manager of Human Resources), "confirmed that awarding contracts was part of [his] responsibilities." Holman Affidavit attached as Exhibit D to Holman's Response at P10. Holman also asserts that he told Greenwood and Kelly that he considered Brady to be racist, and that his co-worker, Tommy [*6] Brennan, told Kelly that he agreed with this. Id. at PP10 and 11.

In August, 2000, Brady reassigned Brennan and Kyle Meyers, who had previously worked as painters under Holman, to general maintenance. Brady Declaration at P 12, and Exhibit 2 to Brady Declaration. Holman was the only remaining painter. Exhibit 2 to Brady Declaration.

In September, 2000, Quindlen assigned Holman the job of single-handedly painting three fire towers. Quindlen Declaration at P5. Holman claims that he asked Quindlen for assistance, but that Quindlen refused. Holman Affidavit at P15. According to Holman, Fire Tower One was unheated, with broken windows, and pigeon droppings coating the floor. Id. at P16. Holman complained about this to the project manager, but was not given any assistance. Id. at P17. Although he has not submitted records to substantiate this, Holman claims that he was taken to the hospital on "several occasions" because he had become sick to his stomach from these conditions. Id.

Holman maintains that Tower Number Two contained lead and asbestos, and that he was not issued a mask. Id. Although this too is unsubstantiated by medical records, Holman has asserted that [*7] he was taken to the hospital after several days with lead exposure. Id.

On December 11, 2000, while he was painting Fire Tower One, Holman fell from his ladder. Holman Deposition at 254. Since he was alone, Holman called for help from his cell phone. Memorandum at 5. He lay in the tower waiting for help for approximately 20 minutes or half an hour. Holman Deposition at 260. As a result of the injury, Holman claims, he incurred a sprained left ankle, foot tarsal tunnel syndrome, and a herniated disc. Holman Affidavit at P22.

After his accident, Holman remained at home on Workers' Compensation. Holman Affidavit at 260. In

Case 1:05-cv-00261-GMS    Document 12    Filed 09/15/2005    Page 14 of 17

Page 3

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

September, 2002, UCA terminated its contract with TCC. Exhibit 24 to Lively Declaration. Holman was discharged, along with all other TCC employees working at UCA. Id. TCC has provided evidence that, of the 56 employees discharged, 20 were white. Charlene Trace Declaration at P9, and Exhibit 1 thereto. Holman was offered employment by the new maintenance contractor, but did not accept it. Exhibit 25. There is a disputed issue of fact as to whether Holman was physically capable of work at this time.

III. Legal Standard For Summary Judgment

Summary [*8] judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Celotex Corp. v. Catrett, supra at 325*; *Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).*

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. *Anderson v. Liberty Lobby, supra at 255*; *Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).* Nevertheless, [*9] Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra, at 323.*

III. Discussion

A. Claims Regarding Holman's Termination Will Be Dismissed

Holman has not shown that a question of material fact exists as to whether his termination was discriminatory or retaliatory. As discussed above, TCC has provided evidence that Holman formerly worked directly for UCA, and that his retention by TCC was contingent upon TCC's management contract with UCA. It has also shown that Holman's employment was terminated only when TCC lost this contract. Most important, Holman was terminated along with every other TCC employee working at UCA, regardless of race or relationship with management. And, like the other terminated employees,

Holman was offered employment by the new maintenance contractor.

Under both § 1981 and Title VII, a *prima facie* case of disparate treatment requires a plaintiff to demonstrate that (1) he is a member of a protected [*10] class; (2) he was qualified for the relevant position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably. *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).*

Since Holman cannot show the fourth factor -- i.e., that other, white, TCC employees were treated more favorably than he, he will not be able to make out a *prima facie* case of racial discrimination. See, e.g., *Tucker v. Merck & Co., Inc., 2004 U.S. Dist. LEXIS 11222, Civ. A. No. 03-5015, 2004 WL 1368823 (E.D. Pa. Jun. 17, 2004).*

To establish a *prima facie* case of retaliation with respect to his termination, Holman would have to show a causal connection between his protected activity and the termination. *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).* Here, again, the fact that every TCC employee working at UCA was terminated would preclude a jury from finding the required connection.

Holman argues that he was not in a position to take advantage of the new offer of employment, because of his medical condition. He argues that his termination at such a time shows retaliation by TCC for his having [*11] filed for workers' compensation. However, there is no such claim in Holman's Complaint, nor has Holman come forth with any evidence of discrimination on this basis. In any event, I would repeat that, since all employees working on this project were dismissed, there was no apparent discrimination. I will dismiss Holman's claims of racial discrimination and retaliation for complaining of racial discrimination in so far as they relation to his termination from employment.

TCC has also asked for the dismissal of any claim that Holman was unfairly denied promotions. I will dismiss such claims since there is no evidence that Holman ever applied for a new position. However, as discussed below, Holman's allegations that he was subjected to discriminatory and retaliatory changes in his employment status will not be dismissed.

B. Holman's Claims of Hostile Work Environment Are Dismissed as Unexhausted

It is well-established that to bring suit under Title VII a plaintiff must first file a timely administrative charge with the EEOC or a similar state agency. *42 US.C. § 2000e-5(e)*; *Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997)*; [*12] *Visnikar v. Dep't of Envtl. Prot., 2004 U.S. Dist. LEXIS 3645, Civ. A. No. 02-*

Case 1:05-cv-00261-GMS    Document 12    Filed 09/15/2005    Page 15 of 17

Page 4

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

*963, 2004 WL 438688* at *5 (W.D. Pa. Jan. 27, 2004). As Judge Francis X. Caiazza explained in Visnikar:

> To determine what claims are properly before the District Court, the test developed by the Third Circuit Court is whether the claims at issue fall "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." See *Antol [v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)]* (citation omitted). The Third Circuit Court has cautioned against reading a plaintiff's EEOC charge too narrowly, stating that courts must "keep in mind that charges are drafted by one who is not well versed in the art of legal description." See *Hicks v. ABT Associates, Inc., 572 F.2d 960, 965 (3d Cir. 1978)*. Thus, "the scope of the original charge should be liberally construed." See *id.* (citation omitted).

*2004 U.S. Dist. LEXIS 3645, 2004* WL at *5. This standard applies to PHRA claims as well. Id.

In his PHRA claim, Holman asserted only that TCC "discriminated against him by demoting him to a lesser position and title, all because of his race and/or color and/or [*13] retaliation." PCHR Statement of Particulars, attached as Exhibit 1 to Declaration of Leah Lively, attached to TCC's motion, at P10. He mentioned Brady's alleged racist statements only in the context of Brady's interference with what Holman believed to be his job duties: "Brady commented that he was concerned about the Blacks and Minority Contractors' ability to do the work. He also said 'I do not want them working in the mainstream buildings. I want them to work outside the main campus of the University of Pennsylvania.'" Id. at P7.

Even construing this charge liberally, it is clear that it does not allege the existence of a hostile work environment, which exists only when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); Nerosa v. Storecast Merch. Corp., 2002 U.S. Dist. LEXIS 16210, Civ. A. No. 02-440, 2002 WL 1998181* at * 4 (E.D. Pa. Aug. 28, 2002).

In *Nerosa, supra, 2002 U.S. Dist. LEXIS 16210*, the Honorable Jay C. Waldman dismissed [*14] as unex-

hausted a hostile work environment claim where a plaintiff had indicated based on her administrative charge only discrimination based on her termination. He cited *Cheek v. Western & Southern Life Insurance Co., 31 F.3d 497, 503 (7th Cir. 1994)*, where the Court of Appeals for the Seventh Circuit wrote: "ordinarily a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination." In other cases, hostile work environment charges have been dismissed where an administrative complaint asserted only failure to promote. *Visnikar, supra 2004 U.S. Dist. LEXIS 3645,* [WL] at *6; *Lawton v. Sunoco, Inc., 2002 U.S. Dist. LEXIS 13039, Civ. A No. 01-2784, 2002 WL 1585582* at *4 (E.D. Pa. Jul. 17, 2002); *Wright v. Phila. Gas Works, 2001 U.S. Dist. LEXIS 15852, Civ. A. No. 01-2655, 2001 WL 1169108* (E.D. Pa. Oct. 2, 2001).

Holman points to *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164 (7th Cir. 1976)*, where the Court of Appeals for the Seventh Circuit permitted a plaintiff to claim sex discrimination even though her administrative charge asserted only race discrimination, because she had asserted in her charge that her supervisor [*15] had accused her of being "a leader of the girls on the floor." Even if Jenkins could be seen as establishing a more liberal construction of an administrative charge than the cases upon which I have relied, I note that it is a thirty-year-old case which has been cited only once in this Circuit, and not for this proposition. See *Hicks v. ABT Associates, Inc., 572 F.2d 960, 966 (3d Cir. 1978)*. Jenkins notwithstanding, therefore, I will dismiss Holman's claim of a hostile work environment.

C. Holman's Remaining Claims

Remaining in this case are Holman's claims under Title VII and § 1981 that (a) he was discriminated against in his work conditions on the basis of racial discrimination; and that (b) he was retaliated against in his work conditions for having complained about racial discrimination. As to these claims, TCC has argued that Holman cannot show an adverse action and cannot overcome TCC's asserted legitimate reasons for the actions it did take, as required by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*.

I remind TCC, however, that the Third Circuit has held that an action which does not involve a [*16] change in salary or benefits can be considered an adverse action if it "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997)*; and see *Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998)* (transfer to an undesirable shift,

2005 U.S. Dist. LEXIS 1608, *; 95 Fair Empl. Prac. Cas. (BNA) 386

eliminating the plaintiff's customary free time, was sufficient to establish a *prima facie* case) and *Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)* (transfer to a "dead-end" job could be actionable).

Holman has asserted that the terms of his employment were altered to take away his subordinates and to remove his authority for entering into subcontracts, ending his involvement in, as Economos put it, the "business side" of maintenance. He has also claimed that he was placed in dangerous and unfavorable physical surroundings with no assistance. These actions by TCC may be found adverse, under the authority cited above. Although TCC has come forward with non-discriminatory reasons for [*17] its actions, the jury may choose to believe Holman's version of the facts. Therefore, TCC is not entitled to judgment as a matter of law on these claims.

IV. Conclusion

For the reasons discussed above, I now enter the following:

ORDER

AND NOW, this 3rd day of February, 2005, upon consideration of Defendant Trammell Crow's Motion for Summary Judgment, docketed in this case as Document No. 36, and the response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART as follows:

1. The Motion is GRANTED in that the following claims are dismissed with prejudice:

a. All claims relating to Holman's termination as an employee of Trammell Crow;

b. All claims that Holman was denied promotions;

c. Holman's Title VII hostile work environment claim

2. The Motion is otherwise DENIED.

BY THE COURT:

JACOB P. HART

UNITED STATES MAGISTRATE JUDGE