01/22/2008 13:35 FAX 3025716305    DRBA EXEC OFFICES    → MARTINELLI YCST    ☒001

# The Delaware River and Bay Authority

## EMPLOYEE SERVICE RECORD

EMPLOYEE NUMBER  3377

NAME  MOON,  Howard  L.,  Jr.  _(LAST)_  _(FIRST)_  _(MIDDLE)_    S.S. NO.  163-48-14.    PHONE  302-836-3894 (~~608~~) ~~795-8378~~

ADDRESS  Mark 70 Condos, Apt. 802    DATE OF BIRTH  5/27/56    SPOUSE

/95    Cherry Hill, NJ  06034    MARITAL STATUS  M    S.S.NO.

Old Mill Village, 65 Merriment Dr.  SEX  M    DATE OF BIRTH

Newark, DE 19702    EDUCATION YRS.    GRAMMAR    HIGH    COLLEGE

| DATE | EVENT | DEPARTMENT | CLASSIFICATION | RATE | REASON OR REMARKS |
|---|---|---|---|---|---|
| 11/20/92 | Physical Exam | | | | Dr. Aldridge |
| 11/23/92 | Hire | Tolls | Toll Collector | $10.00 | 6-month - Temp. |
| 5/30/93 | inc/chg. | Tolls | Toll Collector I | $12.00 = 24,960.00 | probationary |
| 8/20/93 | O.T.I. | | | | Medical attention |
| 1/1/94 | increase | " | " | $12.788 $26,600.00 | annual |
| 8/4/94 | change | " | " | | Permanent |
| 1/1/95 | inc. | " | " | $13.236 = 27,530.00 | annual |
| 1/1/96 | | " | " | 13.765 = 28,631.00 | Annual |
| 2/29/96 | Change | Ferry Res. | Ferry Reservations Administrator | 30,062.00 | Promotion/Selection Process |
| 1/1/97 | inc | " | " | $30,663.00 | Annual Permanent |
| 1/1/98 | inc | " | " | $31,583.00 | " |
| 12/6/98 | inc. | " | " | 33,793.00 | |
| 1/1/99 | inc | " | " | $34,976.00 | |
| 12-19-99 | inc | " | " | $37,976 | |
| 1/1/2000 | inc | " | " | $39,305.00 | |
| 3-26-00 | CHG | " | " | $46,000 (22.115) P | |
| 1-1-01 | Inc | " | " | 47,150 Annual | |
| 1-1-02 | Inc | " | " | 48,565.00 Annual | |
| 1-1-03 | Inc | " | " | 50,264.00 Annual | |
| 1-1-04 | Inc | " | " | 52,275 | Annual |
| 5-16-04 | CHG | " | Ferry Reservations Mgr. | 57,469 | Annual |
| 1-1-05 | ANN | " | " | 59,998 | Annual |
| 1-1-06 | ANN | " | " | 62,240 | Annual |
| 1-1-07 | ANN | " | " | 64,729 | Annual |

A113

01/22/2008 13:35 FAX 3025716305    DRBA EXEC OFFICES    → MARTINELLI YCST    @002

## The Delaware River and Bay Authority    EMPLOYEE SERVICE RECORD

Employee Number  **3377**                    Social Security # _____

Name  **Moon    Howard**                    Phone ( ) _____
      Last    First    Middle

Address _____                    Date of Birth _____    Spouse _____
        _____                    Marital Status _____    S.S.No. _____
        _____                    Sex _____    DOB _____
        _____                    Education  Years _____    Grammar _____
                                                      High School ____    College _____

| Date | Event | Department | Classification | Rate | Reason or Remarks |
|------|-------|------------|----------------|------|-------------------|
| 1-1-08 | ANN | CMLF | Ferry Res. Manager | 66,671 | Annual |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

A114



**WILCOX & FETZER LTD.**

In the Matter Of:

# Moon

v.

# The Delaware River and Bay Authority

C.A. # 05-261-JJF

———————————

Transcript of:

Moon, Howard, Jr. - Vol. 1

February 13, 2007

———————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

## Moon v. The Delaware River and Bay Authority
### Howard L. Moon, Jr.

Page 93

1    A.    Yes.

2    Q.    I would like to direct your attention to the

3    second page labeled in the corner D0443.  The top

4    paragraph, I guess the second sentence in that

5    paragraph states "our records indicate that the

6    Authority, through this program," referring to the

7    educational benefits program, "has made payments on

8    your behalf in the amount of $27,745.14."

9           Do you have any reason to dispute that

10   figure?

11   A.    Yes.

12   Q.    What information do you have that that figure

13   is incorrect?

14   A.    The $27,000 doesn't encompass the programs paid

15   for that are depicted on this sheet here (indicating).

16   It only relates to University of Delaware.

17   Q.    So the figure, the total figure is actually

18   higher than that?

19   A.    The total figure is higher, yes.

20   Q.    Do you have any estimate as to how much higher?

21   A.    No.

22   Q.    So this, I believe, just encompasses education

23   as opposed to training.  Is that correct?

24   A.    It encompasses the degreed program at the

**W&F**

**WILCOX & FETZER LTD.**

## In the Matter Of:

# Moon

### v.

## The Delaware River and Bay Authority

### C.A. # 05-261-JJF

---

### Transcript of:

# Moon, Howard, Jr. - Vol. 2

## Volume # 2

## February 28, 2007

---

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 306

1   the COO and all the top managers under his control:

2   Director of Bridge Operations, Director of Ferry

3   Operations, Director of Engineering, Police

4   Administrator, Director of MIS, Director of Technical

5   Operations, Director of Airports and Director of Human

6   Resources."

7            I was selected by Jeff Lewis to train with

8   them as a future executive leader.  He also spent a

9   lot of time and he was instrumental in pushing me

10  towards the executive M.B.A. program to get a broader

11  perspective on how to manage five divisions.  And if

12  you look in the letter that you presented, he also

13  makes that on his recommendations to Villanova.  He

14  also spent a lot of time going through the official

15  statement teaching me how the organization worked.

16           So, yes, I did have experience.

17  Q.    Your experience being through this training

18  program that you described?

19  A.    Through the training, through strategic

20  planning, through presentations before the board of

21  commissioners, through being mandated to attend

22  commission meetings, through experience working and

23  meeting weekly with the executive director.

24  Q.    Did you manage a budget of over $50 million at

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                    b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A118

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 307

1    the time you applied for this position?

2        A.    No.

3        Q.    Did you manage more than 450 employees?

4        A.    No.

5        Q.    Did you have experience with organized labor?

6        A.    I've had experience in the past with organized

7    labor, yes.

8        Q.    What was your experience?

9        A.    I worked for Amtrak.

10       Q.    You worked for Amtrak?

11       A.    Yes.

12       Q.    What experience did you have with organized

13   labor at Amtrak?

14       A.    Negotiating union contracts between the

15   railroad porters union with Amtrak and working with at

16   the time I believe his name was Mr. Hamilton and was

17   very instrumental in negotiating contracts.

18       Q.    You negotiated union contracts?

19       A.    Well, I was instrumental in bringing the two

20   sides together, yes.

21       Q.    Did you sit at the table and negotiate those

22   contracts?

23       A.    Well, I was brought in, as I said.  One of the

24   main issues was there was an issue at the time that

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A119

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 308

1    it's called Sunnyside Yards, whether we would get

2    paid.  There was an issue in terms of solving the

3    contract whether we would get paid for deadheading at

4    the Sunnyside Yards.  And, yes, I brought the two

5    sides together and was very instrumental in helping to

6    negotiate and finish that contract, yes.

7        Q.    On the union side?

8        A.    Yes.

9        Q.    Is that the kinds of experience you understood

10   to be required by the job posting?

11       A.    It said experience with organized labor.

12       Q.    It also said interpreting policy regarding

13   labor issues.

14       A.    Now, where are you referring to?

15       Q.    We'll come back to that.

16             Moon Exhibit 20, which you I think still

17   have in front of you, the posting on the final page,

18   2166 at the bottom right-hand corner.

19       A.    Mm-hmm.

20       Q.    It says under Abilities the first one is "Able

21   to interpret policy regarding labor issues in a

22   consistent manner."

23       A.    Right.

24       Q.    The experience you described with unions at

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A120

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 309

1    Amtrak, did that give you the ability to interpret

2    policy regarding labor issues?

3        A.    That's just one of the many things that gives

4    me the ability to interpret.  There's a lot of other

5    things within my past experience that gives me the

6    ability to interpret policy.

7        Q.    Did you have the experience interpreting

8    policy?

9        A.    Well, as I said, as being part of a union and

10   spending hours studying and reading, yes.

11       Q.    Did you have experience with facility

12   management?

13       A.    Could you explain the question when you say,

14   "experience"?  Do I have experience --

15       Q.    In facility management.

16       A.    I was experienced being exposed to facilities

17   management being a part of the management team at the

18   DRBA, yes.

19             Do I have it?  Yes.

20       Q.    You have experience in facility management?

21       A.    I have experience and exposure to facility

22   management and an understanding of what goes on within

23   that, yes.

24       Q.    My question is not whether you have been

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)              b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A121

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 310

1    exposed to it but whether you have experience in it.

2    A.    Well, if you are exposed and you work with it

3    in the context and it's a part of meeting every week

4    and hearing all the issues, then, yes, I have

5    experience.

6    Q.    So your experience consists of having meetings

7    with facility management people and others on a

8    regular basis?

9    A.    In being a director, yes, every Monday morning

10   we would meet with the executive director to where

11   facilities and engineering would come up and be part

12   of the topic.

13              To that extent, yes, I did have

14   experience.

15   Q.    Did you have knowledge of relevant economic,

16   financial, political and government trends in which

17   The Authority operates?

18   A.    Yes.

19   Q.    Can you explain that?

20   A.    I've been with The Authority, as I said, for

21   almost fourteen years.  I've sat through commission

22   meetings for years.  I've sat through management

23   meetings for years.  I have done studies and I have

24   the education and I have studied the areas so, yes, I

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                    b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A122

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 326

1    these proceedings was the fact that when they cut the

2    reservation budget, when Walls went in and slashed my

3    budget, cut the budget, Harry, nor Heath Gehrke was

4    made aware until after he had done it.

5        Q.    Do you have experience in ferry and maritime

6    business practices?

7        A.    Yes, I do.

8        Q.    And what is that experience?

9        A.    I've been in ferry operations for almost twelve

10   years and my job directly works with the port

11   captains.  I deal with regulatory issues with the

12   Coast Guard.  If you look on past documentation, you

13   will see me copied.  You will see me copied on the

14   hurricane policy.

15            I was involved in a lot of the strategic

16   planning and the decisions.  I've led process action

17   teams and I work for ferry operations.

18       Q.    In reservations, correct?

19       A.    Reservations is a part of ferry operations.

20       Q.    And you believe that being copied on memos

21   makes you qualified in that area?

22       A.    No.  I work within the process, everything from

23   vessels schedules.  Prior to this new system all the

24   vessel schedules was coordinated through me, the

Wilcox and Fetzer, Ltd. Registered Professional Reporters        302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                    b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A123

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 327

1   capacities that are put on the vessels when you're

2   setting up PCU's, which are per car units.  That

3   determines the allocation of space between the

4   vehicles, the amount of passengers, what the cap --

5   anything that affects those ferry boats involves me

6   because it deals not only with communications within

7   the organization but externally to outside of the

8   organization.

9            So, again, I have twelve years experience

10  in ferry operations, including marine.

11      Q.   You feel qualified to walk in and run the

12  entire ferry operations?

13      A.   Well, I am qualified to go in and run it.

14      Q.   Do you have a Coast Guard chief engineer's or

15  master's license?

16      A.   No, I don't.

17      Q.   Do you have a U.S. merchant mariner's document?

18      A.   No.

19      Q.   Do you have managerial experience in

20  transportation, marine transportation operations?

21      A.   Yes.

22      Q.   And is that the experience that you've already

23  described?

24      A.   Well, part of the experience.  As I said, the

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                    b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A124

Moon v. The Delaware River and Bay Authority
Howard L. Moon, Jr.

Page 328

1  way it's termed I do have experience managing in that

2  environment and working with marine operations.

3      Q.    Do you have knowledge of the operation and

4  maintenance of ferry vessels, facilities and

5  equipment?

6      A.    Yes, I do.

7      Q.    Anything more than what you have already

8  described?

9      A.    For twelve years I sit through maintenance and

10 I sit through staff meetings on a weekly basis.  I've

11 been down to Norfolk.  I've been to the shipyard.

12 I've sat through engineering meetings as we've

13 redesigned and rebuilt those vessels.

14         Actually, the experience where I talked

15 about the plane where we had to make the emergency

16 landing in Norfolk, that was with Glenn Cox, who was

17 the port engineer at the time, and Mike Harkins.  I

18 have enormous experience in ferry operations,

19 everything from vessel, vessel design, vessel

20 maintenance, the overall moving of the ships, the

21 maritime law, the Homeland Security issues, parking

22 lot issues, logistics.  You name it, I have broad

23 experience within ferry operations.

24     Q.    So anyone else present at these meetings that

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by Kurt Fetzer (001-392-517-4448)                    b611bbbc-5d64-4186-a3eb-bdd00b3998fd

A125

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE


HOWARD L. MOON, JR.          :  C.A. No. 05-261 (GMS)
     Plaintiff              :  C.A. No. 07-358 (GMS)
                            :
   - vs -                   :
                            :
THE DELAWARE RIVER AND BAY  :
AUTHORITY                   :
     Defendant             :


ORAL DEPOSITION OF JAMES JOHNSON, JR., taken

before Nancy R. Toner, Registered Professional Reporter,

Notary Public, at the offices of Young, Conaway, Stargatt

and Taylor, 1000 West Street, Wilmington, Delaware on

Wednesday, February 20, 2008, commencing at 10:05 a.m.


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA AND DELAWARE
800-621-5689

Johnson, James T., Jr. - Vol. 1

Page 103

1   different technical reasons or career moves.

2        Q.   So this conversation you had with Mr. Moon

3   was after he was denied the position of COO,

4   correct?

5        A.   I believe that's what it was.  And I

6   believe that either there was some form of

7   correspondence or something that initiated that

8   meeting.

9        Q.   So you personally met with Mr. Moon to

10  talk about why you believe he was denied the

11  position?

12       A.   I believe what may have happened is there

13  was a request or something to find out why Howard

14  was not a successful candidate on the short list.

15       Q.   And that would have been made by Mr. Moon,

16  the request was made by him?

17       A.   I believe.  I don't remember exactly.  I

18  don't think it was something that I would have

19  initiated with people who did not make the short

20  list.

21       Q.   And you explained to him he didn't make

22  the short list of candidates and that's why he did

23  not obtain the position, correct?

24       A.   Yes.

25       Q.   And you told him that there was an outside

Johnson, James T., Jr. - Vol. 1

Page 104

1    firm that was retained in order to evaluate the list

2    of candidates, correct?

3         A.    That's correct.

4         Q.    And that's The Touchstone Group?

5         A.    That's correct.

6         Q.    Who hired The Touchstone Group?

7         A.    The Board.  I signed the contract, I

8    believe.  But it was through Board approval.

9         Q.    Did you recommend to the Board to hire an

10   outside agency such as Touchstone?

11        A.    Yes.  I recommended that the process --

12   recognizing what was going on in the organization at

13   the time with the previous executive director that

14   this would be a proper thing to do, would be going

15   outside of this organization and have someone

16   independent review applications and whatnot for that

17   position.

18        Q.    How did you come across The Touchstone

19   Group?  Did you work with them at DelDOT or prior

20   employment?

21        A.    During my employ at DelDOT, there was a

22   particular position -- I don't remember which one --

23   but at that time there was an outside service used

24   for that particular position.

25              When I got to the place of recommending to

Johnson, James T., Jr. - Vol. 1

Page 115

1  potential applicant would submit a resume and submit

2  their name for consideration and you would forward

3  that to the Touchstone Group?

4      A.   No.  I believe what it says here, present

5  employees who meet the requirements and want to be

6  considered for this position must submit a resume

7  and salary history to NAS Confidential Reply, 1601

8  Walnut Street, Suite 400, Philadelphia PA, 19102.

9      Q.   Was that an address set up by Touchstone

10  Group or set up by DRBA?

11      A.   It was set up by The Touchstone Group I

12  believe.

13      Q.   And it's your understanding that Mr. Moon

14  as well as others submitted a resume and their name

15  for consideration as COO, correct?

16      A.   Correct.

17              MR. HALL:  Can I have that document

18      marked as Exhibit 8.

19  EXHIBIT:

20              (Whereupon, EXHIBIT 8 was marked for

21      identification.)

22  BY MR. HALL:

23      Q.   What was your understanding in your

24  communications with -- is it Ms. Smith or

25  Mr. Lange -- about how the procedure would work at

Johnson, James T., Jr. - Vol. 1

Page 116

1    that point in evaluating potential applicants to the

2    COO position?

3        A.   They established like a scoring criteria

4    and utilized a scoring criteria from the resumes

5    that were submitted.  And then they scored those

6    candidates.

7        Q.   Were you involved at all in scoring

8    potential candidates?

9        A.   No.

10       Q.   Who would score the candidates?

11       A.   Touchstone.

12       Q.   Do you know specifically whether it was

13   Mr. Lange or someone else?

14       A.   I think it may have been Mr. Lange and/or

15   Ms. Smith.

16       Q.   Sir, I'm going to show you a letter and

17   some attached documents from The Touchstone Group.

18   It's identified D-2460 to D-2466.  Do you see that,

19   sir?

20       A.   Yes, I do.

21       Q.   Can you identify that document for me?

22       A.   This is a letter from Touchstone

23   Partnership signed by Edward L. Lange to Mr. Howard

24   Moon dated November 14th, 2002.

25       Q.   And is it fair to say that this letter

Johnson, James T., Jr. - Vol. 1

Page 118

1      A.    That's right.   That's what -- yes.

2      Q.    And down at the bottom of that document,

3  it has prepared by and it appears to be two sets of

4  initials.   Do you know --

5      A.    I think -- sorry.

6      Q.    My question was do you know who signed the

7  document or initialed the document?

8      A.    I believe who would have initialed it SL,

9  that's Skip Lange; and JS looks like is Joey Smith.

10     Q.    Did you have any role or process --

11     A.    No.

12     Q.    -- in evaluating Mr. Moon or any of the

13  other applicants of COO --

14     A.    No.

15     Q.    -- with this scoring located on D-2461?

16     A.    No.

17     Q.    The total points shown on the COO position

18  is 6 out of 11 under total score; is that correct?

19     A.    That's what it looks like, yes.

20     Q.    Did I read that right?

21     A.    Yes.

22     Q.    Did you have any role in evaluating or

23  making a final determination as to who ultimately

24  was --

25     A.    After the short listing?

Johnson, James T., Jr. - Vol. 1

Page 119

1          Q.    Yes, sir.

2          A.    After the short listing, a number of

3     candidates came in for interviews.  Those interviews

4     were conducted with myself and other members of the

5     senior staff at the time.

6               I believe it was Don Rainear who is the

7     deputy executive director.  I believe the CFO, Brad

8     Hopkins.  And I believe the personnel committee,

9     which consisted of a group of commissioners at the

10    time.  There was an interview panel at that point.

11              After that was done, I believe I

12    interviewed -- actually, it was Brad Hopkins, Don

13    Rainear, and myself interviewed candidates again for

14    maybe a second round.

15         Q.    Do you know --

16         A.    And what I would have done was I would

17    have recommended to the Board a candidate for this

18    particular position.

19              There may have been some discussion at the

20    time about the candidates or candidate.  But I did

21    make a recommendation to the Board for a particular

22    candidate.  And then that went to the form of a

23    resolution which the Board passed in a public

24    session.

25              It did not include the person's name.  It

Johnson, James T., Jr. - Vol. 1

Page 121

1  round of interviews they may have provided

2  references.

3       And I may have checked maybe one or two

4  references that were on Mr. Walls' documents.  I

5  don't remember who the actual names of the people

6  were or anything at the time.  But I do remember

7  contacting a reference or two references.

8       Q.   Was there any correspondence between you

9  and The Touchstone Group concerning the short list

10  of candidates that were interviewed?

11       A.   I don't recollect.

12       Q.   How is it that you knew that these are the

13  candidates that The Touchstone Group recommended to

14  you?

15       A.   I'm sorry.  They would provide the listing

16  of the short-listed candidates that I was to

17  schedule to go beyond with probably the resumes and

18  scoring information for that group.

19       Q.   For those group of individuals that were

20  recommended by The Touchstone Group for you to

21  interview and move on to the next process?

22       A.   Yeah.  As I said before, I did receive all

23  of the applications at some point after -- it was

24  either after the short listing or after the process

25  was over.  I don't remember exactly when.

A133

Johnson, James T., Jr. - Vol. 1

Page 122

1          MR. HALL:  Let's mark this as the
2     next exhibit.
3  EXHIBIT:
4          (Whereupon, EXHIBIT 9 was marked for
5     identification.)
6  BY MR. HALL:
7     Q.   All of the writing that would be on Page
8  D-2461 of Exhibit No. 9 would have been by someone
9  from The Touchstone Group?
10    A.   That's what I would believe.
11    Q.   And they came up with this form on how
12 to --
13    A.   They did.
14    Q.   -- rank -- how to rank the particular
15 candidates -- you have to let me finish because the
16 court reporter will kick us both out of the room in
17 a few minutes.
18    A.   Sorry.
19    Q.   This scoring was developed by The
20 Touchstone Group and they provided then the list of
21 candidates that they recommended you should move
22 forward with based on this scoring?
23    A.   Yes.
24    Q.   Did you have any discussions with
25 Ms. Smith or Mr. Lange about the scoring format or

Johnson, James T., Jr. - Vol. 1

Page 128

1    fact that a candidate did not make the short list,

2    what I can remember.

3        Q.    When you made the recommendation to hire

4    Mr. Walls, that was based on your personal belief

5    through the interviewing process and the

6    recommendation from Touchstone as well?

7        A.    I think that was based on the interviews.

8    I think that was based on the commissioner's

9    feedback at the particular time because the

10   commissioners did sit in on the interview process

11   and they did express some opinions.

12            What they were, I can't tell you the

13   exact.  I know they had feelings and expressed

14   feelings.  They are not shy on expressing feelings.

15            So I think it was my recommendation.  But

16   I don't think if -- I don't think that if I made a

17   recommendation that was contrary to their feelings

18   that it would have moved forward.

19       Q.    Did you interview Mr. Walls with respect

20   to issues on diversity and racial discrimination and

21   handling issues like that in the workforce?

22       A.    I do remember discussing union issues and

23   that was about it.  So, no.

24       Q.    You don't recall discussing with him

25   diversity?

IN THE U.S. DISTRICT COURT IN AND FOR THE
DISTRICT OF DELAWARE

- - -

|  |  |  |
|---|---|---|
| HOWARD L. MOON, JR., | : | |
| | : | |
| Plaintiff, | : | No. 05-261GMS/07-358GMS |
| | : | |
| Vs. | : | |
| | : | |
| THE DELAWARE RIVER & BAY | : | |
| AUTHORITY, | : | |
| | : | |
| Defendant. | : | |


- - -

WEDNESDAY, APRIL 2, 2008
- - -
VOLUME II


     Continuing oral deposition of JAMES T. JOHNSON,
JR., taken pursuant to Notice, before Shari Bowen,
Certified Shorthand Reporter and Notary Public, at
Young, Conaway, Stargatt & Taylor, LLP, 1000 West
Street, 17th Floor, Wilmington, Delaware, commencing at
10:00 a.m.


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE

Johnson, James T., Jr. - Vol. 2

Page 258

1    I --

2         Q.    Marylou Dudley, D-U-D-L-E-Y?

3         A.    Marylou's is at the ferry as well as Cape

4    May.

5         Q.    Are you aware of whether she's received a

6    promotion?

7         A.    She was Glenn Cox's secretary or

8    administrative assistant at a particular point in time.

9    If she's gotten -- I don't know.

10        Q.    Andrew Johnson, same question?

11        A.    Andrew Johnson is in computer.

12        Q.    Do you know whether he was promoted to system

13    administrator in 2005?

14        A.    If that's what you're -- if that's what

15    you're attesting then I guess --

16        Q.    You don't have any reason to dispute it?

17        A.    I don't -- I don't have no -- yes.

18        Q.    Heath Gehrke?

19        A.    Yes.

20        Q.    He was promoted?

21        A.    Yes.  He came in as the Assistant Director

22    and he was promoted through a posting Director of Ferry

23    which is --

24        Q.    In June of 2005; correct?

25        A.    If that's the date.

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

- - -


HOWARD L. MOON, JR.,          :

    Plaintiff,          :

    -vs-          :C.A. No. 05-261 GMS/07-358GMS

THE DELAWARE RIVER AND          :
BAY AUTHORITY,
        :
    Defendant.


DEPONENT:   Consuella Petty-Judkins

DATE:       Thursday, March 20, 2008

TIME:       10:05 a.m.

PLACE:      1000 West Street, 17th Floor
            Wilmington, DE

REPORTER:   Lorraine Shickora, CRS-DEL#199
            And Notary Public


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

Petty-Judkins, Consuella - Vol. 1

Page 22

1    concerned about your level of experience working as an EEO

2    officer given that you'd only worked for about a year and

3    a half to two years at the most at MBNA in their human

4    resources department?

5        A.    Not that I recall, no.  I was asked very

6    specific questions that pertain to the position but I

7    don't recall.

8        Q.    What was your goal or what was your job

9    responsibility as you saw it as the EEO compliance officer

10   and recruitment coordinator for The Authority when you

11   began in August of 2003?

12       A.    Well, I wasn't hired as a coordinator.  I was

13   hired as a manager.  So I -- when I came in I was

14   basically -- the objective that I was given is that they

15   really needed to take a strong program in place that would

16   incorporate doing some type of diversity recruitment

17   getting out into the communities, attending venues,

18   something that the DRBA had never done before.  They

19   wanted someone who was familiar with diverse organizations

20   and associations that were out there and they really

21   wanted someone who had the ability to put in place some

22   type of affirmative action plan.

23       Q.    When you started work in August of 2003 did

24   you at that time begin to learn that there were grievances

25   and lawsuits that had been filed by African American

Petty-Judkins, Consuella - Vol. 1

Page 26

1      Q.      And what efforts did you make in order to try

2    to bring in minorities to The Authority?

3      A.      I aggressively started applying, filling out,

4    attending job fairs.  I attended job fairs in Delaware;

5    attended them as far as Washington to New York.  I started

6    putting listings in Hispanic magazines.  I contacted

7    minority organizations, various organizations for Asian

8    Americans, for Hispanic or African American.  I put job

9    postings on their websites.  I attended diversity job

10   fairs.  I started attending historical black colleges and

11   universities, again as far as D.C. to Delaware.  I put

12   things online.  I did a number of things.

13     Q.      Okay.  Was one of your responsibilities also

14   to see that the current or existing minority employees

15   were given full and adequate opportunities to advance

16   within The Authority?

17     A.      I would assume that that would have been one

18   of the things but I don't recall specifically having a

19   conversation about that at that time.  The objective

20   wasn't to exclude any of the minority employees from

21   applying for any positions.  But early on I don't recall

22   really when we first started out having too many minority

23   employees who initially applied for a lot of the positions

24   for the first set of positions that we had out there.  I

25   think if I had maybe two or three.

Petty-Judkins, Consuella - Vol. 1

Page 165

1              MR. HALL:  Why don't we mark that as the

2      next exhibit.

3              (Exhibit No. 3 marked for identification.)

4   BY MR. HALL:

5      Q.      Do you know what Mr. Frasetto was doing, what

6   his employment was at the time that he applied for the

7   position of superintendent of tolls?

8      A.      No.

9      Q.      Do you know why when Mr. Frasetto put down

10  managed customer service issues and disputes on the toll

11  plazas you gave him credit for management experience but

12  when Mr. Moon wrote down marine experience on his resumé

13  you did not give him any points on that?

14     A.      Marine experience for being a ferry

15  reservations manager?

16     Q.      Or for the director of ferry operations.

17     A.      Because as a ferry reservation manager what

18  experience would he have?  If it wasn't explicitly written

19  in his resumé I wouldn't give him points for being -- an

20  experience that related to a marine vessel when you run a

21  customer service center.

22     Q.      That's my point here exactly.  Why did you

23  give credit to Mr. Frasetto for management listing it down

24  there simply because it's listed in his resumé but not Mr.

25  Moon when he listed marine experience in his resumé?

A141

Petty-Judkins, Consuella - Vol. 2

Page 184

IN THE U.S. DISTRICT COURT IN AND FOR THE
DISTRICT OF DELAWARE

- - -

HOWARD L. MOON, JR.,            :
                                :
     Plaintiff,                 :  No. 05-261GMS/07-358GMS
                                :
     Vs.                        :
                                :
THE DELAWARE RIVER & BAY        :
AUTHORITY,                      :
                                :
     Defendant.                 :


- - -
WEDNESDAY, APRIL 2, 2008
- - -
VOLUME II



     Continuing oral deposition of CONSUELLA
PETTY-JUDKINS, taken pursuant to Notice, before Shari
Bowen, Certified Shorthand Reporter and Notary Public,
at Young, Conaway, Stargatt & Taylor, LLP, 1000 West
Street, 17th Floor, Wilmington, Delaware, commencing at
1:50 P.m.




KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE

A142

Petty-Judkins, Consuella - Vol. 2

Page 195

1     A.    Correct.

2     Q.    And you told me that the only thing you would

3  do is review the resume that was submitted by Mr. Moon

4  in evaluating this checklist; correct?

5     A.    I would review whether it was a resume,

6  whether it was an application, whether it was any

7  additional materials that he would attach to it.

8     Q.    Right.  But you never spoke to anybody in the

9  ferry operations department concerning Mr. Moon's

10 experience or his work, you just basically looked at

11 what was in front of you; is that fair to say?

12    A.    At the time I scored the sheet, that is

13 correct.  And then I would take them in along with the

14 other ones that were scored to Mr. Walls, and we would

15 review them together and that way if there was

16 something that was missed in Howard's resume, he felt

17 maybe I had mistaken, then he could have very easily

18 have said, I disagree with this.  There's some

19 qualifications I know that Howard has, I want to put

20 him into a process and that never came about.

21    Q.    Right.  Did you talk to Mr. Walls about

22 Mr. Moon's application for the Assistant Director of

23 Ferry Operations?

24    A.    Yes, we would have reviewed that.

25    Q.    And who made the decision between Mr. Walls

Karasch & Associates
800-621-5689

A143

Petty-Judkins, Consuella - Vol. 2

Page 196

1  or you as to whether Howard would move forward in the

2  process and get an interview?

3       A.    For the Assistant Director of Ferry?

4       Q.    Yes, ma'am.

5       A.    That would have been a discussion that Jim

6  Walls and I would both have.

7       Q.    And what was the conclusion on that?

8       A.    That he did not meet the minimum quals to get

9  an interview.

10      Q.    And why is that?

11      A.    I think we both felt that he did not have the

12 marine backing that was listed in the job description

13 at the time, whether it was a license, whether it was

14 specific things that related to operating and running a

15 vessel, could have been a number of things.

16 Specifically I remember those.

17      Q.    Okay.  But marine background stood out as

18 something you remember being discussed with Mr. Walls

19 as to why Mr. Moon was not one of the candidates

20 recommended for interview for Assistant Director of

21 Ferry Operations; correct?

22      A.    Correct.

23      Q.    And do you have a marine background?

24      A.    No, I do not.

25      Q.    Does Mr. Walls have a marine background?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOWARD L. MOON, JR.,                      )
                                          )
            Plaintiff,                    )
                                          )   C.A. No. 05-261-GMS
     v.                                   )   C.A. No. 07-358-GMS
                                          )
THE DELAWARE RIVER AND BAY AUTHORITY,     )
                                          )
            Defendant.                    )

## AFFIDAVIT OF JAMES H. WALLS

I, James H. Walls, under penalty of perjury, do hereby declare as follows:

1.      I am the Chief Operations Officer ("COO") of the Delaware River and Bay Authority, a position I have held since March 3, 2003.

2.      As Ferry Reservations Manager for the Cape May-Lewes Ferry, Plaintiff Howard L. Moon, Jr. ("Moon") supervises two permanent full-time employees, and additional part-time employees hired on a seasonal basis.

3.      Moon reports directly to Heath Gehrke ("Gehrke"), Director of Ferry Operations, who in turn reports to me.

4.      For the Director and Assistant Director of Ferry Operations openings, the initial screening process was similar.

5.      Consuella Petty-Judkins would do an initial review of the applications and make recommendations to me regarding which candidates should be interviewed for the position.

6.      Ms. Petty-Judkins and I would review her recommendations and I would make the final decision on who would be interviewed for the positions.

A145

7.    For both the Director and Assistant Director of Ferry Operations positions, Ms. Petty-Judkins and I were in agreement that Moon was not qualified based on his lack of marine operations experience, and did not move him forward for an interview based on this.

8.    All of the candidates who were interviewed for these positions had what we believed to be significant marine operations experience.

9.    For the Superintendent of Tolls Operations opening, I made the final decision as to who would be interviewed for the position based on Ms. Petty-Judkins' recommendations.

10.    Along with Ms. Petty-Judkins, Gerry DiNicola-Owens, and P.J. Wilkins (who was from outside the DRBA), I sat on an interview panel for the selection of this position in 2004.

11.    Following the interviews, I concurred with the other panel members that none of the interviewed applicants should be selected for the position, and that we would need to re-advertise the position.

12.    In 2005, we reposted for the opening, and Moon was again interviewed for the position.

13.    The interview panel for the 2005 selection process was comprised of DiNicola-Owens, Trudy Spence-Parker, and me.

14.    It was the consensus of the panel following Moon's interview that his answers were inadequate and often non-responsive, demonstrating his lack of knowledge of this line of business.

15.    The panel made the decision to hire Richard Frasetto ("Frasetto"), an outside candidate who had direct relevant work experience at the Delaware River Port Authority, and whose answers to the interview questions demonstrated a thorough understanding of toll operations.

_____
JAMES H. WALLS

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State of Delaware in and for New Castle County this 8th day of May, 2008.



Christine D Johnson
Notary Public

9/17/2009
Commission Expires

051649.1010

A147

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOWARD L. MOON, JR.,                                )
                                                    )
                    Plaintiff,                      )
                                                    )
                                                    )    C.A. No. 05-261-GMS
                    v.                              )    C.A. No. 07-358-GMS
                                                    )
THE DELAWARE RIVER AND BAY AUTHORITY,               )
                                                    )
                    Defendant.                      )

## AFFIDAVIT OF JAMES T. JOHNSON, JR.

I, James T. Johnson, Jr., under penalty of perjury, do hereby declare as follows:

1.      I am the Executive Director of the Delaware River and Bay Authority
("DRBA" or the "Authority"), a position I have held since April 2002.

2.      The Executive Director position is one of six executive-level positions in
the Authority, which also include the Deputy Executive Director, the Chief Financial Officer,
the Chief Operations Officer, Chief Human Resources Officer, and Chief Information Officer
(position created in 2004).

3.      Since I began in the position of Executive Director, I, along with the
Board of Commissioners, have made a concerted effort to recruit qualified minority candidates
for employment with the DRBA.

4.      On August 18, 2003, Consuella Petty-Judkins began work in the newly-
created position of EEO/Recruitment Coordinator.

5.      Ms. Petty-Judkins' primary responsibilities include:  overseeing
recruitment programs, with a focus on minority recruitment; investigating alleged discrimination
complaint, and developing educational programs related to diversity and equal opportunity.

DB01:2539662.1

051649.1010

A148

6.    Ms. Petty-Judkins has participated in dozens of diversity job fairs and regional college recruitment activities, resulting in hundreds of contacts and a diverse candidate pool for potential job openings at the Authority.

7.    The DRBA is not a federal contractor and is therefore not required by law to prepare a written Affirmative Action Plan.

8.    However, because the DRBA views its oversight role seriously, it developed a voluntary EEO Action Plan, completed in 2005.

9.    The analysis revealed no statistically significant evidence of discrimination against applicants or employees based on race or sex.

10.    An Executive Summary of the EEOC Action Plan was placed on the DRBA website.

11.    The Authority is in the process of revising its EEOC Action Plan based on more recent statistics.

12.    Since 2002, DRBA has hired 132 permanent, full-time employees, and 28% of those have been African American, Asian or Hispanic.

13.    As a result of the minority recruitment efforts, the overall minority level of employment since 2002 has increased from 8% to the current level of 11%.

14.    Howard Moon filed internal grievances regarding his pay on February 17, 2006 and December 13, 2007. Exhibit A.

15.    Mr. Moon spoke before the public session of the Board of Commissioners meeting regarding his concerns about racial discrimination and diversity at the DRBA on January 20, 2006, November 21, 2006, and on March 18, 2008.  Exhibit B.

A149

16.     Mr. Moon has involved the Interdenominational Ministers Action Council (IMAC), who presented at the Board of Commissioners' Meeting on March 18, 2008, and is organizing a press conference on the issue of racial discrimination at the DRBA.  Exhibit C.

17.     As represented to the DRBA in 2008, Mr. Moon plans to file a fourth charge of discrimination with the EEOC, and is organizing other employees to file a class action lawsuit against the DRBA alleging racial discrimination.  Exhibit D.

_____
JAMES T. JOHNSON

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State of Delaware in and for New Castle County this _____ day of May, 2008.

_____
Notary Public

April 5, 2012
_____
Commission Expires

Richard A. Lane, Sr.
Notary Public
State of Delaware
My Commission Expires
April 5, 2012

DB01:2539662.1

051649.1010

A150

# EXHIBIT A



## THE DELAWARE RIVER AND BAY AUTHORITY

Delaware Memorial Bridge
Post Office Box 71
New Castle, Delaware 19720
Tel.: (302) 571-6300
Fax.: (302) 571-6367

Cape May – Lewes Ferry
Post Office Box 827
North Cape May, New Jersey 08204
Tel : (609) 889-7200
Fax: (609) 889-1021

February 17, 2006

**TO:**      Heath Gehrke, Acting Director of Ferry Operations

**FROM:**   Howard Moon Jr., MBA – Ferry Reservations Manager

**CC:**      Commissioner Warren Wallace, Chairman
             Commissioner Edward Dorn, Chairman Personnel Committee
             James Johnson Jr, PE – Executive Director
             Jim Walls – Chief Operations Officer

**RE:**      **Grievance for Unfair Pay and Employment Treatment**

Dear Mr. Gehrke,

As per directed by our Executive Director James Johnson (see February 10, 2006 letter from James Johnson - enclosure 1), I am officially filing this **Grievance** (under section XIX of the DRBA Personnel Manual) for patiently and painfully enduring a long and drawn out process that involved broken promises, references to my pending litigation with the DRBA as being the driving force and road block for preventing me from advancement and pay increase opportunities, false accusations with threatening overtones that were placed in my personnel file, significant components were re-worded and taken out of my job description without my knowledge including components that Jim Walls added in May 2004, and projects were suspended that were in the best interest of improving ferry business and services, all which served to keep me from amicably resolving a fundamental fairness issue regarding my added job responsibilities, pay and career advancement opportunities. I am writing this grievance to request changing the results of my Pay Grade remaining at J and to increase it to I and back pay compensation for performing duties above my scope of responsibilities from March 1, 2005.

I believe the actions taken and the process used to address the re-evaluation of my job description and the business needs of Marketing, Customer Service and the Reservations Department were compromised and tainted. The end results are me taking on significant increases in responsibilities for the same pay while at the same time missing an opportunity to better leverage my skills and marketing service efforts to grow and improve our ferry business and services.

A152

– 2 –                                                February 17, 2006

The added changes to my job duties and responsibilities that were approved and communicated by you and Jim Walls – Chief Operations Officer that were **not** included in nature of work or **accurately included** in my revised job description sent to the Hay Group follows:

1. Managing Cape May – Lewes Ferry Group Sales (Groups include Non-Profit, Churches/Religious, Clubs/Organizations, Senior Citizens, School Outreach Program, Scouting Troops, Nursing Homes, Assisted Living, Disabled, PED (Outside Partnership Employee Discounts) and others)

   o   The only reference on my revised job description to this area of responsibility is deeply embedded in "examples of work" in the 22nd bullet where group bookings were added to "oversees commercial bookings" and "works with Controller and Director of Operations to establish policies and procedures" were taken out *Just recently worked with Controller and Director of Operations to revise these same policies I helped develop*

   o   This function was formerly shared between Cape May and Lewes Customer Service Managers, then with promoted Ferry Customer Service Manager who could not effectively handle the function in addition to other duties and now it is my responsibility.

   o   Additional functions include creating and forwarding confirmations, handling and making decisions on payment arrangements, drafting and sending letters, terms and conditions, policy and procedures and sign off, communicating and applying appropriate rates, correspondence to ferry customer service personnel and manager, keeping CMLF Group Sales Database updated, and acting as the liaison in coordinating group travel and activities with ferry personnel, solving problems etc…

   o   The way this area of responsibility is written on my job description compromises the process and serves to deny me pay advancement opportunities.

2. Managing and supervising the handling, investigating and resolution of Cape May – Lewes Ferry phone, e-mail and web-site inquires and correspondence, problems, complaints and customer service, and maintaining the CMLF Customer Service Data-Base.

   o   My revised job description narrative says "with the Customer Service Manager tracks and resolves customer issues and makes decisions on customer service, refunds and passage," and under examples of work also says "with Customer Service Manager ensures timely follow up."

A153

– 3 –                                              February 17, 2006

- Again, these statements down play what I actually do and should not have been communicated in this way which was framed to down play what I actually do. I work with a broad spectrum of managers and also manage and supervise customer service activities, depending on what the issue is. My staff and I work with the Customer Service Manager only when it involves her reports. Additionally the above mentioned component is adequately communicated in the 3rd bullet of my job description where it says "Collaborates and communicates with police, customer service and other departments."

- This added responsibility also involves developing and maintaining target service level responses and resolution targets as well as monitoring for quality assurances and acting as a liaison between customers, the public and various business units

- The way this area of my job description is written compromises the process and serves to deny me pay advancement opportunity.

3. Managing the CMLF Customer Service Survey Program including designing surveys, creating and developing questions and questionnaires, identifying target population and sample groups, creating and maintaining target customer e-mail databases and administering surveys.

   o This added responsibility in my duties should have been included in the "nature of work," however the only mention of this area of my responsibility is under "examples of work" in the 7th bullet of my revised job description where it says "Manages the online ferry customer service survey program under the direction of the Assistant Director of Ferry Operation."

   o The way this area of my job description is written compromises the process and serves to deny me a pay advancement opportunity.

4. Managing and supervising and selling, mailing and tracking of CMLF Six Pack Discount Ticket Books and Gift Certificates.

   o There is no mention anywhere in my job description of the above responsibility yet, I assumed this added duty in March 2005.

   o Leaving this component out of my job description compromises the process and serves to deny me a pay advancement opportunity.

5. Managing, supervising and tracking the distribution of promotional literature to customers (i.e..ferry brochures) via individual and bulk mailings.

   o This component is a part of our everyday activities yet not mentioned anywhere in my job description and again serves to deny me a pay advancement opportunity.

6. Managing and supervising CMLF marketing administrative support activities that involve promotional mailings to advertising leads (fulfillment) and conducting data entry for marketing surveys.

A154

—4—                                February 17, 2006

○ The only mention in my revised job description is the last bullet under examples of work where after performs a variety of other duties as needed or required says "including managing the providing of administrative support for CMLF marketing activities under the Direction of the Assistant Director of Ferry Operation."

○ Again this component was not included in the nature of work, is down played and not representative of what really occurs. (i.e..we continue to get requests from Marketing and Public Information to mail schedules to Advertising Leads where we defer to the Assistant Director of Ferry Operations and wait for a directive, all for the sake of down playing the activity to deny me an opportunity for pay advancement)

○ Former duties that were suspended such as working with the Public Information Officer to develop and execute various marketing strategies, developing and administering Marketing Research surveys, analyzing and cross referencing data, creating formulas and tabulating statistics while providing a full range of marketing support which increased our ferry traffic and revenues until activities were suspended in August 2005.

  ▪ I was told that these components were taken away because if I were to leave it would not be easy to find someone with the range of skill sets as a Reservations Manger!

  ▪ I was also told that the above duties should not be my responsibilities and were the Public Information and Marketing Managers area of responsibilities, <u>yet the irony is that you and I personally worked for months developing the concepts</u>, with you pushing the business case completion and several of the components you recommended. The components were all flawlessly executed which helped drive increases in ferry rider-ship and revenues. Marketing, Food Service and Ferry Operations were really working together and getting things done until the activities were suspended on August 19, 2005 which shocked everyone!  The very next day after our last meeting on January 5, 2006, you directed me to develop a comprehensive, <u>customer-focused</u> telephone system for the Cape May and Lewes phone system, and when I pointed out that it fell under the Customer Service Managers area of responsibility you said "Howard you know she doesn't possess the skills sets and that I did and could do it!"

  ▪ Again, it seems to me that regardless of the many opportunities that have come about, I will not be allowed to see any pay or job advancement opportunities with the DRBA.

7. The Reservations Manager may be task with providing staff support of other CMLF business support administrative activities was not included in my revised job description however, included as an additional responsibility in a memo sent to me on October 27, 2005.

–5–                                    February 17, 2006

8.  A new component of now reserving 100% reservations and your request for me to now handle 3 Fort Crossing packages and reservations should also be considered as additional duties and responsibilities.

In addition to my above mentioned concerns, a considerable amount of my job components were taken out of my revised job description with out my knowledge, yet in most part these elements remain instrumental in my ability to effectively manage my department and support the DRBA in achieving its goals and objectives. These exclusions only served to compromise the process and deny me the pay that I have earned and deserve. (Attached is a copy of my old job description with all of the exclusions circled and a copy of my revised job description)

The following should have additionally been added to the minimum qualifications of my job description however, were not, which again served to deny me the pay that I have earned and deserve:

- Minimum five (5) years of managerial experience in transportation reservation systems, call centers and customer service including the direct supervision of personnel.

- Minimum three (3) years of budget development and management experience.

This situation can result in an amicable resolution which is fair and in the best interest of the Authority, by moving my position to the appropriate pay grade level I, thus, providing me with pay that is commensurate to my level of responsibilities and contributions to the Authority.

I fully expect an answer within three (3) working days as dictated in section XIX of the DRBA personnel manual with a **full resolution (specifically moving my pay grade to I and a commitment to back pay)**.  However, based upon your continued communications to me that you do not have the power or authority to resolve my pay and advancement issues and this step may be just a formality unless you are given a directive to resolve my issues, I anticipate the need to take the next step 2.

I am also going on record as saying this grievance process is a conflict of interest by any reasonable employment standards because I, in good faith have taken these steps previously, followed the chain of command by addressing my issues and working with you and the DRBA senior leaders, Trudy Spence Parker (Chief Human Resources Officer) and Jim Walls (Chief Operations Officer) over the course of the last seven months.  My grievance issues involves all of you and the actions you took, and to continue putting this matter back in your hands where it began through advise to file this grievance, and repeating steps and processes that were already followed, **basically serves to continue delays in making a decision in resolving my issues, subjecting me to unreasonable stress, pain and suffering, while denying me fair pay for work that clearly rises far above my past job duties and responsibilities as the Reservations Manager.**

A156

6                                February 17, 2006

Through our many meeting and discussions, I understand this complicates things for you in knowing and relying on my knowledge, contributions, talents, management and leadership abilities which can really help you and the organization do great things to increase rider-ship, revenues and fare-box recovery, customer service and marketing efforts while reducing costs and improving operational execution and service delivery. Although you have expressed many times in the past that the senior leadership is nervous because of my pending litigation and that you wish that you could handled this by approaching this a different way which you believe would produced better results, I have always responded in pointing out that these issues are not part of my current litigation and cannot in any way be held against me which continues to be the case.

I as your only manager of color have been in the same position for over 10 years with no opportunity for advancement in spite of my enormous education and training, performance excellence and job accomplishments yet at the same time I continue to watch so many white employees around me in my division advance. I have moved down from a department director (see original job description) to a department manager, have had my operations budget decreased by 36% since I began running the Reservations Department yet at the same time the ferry budget has increased 55% during the same period; I have increased my total revenues 211% and my income fee revenue 205% compared to the overall ferry revenue increase of 27% since my inception; my budget now only represents 1.3% of the overall budget yet at the same time I bring in 35% of all the fare revenues which will increase with the expansion to 100% reservations.

My grievance resolution of moving my position as the Reservations Manager from J to I and paying me accordingly while making a commitment to provide me back pay is simple and serves in the best interest of all parties concerned. I am making this last good faith effort to avoid redressing my issues to the courts or appropriate state or federal agencies in spite of the conflicting nature of using the DRBA personnel manual grievance process recommended by the Executive Director.


Sincerely,



Howard Moon Jr., MBA
Ferry Reservations Manager

A157



## THE DELAWARE RIVER AND BAY AUTHORITY

Delaware Memorial Bridge
Post Office Box 71
New Castle, Delaware 19720
Tel.: (302) 571-6300
Fax.: (302) 571-6367

Cape May – Lewes Ferry
Post Office Box 827
North Cape May, New Jersey 08204
Tel.: (609) 889-7200
Fax: (609) 889-1021

December 13, 2007

**TO:**  Heath Gehrke, Director of Ferry Operations

**FROM:**  Howard Moon Jr., MBA – Ferry Reservations Manager

**CC:**  James Johnson Jr, PE – Executive Director
Jim Walls – Chief Operations Officer

**RE:**  **Grievance for Unfair Pay and Employment Treatment**

Dear Mr. Gehrke,

I am officially filing this **Grievance** (under section XIX of the DRBA Personnel Manual) for disparate treatment as an African American Ferry Manager and failure to provide the same consideration in terms of pay grade increase, re-classification, and advancement as similar situated white employees. I am additionally filing a complaint for indirectly being asked "if promoting me would make my law suit disappear" in spite of the fact that I and the DRBA are represented by legal counsel and could not communicate such an agreement. **I am requesting a re-classification from Ferry Reservations Manager to Ferry Senior Sales and Customer Service Manager and a pay grade increase to I.**

I met in August 2007 with you and Jim Walls where I presented the following issues:

- Ferry Reservation Manager remains 12 years in same job without advancement yet opportunities continue to exist
- Ferry Reservations Manager position has changed significantly over the last three years
  - Role in management has expanded considerably
  - Took on a significant amount of additional management functions and duties which are not well written and represented in job description
  - Many additional opportunities exist for expanding Reservations position management roles and functions that are beneficial to ferry operations, DRBA and Reservations Manager
  - Advancement opportunities for white employees is unbelievably disproportionate to blacks, and in ferry operations FERRY MANAGER is lone left back employee yet has more education and DRBA management experience than all!
- Ferry Reservations Manager job description misrepresents reporting structures and levels of responsibilities.

A158

- o Position has not reported to Assistant Director in over two years. (In fact within the 12 years of stay as Reservations Director, Administrator and now Manager, the total time that position reported to an Assistant Director is a little over 2 years, almost 2 years to COO and 8 years to the Director of Operations)
- o Change in reporting structures combined with other factors affect pay grade placement
- o **Outbound call center functions, special projects, and driving ferry increases in business are not included in job description**
- o **Job description misrepresents current level management functions and misleads evaluators to think that job is limited to inbound call center components.**
- o Many components of the Assistant Director of Ferry Operations job description should be included in my job description yet are not (see attachments)

- Both Reservations permanent employees Crystal Chafin – Reservations Supervisor and Tara Roberts CSR were advanced two pay grades in the past year via grievances yet Reservations Manager was denied same consideration and any pay increase
  - o Both positions had additional expanded duties included in job description yet manager was not allowed same
  - o **Both moved up employees are white**
  - o **One employee (Tara Roberts) had a generic job description created just to serve as a vehicle to warrant a pay increase which is not reflective of what she actually does**

- **Employees and positions DRBA wide continue to be promoted and re-classified all being white employees which in many cases moved up several pay grades some being relatively new to the DRBA**

- SUCCESS IN PAY GRADE ADVANCEMENTS ARE CORRELATED TO HOW WELL JOB DESCRIPTIONS ARE WRITTEN
  - o Those directors or senior managers who are able to write descriptions well and interested in the employee advancing are successful in moving their employees up in pay (i.e... Environmental Program Manager, Systems Manager, Database Analyst, Project Engineer II and III, Business Development Manager, etc...)

I was asked to revise my job description by Jim Walls in which I did which follows:

DELAWARE RIVER AND BAY AUTHORITY

| | |
|---|---|
| Department: | Cape May – Lewes Ferry |
| Class Title: | Senior Manager of Ferry Sales and Customer Service |
| | (Howard Moon, Ferry Reservations Manager- Re-classified) |
| Status: | Non-Exempt |
| Reports To: | Director of Ferry Operations |

**I.        POSITION SUMMARY**

This position reports to the Director of Ferry Operations and is responsible for managing Ferry Sales, Customer Service, and Call Center operations. The position manages all aspects of ferry sales, reservations and customer service including a large variety of leadership and management duties that involves application of short and long term business planning and execution of the same. The person oversees departmental budget, generates new business and drives efforts to increase repeat business, establishes and implements sales and customer service strategies as well as develops and achieves sales, revenue, CRM and customer service goals. This position exercises discretionary judgment and analysis, supports the Director of Ferry Operations in the development and implementation of ferry sales and CRM plans, uses administrative oversight for coordinating, preparing and implementing activities of assigned responsibilities and will be called on special projects as operational needs dictate and performance warrants.

**II.       ESSENTIAL DUTIES AND RESPONSIBILITIES**

A159

– 3 –                                              December 13, 2007

- Directs CMLF sales, customer service and call center activities, including the management and supervision of sales, reservations, and customer service
- Manages revenues, costs, service delivery and efficiency
- Prepares, coordinates and manages operating and capital budgets
- Develops short and long-term sales and customer relationship management plans and directs implementation and execution of sales and customer service policies and practices
- Builds and maintains a sales and customer service team capable of carrying out targeted sales and service goals and initiatives
- Creates and executes annual and monthly business plans
- Directs inbound and outbound call center services
- Identifies and generate leads; manages prospect pipeline from interest (establishing relationships), develops (understanding needs) and closes (achieve sales goals)
- Establishes and implements systems to track, monitor, measure and compare relevant data and statistics to increase ferry sales, customer satisfaction, performance levels and operational efficiencies
- Develops and manages projects and programs to assist in accomplishing established goals
- Creates and administers online, mail, and phone customer and marketing research questionnaires and or surveys

III.    REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES

- Knowledge of effective leadership and management theories, principles, and practices and how to best apply them to ensure optimal effectiveness
- A demonstrated ability to lead and develop people and get results through others
- Knowledge of business and financial practices related to the operation of ferry sales, call centers and transportation systems
- A strong focus and commitment to delivering quality solutions and maintaining effective customer relationships
- Attract, develop and retain capable and committed staff who are dedicated to the success of the Authority
- Identify, develop and implement strategic and tactical plans and solutions
- Knowledge of ferry operations and relevant regulations, protocols and procedures and how they relate to the Cape May – Lewes Ferry mission
- Establish and maintain effective working relationships with internal and external contacts
- Communicate effectively, verbally and in writing

IV.    MINIMUM QUALIFICATIONS

- Bachelors Degree in Business Administration, Sales, or Marketing (MBA preferred)
- Five years of managerial experience in transportation operations with ferry transportation of vehicles and/or passengers preferred
- Five years of managerial experience in sales, call centers and customer service
- Three years of budget development and execution experience

V.    LICENSES, REGISTRATION, AND SPECIAL REQUIREMENTS

- Possession of a valid motor vehicle operators license

A160

– 4 –                                                       December 13, 2007

I believe the above job description better represents my actual job functions and duties. As you have said directly to me, my department and I are the <u>only sales group</u> within the CMLF. Re-classifying me to Senior Sales and Customer Service Manager more accurately reflects my position verses the Ferry Reservations Manager.

<u>**Key points that are not included in my current job description for re-consideration and advancement to pay grade I:**</u>

- Ferry leadership and management duties that involve application of short and long business planning and execution of same
- Called on special projects as operational needs dictate and performance warrants
- Manages Group Sales Program (Key words Sales, Manage and Program)
- Manages Commercial Traffic Sales and Accounts including collections
- Manages CMLF sales, generates new business, drives efforts to increase repeat business
- Establishes sales and customer strategies
- Develops and achieves sales, revenue, CRM and customer service goals
- Assists the Director of Ferry Operations in the development and implementation of ferry sales and CRM plans
- **DIRECTS AND MANAGE INBOUND AND OUTBOUND CALL CENTER SERVICES**
- Identifies and generate leads; manages prospect pipeline from interest (establishing relationships), develops (understanding needs) and closes (achieve sales goals)
- Manages online survey program, direct mail and phone customer research questionnaires and or surveys
- Manages the Internet and Sales System
- Manages the tracking and logging of all CMLF Customer Service Complaints and Data Base
- Manages marketing support and fulfillment
- Manages communications as it relates to sales, traffic and reservations and reports to varying business units
- Provides reports to the Director of Ferry Operations and Chief Operations Officer

**Again, I am requesting a re-classification from Ferry Reservations Manager to Ferry Senior Sales and Customer Service Manager and a pay grade increase to I which will resolve my grievance.**

Sincerely,

Howard Moon Jr., MBA
Ferry Reservations Manager

A161

# EXHIBIT B

01/01/00  TUE 16:56 FAX 302 671 6505        DRBA EXEC OFFICE                    @003

January 20, 2006 – Delaware River & Bay Authority Commission Meeting – Public Comments

**Opening:** My name is Howard Moon; I've been employed with the DRBA over 13 years and running the CMLF Reservations Department over the last 10 years.

- I would like to thank all of you Commissioners for your dedicated commitment and service, congratulate you on your leadership and success with instituting by-laws and GAAP accounting procedures and would be the first to recommend and support to stipend your positions

- I am here today because I believe the Authority has an agency problem,

  o In corporations or government entities' an agency problem exist when actions taken inside the organization by those hired run the organization conflict with the best interest of the major stakeholders.

  o As I look around this table, this board comprises a group of diverse professionals and the message was clear that the Governors meant to create and maintain a diverse and mission capable workforce representative of the communities and customers they serve.

  o I want to make it clear, that my concerns are not directed in any way at this board, not intended to assassinate any-ones character, not spoken on behalf of any group and solely intended to create a needed change that will make us a stronger and more effective organization.

**Shortly after the creation of the Delaware River & Bay Authority's in 1963, Martin Luther King gave his famous I Have A Dream Speech where in he said**

  o "It is obvious that today, America has defaulted on this promissory note insofar as her citizens of color are concerned. Instead of honoring this sacred obligation, America has given the Negro people a bad check, a check which has come back marked insufficient funds."

  o I stand in utter disbelief, that forty- two years later and say "have the DRBA black and minority employees as well as other dedicated employees" been given a BAD CHECK, A check marked insufficient funds? <u>Let's look at some of the key indicators.</u>

- I believe our job selection process has artificial barriers and embedded constraints that are fundamental flawed:

  o To my best knowledge in the last three years under this new administration only one black employee has been promoted or sometimes called re-classified yet at the same time, my best estimate is between 50 and 60 whites were advanced during the same period. Bottom-line between 1 and 2%.

  o If you are black and do not have education it is used against us.

  o If you have education we are told it isn't everything.

  o If our performance is excellent we are told that we do not get paid for performance and when we have years of experience and enormous institutional knowledge it does not count.

  o I have seen us hire a white into a high pay management positions with no management or supervisory experience and whites with high school educations who

1

A163

DRBA EXEC OFFICE                    @004

January 20, 2006 – Delaware River & Bay Authority Commission Meeting – Public Comments

do not even meet minimum qualifications for high level management positions over qualified blacks with MBA's.

   o  As an MBA graduate from Villanova in 2004, an honor business graduate from University of Delaware in 2002, a management certificate from Harvard University, and approximately 40 - 50 management and professional certificates that the DRBA paid for, I speak from experience in telling you that it means absolutely nothing to this administration when it comes to pay and advancement opportunities.

*  The new senior leadership team had a great opportunity to set a new course for the DRBA future, and fix wrongs of the past yet as I look around this table, the 42 year long tradition of never having a person of color at a senior level pay position continues despite the fact that those positions have doubled going from three to six positions.

*  I have heard that we are an organization that is representative of our surrounding communities and those we serve and that 27% of the new hires under this new administration were black:

   o  No one mentioned that at the same time, I believe between 25 and 30% of our black employees resigned during the same period, many in the most part for lack of opportunity, fair pay and treatment.

   o  I believe that up until recently our permanent workforce comprised a little above 7% black, 0 Hispanics and Indians and .66 of 1% Asian. Yet the State of Delaware comprises approximately 19% blacks and 5% Hispanics and New Jersey comprises approximately 14% blacks and 13% Hispanics according to 2000 Census Data. Those numbers are even higher today. We know that in Delaware alone the Hispanic population has more than tripled in the last six years.

   o  The DRBA has had studies conducted @ our toll booths through the University of Delaware that reported between 28 and 33% of all our bridge travelers are people of color. * Study conducted by us during State Police Profiling case

   o  Elliot Bay included in their preliminary report break downs in race and how the surrounding populations would see major increases in people of color yet it was taken out of the final report.

   o  On our web-site we have a message that our affirmative action plan is under review and a new one will be complete in the next 60 days, yet this message has been posted since September of 2004 and 16 months and running. What message does that send to us? It sends the message that we do not care. We are still posting Harkins numbers from June 2001!

   o  Why would we wait until all the positions' are filled, to unveil a plan?

   o  Recently I brought up the subject of diversity in a departmental management staff meeting and was told that it was the EEOC Managers responsibility and that a staff meeting was not a venue to discuss diversity which clearly compromises and violates our former Affirmative Action Plan.

   o  No one took the time to notice that I was the only manager of color in the entire division and have been the only manager of color in the entire 40 year history of the Cape May – Lewes Ferry and that a manager staff meeting under any plan would be the venue to discuss concerns.

2

A164

01/31/06   TUE 15:40 FAX 302 571 6305         DRBA EXEC OFFICE                                @005

**January 20, 2006 - Delaware River & Bay Authority Commission Meeting – Public Comments**

- We have spent over a year watching enormous time money and energy spent of resolving the 542 union contract yet at the end of the day, I believe the union comprises approximately a 5% or less in black membership and when you look at the pay of its members, blacks and women fall under the lowest paid.

- There is something wrong when your blue collar workforce has that low of numbers, think about it, 1 black toll collector (we had 5 in 1992 when I came), 1 black maintenance worker here at the bridge and the most concentrated area of blue collar black reside at the airports where we now have a black director.  New Castle County today alone comprises @ least 22% black not even including significant numbers in the Hispanic population.

- I believe women and people of color are commonly classified as CLERKS to keep them in low pay categories.

- I believe we use the Hay Group to warrant keeping minorities in lower pay categories however; we need to look at our practice of how we write these job descriptions, and are they reflecting what we actually do, or benchmarked appropriately?

- I believe we are hiding our lack of diversity under artificial recruitment, which results in hiring 1000 hour temporary employees at an average $8 to $10 dollars an hour with no benefits yet when it comes to permanent positions we will hire whites over these temporary employees.
  - A perfect example is how a highly qualified black female was hired as temp, worked as an accounts payable job for six months and when it came time to post the position she was not even granted an interview. *(Excluded from speech for time constraints)*

- Most of us employees who have stood the test of time are talented, committed and hard working human beings that are not asking for any favors, special treatment and just want a fair chance at living and providing our families with a better quality of life.

- We need your help in dismantling these deeply embedded constraints and artificial barriers and stop this practice of letting lawyers reap the benefits of hefty legal fees on issues that could easily be resolved if we had better forum for communications and protect the voices from below.

**I will now address some of my broader organizational concerns with leadership and communication barriers "Mixed Signals," "what we say verses what we do."**

We heard that re-organization would stream-line functions and increase efficiency when in fact:

- Re-organization has created a beauractictic hierarchy of red tape where we are managed around resources verses core businesses, decisions take forever, innovation is stifled, communications are broken and service delivery and operational execution are compromised.
  - We are top heavy yet struggling in terms of critical resources and personnel to achieve and maintain adequate customer service and operational effectiveness.
  - Directors and managers are not empowered with degrees of freedom to make decisions and run their lines of business.
  - We can't man our ferry vessels with police due to budget constraints or customer service people to meet demand yet we advocate best practices and "Excellence in Motion." *May have some conflicts with Coast Guard regulations.*

3

A165

01/01/00  TUE 15:40 FAX 302 671 6506          DRBA EXEC OFFICE                                    @006

January 20, 2006 - Delaware River & Bay Authority Commission Meeting – Public Comments

- o Standards of safety excellence were finally signed off and sent out after a traveler sit in a car dead to my best knowledge over 18 hours close to our DMB toll plaza.

- o Cars are now driving away from the ferry because we close our toll plaza for the one person to eat lunch.

- o During peak season we endured back ups and chaos because we weren't positioned to handle increases in traffic.

- o We are more silo'd than there ever were.

- o Employee moral still remains low.

- o And we still don't get that adaptive solutions do not reside in the executive suite, however in the collective intelligent of employees at all levels.

- We say that we strive to be an Employer of Choice yet our actions show that we do not our value our existing employees, or value their time of service, institutional knowledge or a diverse and mission capable workforce.

- We say we are resolving our problem of pay parity which insults those of us who have been in jobs for a long period of time and now see people new to the organization and people who were recently promoted get hefty raises when we do not.

  - o The message appears to be that we are not valued employees who have been here, proved ourselves, possess the overwhelming institutional knowledge and worse yet, it does not foster an environment of information sharing or succession planning.

  - o The real pay parity issues lie within people doing similar jobs yet in different pay grades, and how employees who are in the same pay grades with less time in job and service are making higher wages then those of us who paid our dues.

  - o Or how I believe some individuals carried over time in job when in fact they were promoted into completely new jobs.

- **And lastly, we heard Accountability, Accountability, and Accountability!!!**

  - o We hire consultants to tell us who we are and what we should do yet we pay close to a million dollars annually to our 6 senior staff members when you add senior level perks such as vehicles and gas.

  - o Our Affirmative Action Plan is 14 months over due.

  - o Litigation and legal fees are out of control!

  - o We haven't had a performance evaluation system for over three years and I haven't been rated since 2001.

  - o We the work force have spoken through surveys and the strategic planning task forces yet, follow up and through has not happened.

  - o We as an organization are heading towards a collision course if we don't get some of these monsters out from under the table and do what must be done to protect the integrity of our organization.

4

A166

01/01/00   MON 10:41 FAX 002 071 0000     DRBA EEXC OFFICE                      ☺007

**January 20, 2006 - Delaware River & Bay Authority Commission Meeting – Public Comments**

**The DRBA needs your help and I would ask that you consider**

- o Mandating that diversity be included in our mission statement and that our Affirmative Action Plan be completed.

- o Consider looking at internal candidates first to fill positions before posting outside *Look at our in-house talent first.

- o Form a Committee to speak with all of your minority employees to hear some of our concerns, so the need to speak in an open session will not be necessary.

- o I would ask that you personally put together a bi-state panel specialist in the area of Diversity and EEOC to help us fill the remaining positions.

- o Allow an employee relations committee comprised of a good cross-section of the workforce including those who are deemed adversaries to meet periodically with the commission and executive staff.

*Martin Luther King once said that the true measure of a human being is not where they stand in times of comfort and convenience, its where they stand in times of chaos and controversy. I have faith that this board will stand strong and do what needs to be done!*

5

A167

Public Comments Howard L. Moon Jr., MBA November 21, 2006

- Here at the bridge, we only have one permanent black toll collector yet we hired new toll collectors since I last spoke. One casual black working in the toll department, who has been, with the DRBA for several years, wasn't even granted an interview. I believe we have only two black maintenance workers here at the bridge. These examples in Tolls and Maintenance fall somewhere between a 5% AND 2% of a minority base respectively in a community that resides near 40% people of color.

- For 19 months, our drba.net website posted a message that our affirmative action plan was under review and a new one would be complete in 60 days. After I brought to your attention in January, the message was taken off the website. Now we post an EEO Action plan summary from 2004 with a message that says we are not if federal contractor and do not have to have an affirmative action plan, the message says HR worked hard and there was no SIGNIFCANT statistical evidence of discrimination. What message do you think this sends to us, and the public?

  o I asked the question in Leadership training to our leader about the promised Affirmative Action Plan and asked if our old plan posted on our internal web-site, personnel manual and in the copy rooms was still in effect, and was told in front of a room full of managers and supervisors that the subject could not be discussed because of litigation.

  o As the only manager of color in the entire ferry division in the last 42 years I see serious issues with not revising and implementing an affirmative action plan that attempts to bring us into the 21st century

- WOMEN AND PEOPLE OF COLOR CONTINUE TO FALL INTO LOWER PAY CATEGORIES. Look at a recent compensation study of the Economic Development/Marketing Department when the HAY Group finished, the white males with the exception on 1 all fell into a higher pay category I and the women and only black fell into the lower 7.

- The Hay Group continues to be the crying mantra, which warrants keeping us minorities in lower pay categories. Let me illustrate an example that this Hay process is not above board. Tell me, how can you explain that Hay put a DMB Toll Plaza Manager who manages a 24/7, 70 Million Dollar operation with near 100 employees under his supervision in a lower pay category than a DBB Manager who has 0 employees report to him and deals with compliance programs and issues relating to bids on contracts. Tell me what function is more critical to the organization and public? This is only one example of many.

- Most of us employers who have stood the test of time are talented, committed and hard working human beings that are not asking for any favors, just SIMPLE EXPRESSIONS, freedom, justice, honor, duty, mercy and hope.

I SAY TO YOU IN THE WORDS OF WINSTON CHURCHILL, IT IS NOT ENOUGH THAT WE DO OUR BEST, SOMETIMES WE HAVE TO DO WHAT REQUIRED.

WE REQUIRE YOUR HELP IN HONORING AMERICAS SACRED OBLIGATION TO HER CITIZENS OF COLOR!

My 2nd topic addresses some of my broader organizational issues

Public Comments Howard L. Moon Jr., MBA November 21, 2006

- I communicated in January that re-organization had created a bureaucratic hierarchy of red tape where we are managed around resources verses our core businesses, and how we are so top heavy yet struggling in terms of critical resources and personnel.

- We hear the term cost cutting measures must be taken but then we look and see a new fleet of SUVs, which average around 15 miles per gallon at best for most managers, and executives that do not need trucks. Doesn't it send mixed signals when we all know the high cost of fuel and the difference we could make if we mandated vehicles that get between 30 – 40 miles per gallon

- Also, amid communicated concerns about rising cost we are making some serious mistakes and paying high opportunity cost in terms of not funding various areas that have the ability to grow business and revenues.

  o This year alone, the Reservations system is up 22% at $958,000 that accounts for the entire increase in Cape May – Lewes Ferry revenues over 2005. Reservation fees are up 15% and will come end at 725K THIS YEAR

  o We have been open 7 days a week for the last 9 months yet I only have 2 permanent employees, and forced to use seasonal employees in full time equivalents year around

  o This year we had over 18,000 abandoned calls and my projections show about 244,000 in lost revenues as a result of not funding the center.

    ▪ Finances answer is to allocate less revenue than we used for temp wages in 2006

    ▪ Another management proposal is to waive reservation fees for Internet transactions which basically will lose over 400K rather than funding another 85K to the center who can bring in close to an additional 500,000 with the 85Kfunding

  o What business model will you ever see the won't fund that sales force or marketing. My permanent staff alone was cut by 50% in 2002 yet the Reservations System only received this year 1.16% of the budget (260K) yet brought in 40% of all ferry fares at 5.9 Million.

  o We wonder why ferry usage is declining; reduced sales and customer service resources, cuts in marketing, reduced vessel schedules and crews, not listening to our customers or employees, restrictions on discounts to repeat customers, and no hot food aboard vessels is a very good start to understanding our decline.

  o You may hear that the one boat schedule during the week in the off season is saving money... If you count all of the business we lose everyday, and the Delaware crew working in the yards you would see that we are actually losing significant revenues, especially in October, November and days in December.

  o One department head here at the Delaware Memorial Bridge wanted to not replace toll collectors who call out to save money and let traffic back up across the bridge.

  We are going into deep waters and heading for difficult days unless we start applying common sense in some areas of our business.

Public Comments Howard L. Moon Jr., MBA November 21, 2006

- o Employee moral right now all over this organization is extremely low and one might wonder why.
- o Well for starters, we alienate our workforce who have a lot of time in service and do not afford them the same rules that the new kids on the block get
- o The ways we do business now zaps all creativity and innovation by always looking outside for answers and not listening to the Generals and soldiers in the trenches
- o Consultants and lawyers continue to tell us who we are and what we should do yet again, we pay over a million dollars annually to our senior staff when you add senior level perks such as SUV's and gas
- o Litigation and legal fees are out of control
- o We still do not have a performance evaluation system and we won't even pay bonuses to employees who graduate college, yet it is remains in the Personnel Manual.
- o We the work force have spoken through surveys and the strategic planning task forces , and now leadership and diversity training sessions, yet who is listening and why is follow up and through is not happening.
- o I told you 10 months ago that we are heading towards a collision course and need to do what must be done to protect the integrity of our organization. One of these days we are all going to be dealing with a catastrophic event if we do not take action.
- o Each of your plenums are all over the organization at all sites and every time people see mated vessels they look at you, 10 to 20 minute cell wait times, they look at you, restrictions on discounts they look at you, unhappy employees, they look at you, 3.5 hours between departures on a 70 and 80 degree weather days they look at you and you can imagine what they say.   You deserve better and so do we!

I have five calls for action that I am asking you to consider

- o Allow me and other leaders to form an employee relations committee comprised of a good cross-section of the workforce including those of us who are deemed adversaries to meet periodically with the commission and executive staff
- o Form a committee to meet with all your budget managers and get their input into Strengths, Weaknesses, Opportunities and Threats
- o Form a committee to speak with all of your minority employees to hear some of our concerns, so the need to speak in an open session will not be necessary
- o Mandate the creation and implementation of an Affirmative Action Policy
- o Put together a bi-state panel specialists in the area of EEOC to help us fill the remaining positions

THE PRICE OF GREATNESS IS RESPONSIBILITY AND AGAIN ITS NOT ENOUGH DO OUR BEST, SOMETIMES WE HAVE TO DO WHAT IS REQUIRED

Howard Moon 2/1/07

# EXHIBIT C



**INTERDENOMINATIONAL MINISTERS ACTION COUNCIL**

March 19, 2008

Dear Commissioner:

Some members of our coalition of community leaders and elected officials reached out and expressed some of our concerns at the Delaware River and Bay Authority's Board of Commissioners meeting held on March 18, 2008. Our suspected concerns involve questionable employment practices for our citizens of color that include but not limited to unfair hiring practices, lack of advancement and promotions, unfair wages, disparate treatment, under-representation, zero executive level managers, turnover, failure to hire a fair share of minority contractors, elimination of your community contributions program through an annual 20% phase out plan, and spending exorbitant legal fees defending discrimination complaints and law suits.

DRBA Chairman Michael Parkowski asked us to communicate our concerns in writing. We suspect that the following issues support our concerns:

1. Under-representation of people of color which is estimated between 40 and 45 African Americans, 3 Asians and 3 Hispanics out of 454 approved permanent full time positions, when the major source of DRBA revenue streams are generated by Delaware Memorial Bridge travelers who are estimated between 30% to 40% people of color.

2. Many African Americans employees believe they are not given fair evaluations for increased pay consideration relative to white employees under the current administration.

   A. They believe management manipulates the Hay process for minorities (with the exception of a few) by the way job descriptions are worded and responsibilities are presented in ways that are misleading and duties are taken away when they would lead to higher pay.

3. An estimated 20 African American employees (approximately 50% of the DRBA black workforce) resigned or was fired in the last five to six years. *DRBA communicates that 27% of hiring's under Jim Johnson were minorities yet they fail to communicate that blacks leave at an extremely high rate, many because of pay disparities, lack of promotional opportunities and disparate treatment.

4. Estimates show that only several minorities (African Americans) in the last five years were advanced yet over 100 whites were promoted during the same period.

5. People of color have no representation at the six Executive Senior Paid Level positions (these senior level managers are paid **well** over $1 Million Dollars annually considering

1

A171

vehicle perks and benefits). *DRBA has never employed a paid Minority Executive Senior Manager since its inception of 44 years, which continues to drive the "good ole boy culture."

6. We question the DRBA actual hiring of minority contractors and believe the airports may be where some hiring of minorities took place because they receive millions of dollars in federal grant monies every year.

   A. This issue was pushed several years ago so a DBE position was created. The DRBA hired a white for this position and we believe that the DRBA continues to fall short in actual minority hiring's for agency wide contracts.

7. The DRBA is phasing out its community contributions program by reducing the program 20% each year which effects so many needy organizations who really rely on funding.

8. Several minority employees believe that the DRBA refuses to operate in the framework of its own Affirmative Action Plan/Policy since its inception in 2000.

   o DRBA eliminated old plan, promised new plan and failed to deliver

   o DRBA posted message for 18 months on drba.net web site that Affirmative Action Plan would be completed in 60 days and now they post a one page executive summary EEOC action plan that states they don't have to do an Affirmative Action Plan.

9. The DRBA has a long history of discrimination, appears to give minorities no choice other than filing DOL complaints, EEOC complaints and law suits, and would rather spend millions in legal fees and settlements rather than resolve the issues under some common ground. The following are some illustrative examples to give you an idea of why we are concerned and committed to take action:

   A. Many of these complaints and law suits were easily resolvable and should have never escalated to a point of litigation.

   B. Since 2002 under the James Johnson administration estimates are that nine blacks (they represent 25% of the average African American workforce) had discrimination and/or retaliation complaints in the EEOC, DOL or Federal Courts, there have been 13 cases and 6 settlements.

   C. In 1999, the DRBA settled with black employee Clyde Green who was threatened with hanging ropes and KKK implications and had an item placed on his head and set on fire yet white employees were not immediately reprimanded or fired. The employee who executed the action, was allowed to wear a visible KKK tattoo on hand while working at the Cape May – Lewes Ferry.

   D. In 2000, pictures of monkeys with two African American employees names "Donny and Al" were placed above the pictures and posted on DRBA property. These employees were commonly referred to as porch monkeys and spear chuckers.

   E. In 2002, a white employee made comment in front of Airports Director and Millville airport employee that they need to take all the niggers out of jail and send them to Afghanistan.

2

A172

F. Within James Johnsons first year of becoming the DRBA's executive director in 2002, the DRBA settled three law suits with former African American employees Albert Jackson, Donnie McCoy and Dawn Pitt and spent outrageous legal fees.

- We suspect that James Johnson knew there were problems yet his Administration awarded some of the white employees implicated in their cases with promotions

G. In 2002, a white employee made derogatory comments about Blacks and Jews, which upset employee relations manager who had been trying for years to do something about this employee. (Same employee referred to in bullet E)

H. In 2003, the first action of new CHRO Trudy Spence – Parker was to fire the employee relations manager Tom Irvin who is an African American with over twenty years experience with the AFL-CIO and graduate from Georgetown University (another EEOC complaint).

I. In 2003, a white supervisor told an African American employee that "just like a lazy nigger coming to get free money" several times yet the incident was pushed off as he was just joking and the white employee was later promoted.

J. In 2004, Robert Matthews settles discrimination law suit with DRBA, Doris Kennedy, Ron Riley and Howard Moon file discrimination complaints at the EEOC, and a document with the words "nigger application" was placed on African American employee's locker.

K. In 2005, Howard Moon files discrimination and retaliation law suit, Ron Riley files discrimination law suit and Dan Douglas files DDOL discrimination complaint, and African American employee Gail Combs who had worked in Finance for a long period of time was denied a permanent position and the DRBA chose to hire a white employee.

L. In 2006, Ron Riley and Howard Moon files complaints at the DDOL, and Juanita Molleta, Ann Cheers and Janeka Peace-Wickham file discrimination complaints at DDOL.

M. In 2006, an African American supervisor heard two whites in DRBA Café say that "we used to hang blacks down south for that," white employee threw receipt and hit African American supervisor in the face, racial comments were made about blacks by white employee, manager and supervisor were harassed by white DRBA employees, and African American employee was not permitted to eat at tables in Café and was forced to eat in the back by white supervisor.

N. In 2007, the DRBA was found guilty by DOL of three different counts of discrimination, settles discrimination complaints with Juanita Molleta and Ann Cheers, Howard Moon files another discrimination and retaliation law suit in federal court, Ron Riley files a retaliation law suit in federal court, Janeka Peace-Wickham files a retaliation case at DDOL and discrimination law suit in federal court, and it was reported that the DRBA violated a settlement agreement by failing to terminate and/or re-hired the white employee who they agreed to terminate along with failing to deliver other agreed actions.

3

A173

O. In 2007, a sign was put up in DRBA Café after African American female settled law suit "free at last, free at last, etc.. and DRBA management failed to adequately address the matter, and rather than give the DRBA Café supervisor a chance at working in an Acting Manager capacity which is common for white employees under similar circumstances, they chose to bring a temporary manager from an outside agency to manage permanent staff.

P. In 2008, another African American female Charity Irving was denied permanent position and the DRBA chose to offer a white female the position who is friends with one of the managers in the Finance department.

Judging from many communications and the several meetings we held, it appears that the existing management team may need to become more sensitive to the inherent problems and concerns when it comes to its employees of color. Those employees who voice their concerns and file grievances, complaints and/or file law suits appear to be alienated and openly retaliated against, judging from the references made to litigation in your commission meetings.

We should remain mindful that the law protects any employee who files a complaint and that employee cannot be treated any different than another employee, as a result of filing claims with the DOL, EEOC or the state or federal court systems.

Our purpose is to assist you in breaking down your existing barriers and to establish a Community Business Agreement (see enclosure) which will help your organization become an "Employer of Choice" while helping you avoid any further discrimination complaints and/or individual and class action law suits.   We ask that you agree to meet with us no later than April 7, 2008 to formalize our proposed CBA.

Please contact me directly at 302-420-7889 to schedule a time that best meets your busy schedules.

Sincerely,

Elder Dwayne C. Johnson Sr.
2nd Vice President IMAC
Chairman
Social Political Action Justice Committee

4

TOTAL P.06

**Proposed Community Business Agreement – CBA with Delaware River and Bay Authority**

1. Hire a minority (person of color) to the executive level (pay grade E)
   a. To the open Chief Financial Officer or Chief Human Resources Officer position
   b. Or create a Chief Relations Officer

2. Re-classify and increase pay grades for the following minority employees (30% of African American Workforce with legitimate situations that need to be corrected):
   ✓a. Ronald Riley to Senior CSR from pay grade P to M
   b. Howard Moon to Ferry Senior Sales Manager from pay grade J to I
   c. Janeka Peace-Wickham to Café Manager from pay grade N to J
   ✓d. Kenneth Hynson to Community Relations Manager from pay grade J to I
   e. Sandra McKinney to Senior Training and Education Manager from pay grade J to I
   f. Doris Kennedy to Senior CSR from pay grade N to M
   g. Grace Creamer to Senior CSR from pay grade N to M
   h. Wanda McClairen to Accounting Analyst from pay grade O to L
   i. Luther Dasheill to Corporal from pay grade K to J
   j. Melvin McCord to Corporal from pay grade K to J
   k. Clayton Palmer to Sergeant from pay grade J to I
   l. Temporary employee Charity Irving to permanent accounting position in Finance
   m. Temporary employee Pat Mathis to permanent CSR in EZ-Pass

3. Mandate that the remaining 38 positions are filled with minorities (people of color)

4. Place a 25% floor on hiring minority contractors, meaning that a minimum of 25% of the Capital Improvement Projects and 25% of remaining DRBA contracts will be awarded to minority businesses

5. Form an Ad Hoc Committee comprised of Commissioners to meet with minority employees and targeted community leaders
   a. Investigate minority problems at the DRBA
   b. Mandate change and resolution

6. Appoint a committee of New Jersey and Delaware EEOC representatives to help the DRBA in re-vamping and improving its hiring and promotions processes

7. Create and implement an Affirmative Action Plan by May 1, 2008

8. Create an employee relations committee comprised of good cross section of the workforce to meet every month with the commission and executive staff

9. Set up meeting with Governors and various agencies effected by the elimination of the Community Contributions program to devise a way to re-instate the program

10. Report annual EEOC numbers on web-site and annual reports

5

A175



**INTERDENOMINATIONAL MINISTERS ACTION COUNCIL**

May 5, 2008

Dear Chairman Parkowski:

As indicated in a letter sent to you on May 2, 2008, this correspondence serves as our rebuttal to your response dated April 29, 2008, sent to us for the purpose of addressing our concerns that involve questionable employment practices for our citizens of color. Our concerns include, but are not limited to, unfair hiring practices, lack of advancement and promotions, unfair wages, disparate treatment, under-representation, zero executive level managers, extensive turnover, failure to hire a fair share of minority contractors, elimination of your community contributions program through an annual 20% phase out plan, and spending exorbitant legal fees defending discrimination complaints and law suits.

You communicated that the information you sent us was factual and yet we have quite a bit of information that contradicts what you have sent us. The overwhelming majority of our concerns were not addressed and we believe that you have not made the necessary efforts to eliminate barriers that impede progress towards creating equal employment opportunity, treatment and justice at the Delaware River and Bay Authority. However, we do remain hopeful that your Delaware Commissioners will follow the New Jersey Commissioners commitment to equal employment opportunity, treatment and justice.

**Our purpose is clear and simply stated; we are serving as the DRBA Coalition for Equal Employment Opportunity, Treatment and Justice with a clear vision of righting wrongs and assisting the DRBA in creating a promising future that serves the best interest of your employees, organization and surrounding communities.**

We believe that we have support from New Jersey elected officials and Commissioners however, we need your leadership in moving the Delaware Commission and DRBA Executive Director, Acting Chief Financial Officer and Chief Operations Officer away from a stance of denial and spending exorbitant legal fees defending discrimination complaints and law suits that are easily resolvable at a fraction of your costs.

<u>**Disparate Treatment including Racial Slurs and Epitaphs**</u>

In your letter you talked about the procedures in place to deal with discrimination and harassment in the workforce. If your procedures are effective and fair, you certainly would not have had over 25% of your African American workforce file discrimination and/or retaliation complaints in the EEOC, DOL, or Federal Courts, resulting in an estimated 13 cases and 6 settlements, all under the James Johnson Administration. In fact, we learned that the Delaware Department of Labor found the DRBA guilty of discrimination three times in 2007. You have yet to provide an explanation or concede that you have serious problems related to your minority workforce. You have not provided any factual support or information that disputes our comprehensive list of incidents which are gathered from various current and past employees at the DRBA. The policy you provided shows more emphasis on harassment than discrimination, which brings us to some serious matters.

1

You make several references to your process and highlight the fact that under this administration, you hired a new EEOC Manager to handle these matters. We believe this person is being investigated on serious suspected policy violations including alleged criminal activities on the job, which has to cause you some concern! A reasonable person would infer that it may be possible that more activities are going on under your watch than you care to admit.

We also learned that it is common practice at the DRBA for executive, senior level and mid level managers implicated in employee's complaints and litigation to conduct investigations involving these complainants, where there are obvious conflicts of interest. You can no longer afford to take a Pontius Pilate approach by looking the other way and pretending these issues do not exist. We received reports that Chief Operations Officer James Walls, this past week, allegedly referred to three African American employees who are under suspension, as being toast. We also learned that in the past, he allegedly referred to another former African American employee as being toast before the employee was terminated.

We also have information that James Wall's former employer Amtrak, under its northeastern corridor, settled $24,000,000 in discrimination lawsuits where he was a senior director in its northeastern corridor. Since his arrival at the DRBA, he has been named in numerous complaints and lawsuits by African American employees.

You have employees, past and present, who suffered and continue to suffer, and we will not stop until the suffering and injustices are eliminated.

## Under-Representation of Minorities in the DRBA Workforce

First we would like to thank you for the hiring's of minorities that have taken place over the course of the last month, after we presented our concerns to you.

In your response letter, references were made to recruitment efforts and the establishment of a fulltime Equal Opportunity position. We received reports that this was not a new position and a former African American employee Ezzi Henry served in that position, prior to the arrival of James Johnson. We learned that former Chairman Warren Wallace had to fight and force James Johnson into establishing the EEOC position, where Johnson believed that former Chief Human Resources Officer Trudy Spence – Parker could handle the duties. We also received reports that she was allegedly harassed after turning over resumes for the CFO position to former African American Chairman Warren Wallace (who we believe, it is no secret that James Johnson did not get along with). Warren inquired as to how several qualified candidates including minorities failed to make the short list for the position. Sources report that Warren and various members of the New Jersey Commission did not agree that the process was above board, nor did they agree that current Acting CFO Victor Ferzetti was the most qualified person for the position. We learned that Trudy Spence – Parker resigned the morning we attended your Commission meeting and may be filing charges against James Johnson and the DRBA.

Although you may believe that your hiring efforts were sufficient, the fact remains that you continue to be under-represented by people of color. The state of Delaware and New Jersey comprises 30% minorities. As you referred to the bigger picture, Michael Harkins increased the African American workforce by approximately 210% during his 10 years at the DRBA and had less than a 5% minority turnover rate. He went from approximately 12 African American employees in 1991 to 37 by June 2001, where the DRBA workforce was still under-represented. Under the James Johnson Administration, the DRBA has only increased its African American workforce by an estimated 10 employees since 2001 and only increased your Hispanic and Asian workforce by one person each for a total of three Hispanics and three Asians. The DRBA at 13% minorities falls 131% below the minority population percentages of Delaware and New Jersey at 30%.

2

A177

As to your reports of only 14 minority employees leaving, we believe that between 18 and 20 African Americans have left since 2001 and we also believe many left because pay disparities, lack of promotional opportunities and disparate treatment. We will work with you to set up meetings and phone calls with current and former employees so you can hear it first hand from them.

## Minority Advancement and Compensation

You tell us that you will not engage in discussions that involve matters in litigation, yet we were notified that you have provided us with personal information being litigated by several of your employees, without their consent. It appears that you may have violated your own freedom of information policy by providing us and others with specific employee salary and other medical related information (LTD) by their name, date and title, which was turned over to several employees during the discovery process in their law suits. We and your employees refrained from discussing specifics of their law suits and dealt with current issues along with a vast scope of current and historical problems at the DRBA.

We identified employees who we believe you should advance to higher pay positions and categories or to make two of them permanent employees. Although we met with some of your employees, we did not have contact with all those employees listed in our proposed CBA, so you should not assume all of them are directly involved with us. We did not ask you to provide us with a smoke screen of sending these African American employees salary increases, which for the most part we believe involved normal annual raises and time in job adjustments, most as an established change to your compensation policy for all employees. We communicated a concern that your management is manipulating the Hay Group compensation process used to reclassify positions and increase pay for minority employees relative to their white counterparts.

We expressed a concern that the overwhelming majority of job promotions are being received by white employees, who you did not voluntarily provide salary increases such as Victor Ferzetti to Acting Chief Financial Officer, Geraldine DiNicola – Owens to Chief Information Officer, George Iannetta to Superintendent of Food and Retail, Steve Russell to Assistant Director of Maintenance South, Lee McGaughan to Director of Maintenance North, Andrew Ritchie to Human Resources Manager, John Jones to Director of Engineering and Maintenance, Brian McEwing to Port Captain, Joe Carson to Captain, Heath Gehrke to Director of Ferry Operations, Dave Hoppenjan to Project Engineer 3, just to name a few and a list of over a 100 more white employees who advanced under the James Johnson Administration.

We believe you have a police department that does not employee any African American supervisors other than an Assistant Police Administrator. We believe that you only had two African American employees in your Maintenance department at the Delaware Memorial Bridge. We believe until several weeks ago, you only employed two African American permanent employees in your manual DMB toll department and now three. In your ferry operations, we believe you have one manager, no permanent supervisors and a severe shortage of permanent minority employees. In your finance department, we believe you have no black managers or supervisors. It appears that the highest concentration of African American employees reside at the New Castle County Airports where you receive Federal Grant monies. Our proposed Community Business Agreement provides you an opportunity to eliminate barriers that will make a positive impact for better race relations with your employees and avoid further litigation, lawsuits and legal fees.

We are not asking you to give preferential treatment based upon the race of your minority employees, however, to treat and provide them with the same opportunity and treatment as their similar situated white co-workers and superiors and to fix imbalances and mistakes of your past.

3

A178

**Lack of Minority Hiring's for Contracts**

In your response you stated that we questioned your Disadvantaged Business Enterprise (DBE) program which is a misrepresentation of our concerns. We question the DRBA actual hiring of minority contractors and believe that people of color are not getting their fair share of business. You have validated our concerns by providing information that shows that you do not, in fact, hire a fair share of minority owned businesses. We are not interested in your FAA program with smoke screens, we want a fair share in actual minority hiring's agency wide throughout all your sites and locations!

We understand that this is also a concern of the New Jersey delegates, and we back them 100% in mandating that you achieve greater results in the actual hiring's of minority businesses. We would like to get involved in helping you increase your hiring of minority businesses. Our CBA proposed eliminating barriers by a setting floor in awarding 25% of your contracts to minority businesses. We will assist you in setting and achieving goals without violating any laws. We also urge you to create a Minority Business Enterprise program at the DRBA.

**Community Contribution Program**

We are pleased and excited that you intend to address our concerns regarding the preservation of your Community Contribution Program. We will be sure to meet with our Delaware gubernatorial candidates to gain support for your efforts!

**Executive Positions**

In your response, you have verified that you do not employ a person of color at the senior executive level. You also stated that the DRBA does not intend to discriminate against any candidate for employment, and we would expect that you will not. We are urge you to appoint a highly effective and competent person of color to your senior executive leadership team. James Johnson was appointed to the Executive Director position and Don Rainear was appointed to the Deputy Executive position, neither going to a competitive selection process.

The Board, with support from both Governors, has the power to appoint a minority to your senior executive team. With all of your past and existing problems with minorities and your lack of diversity, this seems to be your best alternative. We believe this is one of the most important recommendations in our CBA. We need representation at the top level to ensure that minorities get their equal opportunity, treatment and justice. We will also be urging our gubernatorial candidates to appoint a person of color from Delaware's largest city, Wilmington, to your Board of Commissioners!

**Affirmative Action Plan**

In your response, you stated that you have an Affirmative Action plan, yet you did not provide it to us. It appears that you are keeping this plan in secret and it is not a document that is being shared with your managers, employees and the public. An Affirmative Action plan should have specific written goals, objectives, guidelines and actions for people at all levels of the DRBA to follow.

Please send us a copy of your Affirmative Action plan at your earliest convenience along with your latest EEOC reporting numbers. This request is formal under your freedom of information policy.

**Other Matters**

In your response you communicated that a number of our issues raised were identical to those presented in Mr. Moon's presentation to the Board on January 20, 2006. We find it troublesome that the issues he presented before the board have substance and we found that he has made several presentations

4

A179

over the course of the last several years to you, reaching out for your help and predicting problems you would encounter if you did not take action, and his predictions appear to have come to fruition.

Your continued reference to Mr. Moon's lawsuits suggests that he and others may be targets of retaliation. Mr. Moon and others have not discussed specifics of their lawsuits yet it appears that you do. We believe his and others issues deal with specific occurrences in the past and you cannot continue to hide a vast array of minority problems under their umbrella of litigation that deals specifically with their particular cases.

You talked about numerous improvements and reform yet our preliminary reports indicate that you have some serious issues including but not limited to suspected gross misconduct and criminal activities of senior and mid-level managers, suspected regulatory infringements and crimes, lack of accountability of management, conflicts of interests, suspected gross misuse of company SUV's (no policy or accountability), no performance evaluation system, rising ferry deficits, poor communications, and poor employee moral, on top of questionable employment practices for our citizens of color that include, but are not limited to, unfair hiring practices, lack of advancement and promotions, unfair wages, disparate treatment, under-representation, zero executive level managers, extensive turnover, failure to hire a fair share of minority contractors, elimination of your community contributions program through an annual 20% phase out plan, and spending exorbitant legal fees defending discrimination complaints and law suits.

**What's Next**

Again, after reading your response, we agree that you do not take our concerns as seriously as we do. We are moving forward with our plan to attend your next Commissioners meeting (we believe May 20, 2008) with the full support of IMAC President Reverend Dr. H. Ward Grier and all our members, various other organizations, churches, elected officials, political activists and community leaders. We will hold a press conference after the meeting with a deliberate plan to bring our concerns and progress or lack there of, to the public, media and elected officials.

**Remember, our purpose is clear and simply stated; we are serving as the DRBA Coalition for Equal Employment Opportunity, Treatment and Justice with a clear vision of righting wrongs and assisting the DRBA in creating a promising future that serves the best interest of your employees, organization and surrounding communities.**

We again urge you to reconsider your position and give consideration to our proposed Community Business Agreement with the DRBA. We believe this meeting should be held in New Castle, Delaware verses taking the meeting off-site to avoid controversy. Last months meeting was held in Rehoboth, Delaware, so we hope that your next meeting will be held at your home base.

Please contact me directly at 302-420-7889, if you wish to meet prior to our attending your next Commissioners meeting.

Sincerely,

Elder Tyrone C. Johnson Sr.
2nd Vice President IMAC
Chairman, Social Political Action Justice Committee
PO Box 26253
Wilmington DE 19899

A180

**Proposed Community Business Agreement – CBA with Delaware River and Bay Authority**

1. Hire a minority (person of color) to the executive level (pay grade E)
   a. To the open Chief Financial Officer or Chief Human Resources Officer position
   b. Or create a Chief Relations Officer

2. Re-classify and increase pay grades for the following minority employees (30% of African American Workforce with legitimate situations that need to be corrected):
   a. Ronald Riley to Senior CSR from pay grade P to M
   b. Howard Moon to Ferry Senior Sales Manager from pay grade J to I
   c. Janeka Peace-Wickham to Café Supervisor from pay grade N to L
   d. Kenneth Hynson to Community Relations Manager from pay grade J to I
   e. Sandra McKinney to Senior Training and Education Manager from pay grade J to I
   f. Doris Kennedy to Senior CSR from pay grade N to M
   g. Grace Creamer to Senior CSR from pay grade N to M
   h. Wanda McClairen to Accounting Analyst from pay grade O to L
   i. Luther Dasheill to Corporal from pay grade K to J
   j. Melvin McCord to Corporal from pay grade K to J
   k. Clayton Palmer to Sergeant from pay grade J to I
   l. Temporary employee Charity Irving to permanent accounting position in Finance
   m. Temporary employee Pat Mathis to permanent CSR in EZ-Pass

3. Mandate that the remaining 38 positions are filled with minorities (people of color)

4. Place a 25% floor on hiring minority contractors, meaning that a minimum of 25% of the Capital Improvement Projects and 25% of remaining DRBA contracts will be awarded to minority businesses

5. Form an Ad Hoc Committee comprised of Commissioners to meet with minority employees and targeted community leaders
   a. Investigate minority problems at the DRBA
   b. Mandate change and resolution

6. Appoint a committee of New Jersey and Delaware EEOC representatives to help the DRBA in re-vamping and improving its hiring and promotions processes

7. Create and implement an Affirmative Action Plan by May 1, 2008

8. Create an employee relations committee comprised of good cross section of the workforce to meet every month with the commission and executive staff

9. Set up meeting with Governors and various agencies effected by the elimination of the Community Contributions program to devise a way to re-instate the program

10. Report annual EEOC numbers on web-site and annual reports

6

A181

# EXHIBIT D

Plaintiff Howard Moon Jr. has filed charges at the Delaware Department of Labor for Harassment, Hostile Working Environment and Retaliation. Plaintiff has had threats made against him that involve physical harm should he be seen outside the DRBA, comments were made that he got personal in depositions and was passing notes to his lawyer, and if he was seen in the street hmmm..... Employees are being directed to stay away from him, derogatory comments and inferences are being made about he cannot be trusted, stay clear of him and he should have been a man after his depositions where Consuella Petty-Judkins perjured herself.

Plaintiff reported concern after his depositions and met with DRBA Police investigator prior to these incidents. Employees involved in crimes were not immediately dealt with and were allowed work without consequences even after violating federal FAA regulations. Plaintiff believes Homeland security was breached by allowing the distribution of NCA Airports Employee Badges to people who do not work for or at the Airports. He further believes that by DRBA Executive Management taking so long to act also breached airport security. A Senior Manager was allowed to try to compromise DRBA badging system and execute the above-mentioned hostile actions. Senior Managers are being allowed to tell their employees to stay clear of Plaintiff making it very stressful to work.

Plaintiff continues to work and handle additional duties with refusal by the DRBA to reclassify his position to the correct title and increase his pay grade for J to I. The DRBA refuses to advance him and treat him fairly as his similar situated white managers and supervisors because of his litigation and lawsuit. Plaintiff was told in an open session of the Commissioners meeting that they were advised by attorneys not to discuss diversity and discrimination issues with him because of his litigation, which is an open admission to retaliation.

Plaintiff plans on grouping his complaint with others for purposes of filing a class action lawsuit. He plans on meeting with federal EEOC Attorney Jaqueline McNair to discuss the exorbitant amount of complaints coming from an organization to only employees between 40 and 50 African American employees and the need for an EEOC class action suit!